# EXHIBIT 1



United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy Street, Suite 300
Arlington, VA 22203

(703) 235-3750                    ibla@oha.doi.gov

STATE OF ALASKA (ON JUDICIAL REMAND)

IBLA 2016-0109 & 2017-0055                    Decided April 2, 2024

Remand of the Board's Decision in *State of Alaska*, 196 IBLA 155 (2020), which resolved appeals from two decisions of the Alaska State Office, Bureau of Land Management, denying the State of Alaska's request for priority conveyance of lands in six townships selected pursuant to the Alaska Statehood Act and denying the State of Alaska's protest to the official filing of a survey plat for a seventh township containing selected lands. AKF-31832, *et al*.

Decision Modified in Part, Affirmed in Part.

APPEARANCES: Treg R. Taylor, Esq., Ronald W. Opsahl, Esq., Office of the Attorney General, Anchorage, Alaska, for the State of Alaska; Kathleen C. Schroder, Esq., Gail L. Wurtzler, Esq., Mark E. Champoux, Esq., Davis Graham & Stubbs LLP, Denver, Colorado, for the State of Alaska; Nicholas Moore, Esq., Mike Gieryic, Esq., Office of the Regional Solicitor, U.S. Department of the Interior, Anchorage, Alaska, for the Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE BALLENGER[1]

The State of Alaska (State) brought these two consolidated appeals challenging actions of the Bureau of Land Management's Alaska State Office (BLM) related to the identification of the northwestern boundary of the Arctic National Wildlife Range (ANWR),[2] as defined in Public Land Order (PLO) 2214 and related documents. The Board affirmed BLM's decisions in *State of Alaska*, 196 IBLA 155 (2020) (Decision),

---

[1] Administrative Judge Haugrud took no part in the consideration or decision of these appeals.

[2] *See State of Alaska*, 196 IBLA 155, 155 n.2 (2020) (explaining that, while the area at issue has been renamed several times, the naming distinction is not relevant to the issues on appeal, so for simplicity ANWR will be used to refer to the area consistently over time). The Decision can be found in the Administrative Record (AR) at AR 000006-57, though we will cite to the Board's published version. Citations throughout to the AR are to the Bates-numbered AR submitted in *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG.

198 IBLA 218

which the State has challenged in the United States District Court for the District of Alaska (Court). The appeals are back before us on remand by order of the Court.

SUMMARY

The Court remanded these appeals to the Board "to undertake a reasoned inquiry into how, if at all," certain maps introduced by the State of Alaska for the first time on judicial review "affect [the Board's] analysis and decision."[3] In the Decision, we held that the State had not carried its burden to show that BLM erred in implementing the description of the northwestern boundary of ANWR set out in PLO 2214, which established ANWR. To carry out the Court's remand, we reviewed the maps proffered by the State during the district court proceedings, as well as an additional map provided by the State on remand. Based on that review, we determined that those maps do not change the conclusions we reached in the Decision. We also analyzed the manner and extent to which certain other maps that we considered in reaching the Decision must be reevaluated based on new information regarding the timing of their availability that arose during briefing before the Court. Based on those analyses, we modify the Decision in certain respects but ultimately reaffirm the remainder of the analysis and BLM's decisions.

BACKGROUND

The Board's November 9, 2020, Decision provides a thorough overview of the extensive factual and procedural history underlying these appeals,[4] which themselves spanned several years and multiple rounds of briefing. For efficiency, we incorporate by reference the contents of that Decision, except to the extent expressly modified herein, and assume the reader's familiarity with it for purposes of this discussion.

At a high level, the parties' dispute is over whether almost 20,000 acres of public land situated in seven townships that lie along the northwestern boundary of ANWR are within that boundary (and thus not available for selection by and conveyance to the State) or outside of the boundary (and thus available for selection by and conveyance to the State).[5] The answer depends on the proper understanding of the description of that boundary as set forth in PLO 2214 and related documents. In the two decisions challenged on appeal, BLM concluded that the lands at issue fell within ANWR, consistent with numerous undisputed actions taken by the Department of the Interior

---

[3] Order re Motion to Supplement Administrative Record, *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG, Document No. 29 at 22 (Mar. 9, 2023) (Remand Order); *see also id.* at 16 ("[T]he IBLA should consider and address the 1951 Maps in determining ANWR's boundary.").
[4] *See, e.g.*, *Alaska*, 196 IBLA at 157-72.
[5] *Id.* at 156.

(Department) over the preceding 60 years. Our Decision held that the State had not met its burden to demonstrate error in BLM's decisions or in the underlying actions that informed them, and we affirmed those decisions.[6] We concluded based on the historical record that the drafters of PLO 2214 intended to establish ANWR's northwest boundary following the topographic features depicted on contemporaneous maps as the Staines River distributary of the Canning River system. In reaching our conclusion, we rejected the State's argument that the drafters intended to locate the northwest boundary of ANWR along a branch of the Canning River further to the east.

On April 6, 2022, the State filed a complaint in Federal district court under the Administrative Procedure Act, asking the Court to, among other things, set aside the Board's Decision and the underlying BLM decisions as arbitrary, capricious, an abuse of discretion, and contrary to law.[7] On November 17, 2022, the State moved to supplement the administrative record with 20 maps that had not been introduced during the years of prior proceedings before the Department that culminated in the Decision.[8] Briefing on the motion concluded in January 2023, and by order dated March 9, 2023, the Court granted the State's request.[9]

In its order, the Court acknowledged new questions that had been raised regarding whether the 1955 U.S. Geological Survey (USGS) quadrangle maps[10] introduced by the State in support of its arguments before the Board, and referenced throughout the Decision, had been published and were available in 1957 to the drafters of the metes and bounds description of the ANWR boundary that would ultimately make its way into PLO 2214.[11] Despite this uncertainty regarding their publication dates, we will refer to those maps as the "1955 Maps" for ease of reference and consistency with the Court's order and parties' briefing. In part because of the questions surrounding whether the 1955 Maps were available in 1957, the Court concluded "that the IBLA should consider and address" the 20 maps provided by the State—mostly USGS maps labeled as dating to 1951 but reflecting varying edition and publication dates (the 1951 Maps).[12] The Court reasoned that those maps were available at the time the description was drafted, "may have been the most refined topographical depiction of the

---

[6] *See generally id.* at 177-206.

[7] Complaint, *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG, Document No. 1 (filed Apr. 6, 2022).

[8] *See* Plaintiff's Motion to Supplement Administrative Record, *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG, Document No. 23 at 3 (filed Nov. 17, 2022) (Mot. to Supp.).

[9] Remand Order at 21; Civil Docket Report, *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG.

[10] *See* AR 000618-21.

[11] Remand Order at 4-5.

[12] *Id.* at 16.

disputed land available" at that time, and thus "are relevant to the IBLA's interpretation of the PLO 2214 drafters' intent since they show the very boundary established in that order."[13] The Court also noted that BLM based much of its subsequent work implementing the PLO 2214 ANWR boundary on maps available at the time, "which included both the 1955 Maps and, in all likelihood, the 1951 Maps,"[14] making the 1951 Maps relevant to the Board's obligation "to fully explain its decision and consider all relevant factors."[15] While the Court "recognize[d] that the State ha[d] not offered conclusive evidence that the PLO 2214 drafters considered the 1951 Maps when they drafted the description of ANWR's boundary," it nevertheless concluded that they "appear to be relevant" to "the intricate puzzle the IBLA must piece together."[16] Accordingly, the Court "remand[ed] the matter to the IBLA to undertake a reasoned inquiry into how, if at all, the 1951 Maps affect its analysis and decision."[17]

The Board re-opened the consolidated appeals,[18] and the parties exchanged briefing regarding the relevance of the 1951 Maps to the Decision.[19]

## ANALYSIS

### I.    Scope and Standard of Review

As instructed by the Court, our inquiry is a narrow one: to determine "how, if at all, the 1951 Maps affect" our analysis and Decision.[20] In carrying out the Court's instruction, we analyze the newly provided materials within the context of the overall record and apply the general standards and burdens applicable to these appeals. As described in the Decision, the State's burden in IBLA 2017-0055 is "to demonstrate, by a preponderance of the evidence, that the surveyor erred in the methodology used or the results obtained, or by failing to adhere to the Survey Manual," while its burden in IBLA 2016-0109 is to prove "by a preponderance of the evidence that the[ challenged surveys] are fraudulent or grossly erroneous."[21] Under either standard, the Board shows deference to the professional opinions of BLM's experts on matters within their expertise,

---

[13] *Id.* at 16-17.

[14] *Id.* at 17.

[15] *Id.*; *see id.* at 17-18.

[16] *Id.* at 18, 19.

[17] *Id.* at 22.

[18] *See* Order, Consolidated Appeals Re-Opened; Remand Report Ordered (Mar. 20, 2023).

[19] *See* Supplemental Statement of Reasons (filed Sept. 1, 2023) (Remand SOR); Answer for IBLA 2016-109 and IBLA 2017-55 (filed Nov. 6, 2023) (Remand Answer); Reply (filed Dec. 22, 2023) (Remand Reply).

[20] Remand Order at 22.

[21] *See Alaska*, 196 IBLA at 172.

and the State cannot carry its burden simply by presenting a difference of opinion or a different interpretation supported by the evidence.[22] Both parties also take the opportunity to reargue a number of positions unconnected to the 1951 Maps. Given the narrow scope of review ordered for this remand, we do not revisit our prior conclusions on those issues. Except as expressly noted herein, the Board reaffirms its prior analyses with respect to the parties' arguments repeated in the briefing on remand.

II.    The 1951 Maps Do Not Materially Alter the Analysis or Conclusions in the Decision

A.  Identifying the Potentially Relevant 1951 Maps

The State introduced, and the Court added to the record for consideration, 20 different maps. But in its supplemental briefing filed with the Board on remand, the State relies almost exclusively on only one map from that group, State Exhibit 3 (Flaxman Island), to support its arguments. We conclude, however, that State Exhibit 3 was not available in 1957 to the drafters of the metes and bounds description, or in 1958 when BLM published the metes and bounds description in its notice of proposed withdrawal. While the other 19 maps submitted to the Court are labeled as 1951 maps published in varying editions by USGS, the markings on State Exhibit 3 indicate that it was prepared by the Army Map Service from a copy made of a USGS map in 1952.[23] To determine the map's actual date of publication, the State's Chief Surveyor directs our attention to the "very small print at the lower right of the map directly below the image and above the version year."[24] On State Exhibit 3, that notation indicates that the map was published in June 1958,[25] a year after the U.S. Fish and Wildlife Service (FWS) drafted the metes and bounds description that informed PLO 2214 and five months after the Notice of Proposed Withdrawal for ANWR was published in the Federal Register.[26] Accordingly, it could not have been considered by the drafters in crafting the metes and bounds description.

On reply, the State does not dispute this conclusion, instead focusing on the map's notation indicating that it was copied from a 1951 USGS map as evidence that such a

---

[22] *Id.* at 172-73.

[23] *See* Remand Answer at 7-8 (discussing notations on maps); Remand SOR, State Exhibit (Ex.) 3 (notation in bottom left corner) (State Ex. 3).

[24] Remand SOR, State Ex. 2, Declaration of Gwen M. Gervelis in Support of Plaintiff's Motion to Supplement Administrative Record ¶ 11 (signed Nov. 16, 2022) (Gervelis Supp. Decl.).

[25] *See* State Ex. 3 ("PRINTED BY ARMY MAP SERVICE, CORPS OF ENGINEERS, 6-58."); Remand Answer, Attached Declaration of Michael A. Tischler ¶ 4 (signed Oct. 24, 2023) (Tischler Decl.).

[26] *See Alaska*, 196 IBLA at 157-59.

map existed, allowing the Board to "logically infer [that a 1951 USGS map] was available to FWS in 1957."[27] But this does not alter the fact that the map at State Exhibit 3 could not have been considered during the drafting of the metes and bounds description. Therefore, while State Exhibit 3 may retain relevance as part of the larger record of materials available shortly after FWS drafted the metes and bounds description, it does not appear to have been "available to, and considered by, the USFWS when it drafted the metes and bounds description."[28]

With its Reply, however, the State produces a new map, State Exhibit 7, that it represents to be the missing 1951 USGS map that USGS itself could not locate.[29] This map is beyond the scope of the existing record as supplemented by the Court's Remand Order. Nevertheless, based on the markings on the map and consistent with the Court's conclusion regarding other 1951 USGS maps (not including State Exhibit 3), we conclude that this map was likely "available when the PLO 2214 drafters drafted the boundary's description."[30] Accordingly, based on the reasoning of the Court's order and to avoid further unnecessary delay and litigation burdens on the parties and the Court, we will consider State Exhibit 7 (which we will refer to as the 1951 Flaxman Island Map) to determine whether it changes the analysis or conclusions in our Decision.

As the Court concluded with respect to the 1951 Maps submitted by the State in the district court proceedings, we conclude that there is insufficient evidence on which to definitively determine that the 1951 Flaxman Island Map was actually used by the drafters in creating the metes and bounds description.[31] The State argues that the Department "necessarily" relied on USGS 1:250,000 quadrangle maps, that the 1951 Maps were available, and that certain "calls to points and locations" from PLO 2214 can be identified on the 1951 Maps.[32] But this does not establish that the

---

[27] Remand Reply at 3.

[28] Remand SOR at 2.

[29] *See* Remand Reply at 4 (introducing State Ex. 7); Tischler Decl. ¶ 5 (USGS Director of National Geospatial Program explaining that "USGS staff members and I were unable to locate a 1951 1:250,000 scale topographic map of the area").

[30] Remand Order at 16; *see also* Remand Answer at 12 n.15 (conceding generally that the 1951 Maps "were likely available at the time of drafting the metes and bounds description").

[31] *See* Remand Order at 19 ("[T]he State has not offered conclusive evidence that the PLO 2214 drafters considered the 1951 Maps when they drafted the description of ANWR's boundary.").

[32] Remand SOR at 12-14; *see also* Remand Reply at 5 (arguing "that the calls in PLO 2214's metes and bounds description could only have been drafted using maps at a scale of 1:250,000").

drafters in fact relied on the 1951 Flaxman Island Map.[33] Indeed, the fact that it appeared nowhere in the Department's historical records, or even in targeted searches by USGS of its records in connection with the remand, suggests otherwise. Nevertheless, we extend the Court's determination to it and will treat it as "relevant to the IBLA's interpretation of the PLO 2214 drafters' intent since [it] show[s] the very boundary established in that order, and . . . may have been the most refined topographical depiction of the disputed land available" at the time of drafting.[34] Accordingly, we will assume for the sake of analysis that the 1951 Flaxman Island Map was available during drafting and consider "how, if at all," it affects our analysis and Decision.[35]

        B. The two new Flaxman Island maps do not materially impact the conclusions in the Decision

      The parties' arguments regarding the relevance of the 1951 Maps focus almost exclusively on whether the 1951 Flaxman Island Map and State Exhibit 3 indicate that the description in PLO 2214 of the boundary's path from Brownlow Point leads to the Staines River, as we concluded in the Decision, or to the State's preferred channel, the branch of the Canning River lying further to the east.[36] The specific language at issue in the metes and bounds description described the northwestern boundary of ANWR as running from "a point of land on the Arctic Seacoast known as Brownlow Point at approximate Long. 145˚51' W. and Lat. 70˚10'N; thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of

---

[33] *See* Remand Answer at 12 ("While BLM acknowledges there is evidence in the record suggesting that USGS maps were utilized during the process of developing FWS's withdrawal application, the record does not support the State's newfound certainty regarding which maps were actually relied upon.").

[34] Remand Order at 16-17; *id.* at 19 ("It is not unreasonable to infer that the drafters more likely than not considered [the earlier, completed versions of these USGS maps . . . .").

[35] *Id.* at 22; *see also Alaska*, 196 IBLA at 185 ("As his direct delegate, the Board, no less than the Secretary, himself, is required to consider all relevant information tendered both by an appellant and by BLM in furtherance of our *de novo* review authority." (quoting *Nat'l Wildlife Fed'n*, 145 IBLA 348, 361-62 (1998)) (cleaned up)); *id.* (stating that "resources that were before [the drafters] contemporaneous with the development of the PLO and that may have informed their intent (or reveal it) are relevant to the core question before us" and that "[i]t would be unreasonable for the Board to turn a blind eye to the readily apparent evidentiary value of these materials").

[36] *See* Mot. to Supp. at 12; Remand SOR at 20-23; Remand Answer at 10 ("[T]he State's sole argument falling within the proper scope of the remand order is that the 1951 Maps' depiction of Brownlow Point undermines the Board's 2020 decision to a degree that warrants reversal."); *cf.* Remand SOR at 14 (citing Table Mountain maps not for merits issues, but rather to argue that the 1951 Maps were relied upon by the drafters).

the Canning River."[37] In our Decision, we assessed this language within the context of the historical record—including the 1955 Maps provided by the State during its original appeal—and concluded that the drafters of the metes and bounds description intended the phrase "extreme west bank of the Canning River" to refer to the Staines River.[38]

On remand, the State makes several arguments relying on State Exhibit 3 and the 1951 Flaxman Island Map in support of its position. First, the State notes that—unlike in the corresponding 1955 version cited by the Board in its Decision—the label for Brownlow Point on State Exhibit 3 does not appear above the "sand spit" extending westerly from the end of the peninsula.[39] At the same time, however, the State points out that "a cartographer's placement of its label on a map" is "often offset to avoid obscuring the location" and therefore bears little actual relevance to the location of a monument.[40] Further, the cited difference in label position is true only with respect to one of the 1955 Maps and not the other, which themselves differ in this respect.[41] The State argues that because State Exhibit 3 shows the label for Brownlow Point above the terminus of the peninsula, it is evidence that the Board incorrectly located Brownlow Point at the "sand spit."[42] We do not view the placement of the label as significant for purposes of evaluating the parties' conflicting positions on the call. The Decision's passing observation that one of the State's 1955 Maps "places the label for Brownlow Point out along the spit"[43] should not be overinterpreted.[44] For the avoidance of confusion, we here clarify that that observation is not a material element of the Decision's analysis or conclusions.

Second, the State asserts that the broken string of land projecting westerly from the tip of the peninsula "does not appear on the 1951 Maps at all."[45] While the representation varies somewhat across map versions, the broken string of land

---

[37] *Alaska*, 196 IBLA at 159; *see id.* at 157-60.

[38] *See e.g.*, *id.* at 182 ("We find this historical record to strongly, and almost uniformly, confirm BLM's position that the PLO's reference to the 'extreme west bank of the Canning River' was, in fact, intended to refer to the mapped channels of the Staines River . . . .").

[39] Remand SOR at 20-21.

[40] *Id.* at 21 n.14.

[41] *Compare* AR 000618 (1:250,000 USGS 1955 Flaxman Island map, placing the label more to the east, over the peninsula), *with* AR 000620 (1:63,360 USGS 1955 Flaxman Island map, placing the label more to the west, over the spit).

[42] Remand SOR at 21.

[43] *Alaska*, 196 IBLA at 198.

[44] *See, e.g.*, Remand SOR at 27 (asserting that "the Board rejected the State's 'technical theories' that the call to Brownlow Point in PLO 2214 referred to the peninsula rather than the sand spit based on the placement of the label for Brownlow Point on the 1955 Map").

[45] *Id.* at 21; *see id.* at 20-21.

unmistakably appears in each, including the 1951 Flaxman Island Map. Viewing the record as a whole, these variations between the 1951 Flaxman Island Map, the 1955 Maps, State Exhibit 3, or other resources available at the time of drafting, for that matter,[46] do not demonstrate error by BLM or in our Decision's analysis and conclusions. Nor are the State's arguments regarding whether the maps' depictions are better described as a "sand spit" or a "string of islands broken by the tide" or a "string of sand bars"[47] material to the ultimate questions presented—i.e., whether the path from Brownlow Point to the "extreme west bank of the Canning River" described in PLO 2214 places the northwest boundary of ANWR at the Staines River or the State's preferred channel. Similarly, the parties' speculation regarding the amount of the sand spit that would be visible at low versus high tide[48] bears no apparent relevance to the intended meaning of the metes and bounds description that was developed without the use of field observation.[49] For reasons stated in the Decision and below, the State's criticism that such a natural monument would be a poor choice for a metes and bounds description[50] does not overcome the historical record evidence indicating that it was the monument chosen.[51] In light of that record, we also find that the parties' competing perspectives on the proper definition of the isolated word "point"[52] offer limited insight into the relevant questions and amount to little more "than a difference of opinion or speculation" indicating "simply that a different . . . interpretation is available and supported by the evidence," which is insufficient to show error.[53]

Third, the State argues that State Exhibit 3 "contradict[s] the Board's finding that the mouth of the Canning River is 'virtually due south (rather than southwesterly) less than three miles from the State's interpretation of Brownlow Point.'"[54] It asserts that a three-mile line drawn from a selected location on the peninsula "arrives at the west bank of the Canning River . . . in a direction somewhere between south and west and is

---

[46] *See, e.g.*, *Alaska*, 196 IBLA at 198 ("The presence of the spit of land is apparent from the 1955 aerial photographs analyzed by the State . . . .").

[47] Remand Reply at 6 & n.8.

[48] *Id.* at 8; Remand Answer at 13-14.

[49] *See Alaska*, 196 IBLA at 195 (stating that "surveying, fieldwork, expert analysis, and application of modern technology 50 years later are of little to no relevance in determining what the drafters of the withdrawal and PLO intended when describing the location of the desired boundary line based on their understanding of the resources actually available to them between 1957 and 1960" which "had not been field checked").

[50] Remand SOR at 21 n.15; Remand Reply at 7.

[51] *See, e.g.*, *Alaska*, 196 IBLA at 194-96, 198-99.

[52] Remand Answer at 14; Remand Reply at 7-8.

[53] *Alaska*, 196 IBLA at 173.

[54] Remand SOR at 22 (quoting *Alaska*, 196 IBLA at 198-99).

therefore southwesterly, consistent with the metes and bounds description,"[55] whereas "the 1951 Maps reflect a distance of approximately 4 ¼ miles between the peninsula and the Staines River."[56]

There are several problems with the State's current argument. First and foremost is its suggestion that FWS and the Secretary of the Interior—without acknowledgment, explanation, or identifiable justification—intended the metes and bounds description to carve out from ANWR the northwest portion of the peninsula, as well as another outcropping of the coastline between the peninsula and the State's preferred channel.[57] This theory strains reason and is inconsistent with the historical record, including prior State positions.[58] The State's position further illustrates the leaps required to align the call from Brownlow Point with the State's preferred channel, which its consultant's report describes from historical maps as "entering the sea right up against the west edge of Brownlow Point" and "tight up against the western shore at the base of 'Pt. Brownlow.'"[59] The State's only rebuttal in defense of its theory is to repeat comparative criticisms of BLM's alternative interpretation of the call from Brownlow Point,[60] which have been considered and addressed elsewhere in the Decision and here.

---

[55] *Id.*

[56] *Id.* at 23.

[57] *See* Remand SOR at 22 (map excerpt with State-proposed connecting line); Remand Reply at 8-10 (acknowledging this implication of its line-drawing).

[58] *See, e.g., Alaska*, 196 IBLA at 157-58 (discussing involved drafting of metes and bounds description to define logical areas for purposes including preservation of wildlife and wilderness resources and "an undisturbed portion of the Arctic large enough to be biologically self-sufficient"); *id.* at 199 (discussing original version of the metes and bounds description (AR 000138) tracing the shoreline for nine miles between Brownlow Point and the extreme west bank of the Canning River, indicating an intent to include all lands inland of the shoreline between Brownlow Point and the river; later edited with no apparent intent of substantive change); *id.* at 166 (discussing the State of Alaska's position regarding the ANWR boundary before a Special Master appointed by the Supreme Court, reflected in a map showing that the State agreed that ANWR included the entirety of these features (*see* AR 000229)); *id.* at 199 (discussing 1965 survey plat that "traces the relevant call to the end of the spit of land, in fact to the last of the broken pieces of the spit" without objection from the State); *infra* notes 94 & 104 and accompanying text.

[59] AR 000322 (State Ex. GG to Statement of Reasons in IBLA No. 2017-55, Report of Jerry R. Broadus at 18).

[60] *See* Remand Reply at 9-10 (criticizing BLM's attribution of the call to the end of the projection of broken land extending from the peninsula, and questioning the distance between that point and the mouth of the Staines River).

Further, to explain the nearly north/south orientation required for the line to reach its preferred channel, the State argues that its line "proceeds in a direction somewhere between south and west and is therefore southwesterly" and matches the PLO's chosen descriptor of "a southwesterly direction."[61] The State asserts that BLM's argument in favor of a trajectory closer to the midpoint between south and west would amount to "discarding technical standards in favor of common definitions."[62] While the State may be correct that its line technically qualifies as running southwesterly (it does not provide a bearing to confirm), there is no dispute that the line posited by BLM does, as well. And our ultimate task is to determine whether the interpretation of the PLO's language reflected by the State's new line on its new maps demonstrates error in BLM's decisions or ours, as opposed to simply a different available interpretation or difference of opinion.[63] We find that it does not.

For comparison, a three-mile-long line following the "common definition[]" of southwest and terminating at the State's preferred channel would have to start at a point in the Beaufort Sea east of any location on or that could be considered part of the peninsula.[64] By contrast, a comparable line terminating at the mouth of the Staines River would begin "approximately" at the last of the pieces of land extending west from the peninsula. The State questions this conclusion by asserting that such a line would have to be closer to 3.5 miles long to reach land,[65] though in prior briefing it estimated the distance at "3 ¼ miles."[66] Accepting these estimates for the sake of argument, alongside the State's theory that the drafters were using the 1951 Flaxman Island Map as a measurement and drafting reference (on which one inch equates to about four miles), the quarter-mile deviation estimated by the State would amount to only 1/16 of an inch,

---

[61] Remand SOR at 22 (citing treatise for the proposition that "*southwesterly* embraces 45° between the bearings S 22 1/2° W and S 67 1/2° W").

[62] Remand Reply at 11; *see also id.* ("The State founds its position that 'southwesterly' references a general direction on technical standards for drafting legal descriptions.").

[63] *See Alaska*, 196 IBLA at 173 nn.131-33 and accompanying text; *see also Udall v. Oelschlaeger*, 389 F.2d 974, 976 (D.C. Cir. 1968) (holding that unless the position "espoused by the Secretary is beyond the bounds of reasonableness" it "prevails, even though appellee's arguments are not without substance" and "plausible grounds can be advanced for each of the contending constructions").

[64] *See Alaska*, 196 IBLA at 187.

[65] Remand Reply at 9; *see also id.*, Attached Declaration of Gwen M. Gervelis in Support of State's Reply ¶ 10 (signed Dec. 18, 2023) (Gervelis Reply Decl.).

[66] *Alaska*, 196 IBLA at 191, 192 (quoting Statement of Reasons in IBLA No. 2016-0109 at 16 (filed May 27, 2016) (2016 SOR)); *see also* Remand SOR at 19 ("The State observed that a line between the end of the sand spit and the Staines River is 3 ¼ miles long . . . ."); *cf.* Remand Reply at 10 (observing that "the drafters of the metes and bounds description rounded other distances to the nearest half mile").

less than the thickness of a quarter[67] (or two quarters, based on its new estimate). That is not incompatible with the PLO's characterization of the distance as "approximate."[68]

It is similarly unclear how the State chose the point on the peninsula from which its line was drawn, or why it chose to use a different point north of the peninsula in the Beaufort Sea as the origin for the line it drew to the mouth of the Staines in an effort to demonstrate that there is "a distance of approximately 4 ¼ miles between the peninsula and the Staines River."[69] The State merely asserts that BLM offers nothing better and that adjustments to the locations and measurements would not materially change its analysis.[70] As discussed above, we disagree with this assessment. At the very least, it undermines the reliability of the evidence as proof of error by BLM. We also note that the State characterized its proposed line as "just under 3 miles" long in prior briefing.[71]

The State inverts the burden on appeal by asserting that "BLM . . . establishes no error in the State's conclusions" regarding the call from Brownlow Point.[72] As set forth in the Decision, and still applicable here, it is the State's burden to demonstrate that BLM's conclusions constituted either error (for IBLA 2017-0055) or fraud or gross error (for IBLA 2016-0109).[73] We find that the State's arguments based on State Exhibit 3 and the 1951 Flaxman Island Map fall well short of these burdens based on: the unexplained exclusion of seemingly arbitrary pieces of land; the closer cartographic match to BLM's interpretation; the vagaries of the proffered measurements and the lines' start and end points; the PLO's characterization of the distance as "approximate[]"; and—most

---

[67] *See* United States Mint, Coin Specifications, https://www.usmint.gov/learn/coin-and-medal-programs/coin-specifications (last visited Apr. 2, 2024).

[68] *Cf.* Remand Reply at 8 (arguing that a map's representation of an "approximate" line of mean high tide reflects that actual high tide may vary meaningfully from the depiction); *id.* at 14-15 (arguing that reference to an "approximate" line of longitude allowed ample flexibility for deviation from the line).

[69] Remand SOR at 23. *But see* Remand Reply at 11 n.14 (explaining that the origin for the line drawn to the Staines was chosen based on the approximate latitude and longitude named in PLO 2214, but not explaining why the same approach wasn't taken for the measurement to the State's preferred channel, or how that strategy comports with its maps placing the identified point north of the peninsula in the sea).

[70] Remand Reply at 10-11.

[71] *Alaska*, 196 IBLA at 191, 192 (quoting 2016 SOR at 16 (AR 000603)).

[72] Remand Reply at 6; *see also id.* at 10 (asserting "BLM has not identified error in the State's demonstration" regarding the Brownlow Point call); *id.* (asserting "BLM . . . fails to demonstrate any error" in the State's distance measurements); *id.* at 11 (asserting "BLM does not identify any error in the State's conclusion" regarding distances).

[73] *See Alaska*, 196 IBLA at 172-73 (describing the State's burden of proof in its appeals).

importantly—the contradictory direct evidence of the Metes and Bounds Map.[74] Further, for other reasons discussed in the Decision, the record indicates that BLM offers the better understanding of the line's intended path,[75] and the State's arguments on remand do not alter our conclusions.

Finally, the State asserts that, "[o]n remand, the Board must 'weigh[ ]' the 1958 [BLM] Field Report 'within [the] context' of the legal description as applied to the 1951 Maps."[76] Our Decision addressed the nature and significance of BLM's 1958 preliminary Field Report analyzing the FWS Withdrawal Application.[77] The State does not identify how the 1951 Maps are relevant to our analysis of that report, and we do not perceive them to be. We find no basis for modifying our prior analysis of that document and its place within the historical record. The State further asserts that "[b]ecause the 1951 Maps demonstrate that the drafters intended to designate the Canning River as the Refuge's northwest boundary," the Board may reopen and revisit the full scope of its prior conclusions.[78] Because we disagree with the premise and conclude that the 1951 Maps do not support a different determination regarding the meaning of PLO 2214, we decline to do so.

Consistent with the Court's remand order, we have analyzed the State's new maps, including State Exhibit 3 and the 1951 Flaxman Island Map, to determine whether and how they affect our analysis in the Decision. Even assuming that the 1951 Flaxman Island Map was available to the drafters, we conclude that none of the State's arguments based on any of the newly introduced maps materially impact our analysis and conclusions in the Decision. Because, however, the introduction of the 1951 Maps has raised questions regarding the 1955 Maps and the Decision's treatment thereof, we next address those questions and how they do (and do not) alter the Decision.

---

[74] *See* AR 000154 (BLM Ex. G to Answer in IBLA 2017-55, discussed further *infra* at notes 112-120 and accompanying text) (Metes and Bounds Map).

[75] *See, e.g.*, *Alaska*, 196 IBLA at 165, 187 (discussing ANWR boundary codified by ANILCA description of the same line as running "approximately 3 ¼ miles to the line of extreme low water of the most westerly tip of the most northwesterly island, westerly of Brownlow Point" in section 6 of Twp. 9-25); *id.* at 198-99 (observing that the State's 1955 Flaxman Island Map "places the mouth of the State's favored river channel virtually due south (rather than southwesterly) less than three miles from the State's interpretation of Brownlow Point" and that the spit of land is identifiable).

[76] Remand SOR at 29.

[77] *See Alaska*, 196 IBLA at 159-60, 184-85.

[78] Remand Reply at 19.

Case 3:22-cv-00078-SLG   Document 31-1   Filed 04/09/24   Page 14 of 23

III.    Because the 1955 Maps Were Not Available in 1957, We Reevaluate Our Analysis and Modify the Decision Accordingly

The State's introduction, and Court's acceptance, of the 1951 Maps into the record were founded in part on the conclusion that the 1955 Maps the State previously provided to the Board were not available to the drafters of the metes and bounds description in 1957.[79] While the State attempts to suggest otherwise,[80] this represents a change from the position it previously argued on appeal.[81] Nevertheless, the parties now appear to agree that the 1955 Maps[82] presented in the original appeals were not available in 1957 when FWS drafted the metes and bounds language.[83] Accordingly, and because this issue is intertwined with the subject of the remand,[84] we accept the parties' current consensus.

---

[79] *See, e.g.*, Remand Order at 4-5, 20-21.

[80] Mot. to Supp. at 8 n.7 ("The referenced maps were submitted to demonstrate that the Staines and Canning Rivers were separate and distinct and not to demonstrate the USFWS's purported intent."); Reply in Support of Motion to Supplement Administrative Record, *State of Alaska v. United States Dep't of the Interior*, Case No. 3-22-cv-00078-SLG, Document No. 28 at 9 (filed Jan. 5, 2023) (Reply re Mot. to Supp.); Remand SOR at 7 ("The State had introduced these maps to support its argument that the Staines and Canning Rivers are separate and distinct.").

[81] *See* 2016 SOR at 12-13 (AR 000599-600) (characterizing the 1955 Maps as having been "utilized by BLM and U.S.F.W.S. in the 1950s to define the boundary of the Range" and arguing that, because the drafters could have "easily identified" the Staines River based on the maps' markings, they must have intended to refer to the State's preferred channel).

[82] *See* AR 000618-21 (State Exs. B and C to the Statement of Reasons in IBLA 2016-0109).

[83] Mot. to Supp. at 10-11; Reply re Mot. to Supp. at 8 ("The 1955 Maps were incomplete when the USFWS drafted the metes and bounds description that was adopted in PLO 2214."); Remand SOR at 13 ("[T]he 1955 Maps were not available when the USFWS was preparing the metes and bounds description."); Remand Answer at 3 (characterizing the 1955 maps as "not yet published when the drafters first proposed the boundary in 1957"); *id.* at 17 n.22 (discussing the "misconception that the 1955 edition USGS maps were available to the drafters at the time of drafting in 1957").

[84] Remand Order at 12-13 (examining the State's arguments regarding the necessity of considering the 1951 Maps based on the unavailability of the 1955 Maps in 1957); *id.* at 18 (characterizing the 1955 Maps as "potentially inferior evidence" to the 1951 Maps due to their unavailability in 1957); *id.* at 19 (comparing the evidentiary value of the 1955 Maps and 1951 Maps based on their availability to the drafters); *id.* at 20-21 (noting that, while the State may have "portrayed the 1955 Maps as worthy of consideration at the proceedings below" its "oversight does not relieve the IBLA of its obligation to consider 'all relevant factors'").

As a result, we modify our Decision to reflect that the 1955 Maps were not available to the drafters. We withdraw the following statements made in the Decision, suggesting that those maps were: (1) "generally acknowledged to have been the primary resource at the disposal of FWS and the Secretary throughout the drafting process"[85]; (2) "utilized by FWS and the Secretary in developing the metes and bounds description between 1957 and 1960"[86]; (3) "relied upon" by "the drafters of the 1957 Withdrawal Application and 1960 PLO"[87]; (4) "the mapping on which FWS and the Secretary relied in describing the course of their intended boundary"[88]; (5) "the resource that the drafters employed in discerning where the line should be drawn"[89]; and (6) "the resources employed by the drafters of the metes and bounds descriptions for the Withdrawal Application and the PLO."[90] This then leads to the next question—like the question on remand—of how, if at all, these modifications influence the analysis in and outcome of the Decision.

As an initial matter, we find that this modified understanding of the 1955 Maps does not render them irrelevant to the analysis as the State suggests. The Court observed that "neither party identifies when, exactly, the USGS finalized and published these maps,"[91] which remains the case. The State's Chief Surveyor opines "either that the update was in the process of being compiled in 1957 or that work on an update began after 1957" and may have been "a multi-year process."[92] Accordingly, we will treat the 1955 Maps (as both parties stated on appeal) as among the "maps of the era" that were "created contemporaneously with the legal description of the range,"[93] the adoption of

---

[85] *Alaska*, 196 IBLA at 182.

[86] *Id.* at 186.

[87] *Id.* at 194.

[88] *Id.* at 195.

[89] *Id.* at 196.

[90] *Id.* at 199. *But see id.* at 188 (stating that "[t]he maps available to the drafters depicted these rivers in close proximity, as elements of a river system branching into a delta as it approached the Beaufort Sea," which is true of the 1951 Maps, as well).

[91] Remand Order at 4; *see* Mot. to Supp. at 11 (suggesting only that "the 1955 maps were published sometime after 1955"); *id.* at 13 (stating only that the maps were "developed after 1955").

[92] *See* Gervelis Supp. Decl. ¶¶ 10, 13; *see also id.* ¶ 10 ("The text in the bottom left hand corner and/or in the bottom center of each map provides the information to determine when work on the original map or any update occurred."); AR 000620 (stating in the indicated text that the map was developed from "aerial photographs taken 1955, field annotated 1955" and "[s]elected hydrographic data compiled from USC&GS Chart 9474 (1956)"); AR 000618 (stating that it was "compiled in 1959 from Army Map Service 1:50,000 series maps").

[93] *See* 2016 SOR at 12-13 (AR 000599-600); Answer for IBLA 2017-55 at 15 (filed Mar. 12, 2018) (AR 000113).

that description in the 1960 PLO, and the implementation of that description in the immediate aftermath. In that respect the 1955 Maps, like other record evidence from the period,[94] continue to provide meaningful insights into the roughly contemporaneous understandings regarding the area and the intended boundary, even if they were not among "the maps that the USFWS used to draft the legal description in PLO 2214."[95]

The State's assertion that the Board's prior treatment of the 1955 Maps constituted "fundamental error [that] undermines the entirety of the Decision"[96] overshoots the mark. It is founded on the implication that material differences exist between relevant features of the 1955 Flaxman Island Map, the 1951 Flaxman Island Map, and State Exhibit 3. But as discussed above, both of the newly introduced Flaxman Island maps are generally consistent with and support the same conclusions as the 1955 Flaxman Island Map analyzed by the parties and Board previously. For example, a significant number of the Decision's references to the 1955 Maps were associated with the Board's conclusion that the drafters "relied upon the hydrography as depicted" on available maps "to inform their understanding of the physical circumstances along their intended boundary line."[97] The Board made this observation in response to the State's arguments questioning whether a river existed at places along BLM's boundary based on information unavailable to the drafters at the time (e.g., modern fieldwork).[98] Our point was that, in the absence of such on-the-ground information at the time, the drafters would have had to rely on the representation of rivers as depicted on available maps. Just like the 1955 Maps, State Exhibit 3 and the 1951 Flaxman Island Map both depict the Staines as a river for the entirety of the relevant stretch, "which provides a natural explanation for [the drafters'] choice to use the 'mean high water mark' language associated with a riverine boundary."[99] Therefore, the same point regarding reliance upon the depiction of hydrography on available maps stands. Further, again in keeping

---

[94] *See, e.g.*, *Alaska*, 196 IBLA at 160, 183 (discussing map likely dating from the year following PLO 2214, depicting ANWR boundary following the Staines River (AR 000219)); *id*. at 167 (discussing map depicting ANWR boundary following the Staines River maintained in a National Archives file dated "1957-1962" (AR 000524)); *id*. at 161-62 (discussing 1965 BLM surveys identifying ANWR boundary along the Staines River without State objection (AR 000783-85, 796, 798, 800)); *id*. at 162, 183 (discussing 1967 Dictionary of Alaska Place Names identifying "Staines River" as a variant for Canning River and a distributary thereof, with a mouth at a latitude and longitude better aligned with the metes and bounds description than that of the Canning (AR 000130-31)); *id*. at 163 (discussing undisputed 1969 BLM decisions rejecting State selections based on the Staines River being the ANWR boundary (AR 000723-29)).

[95] Mot. to Supp. at 10.

[96] Remand SOR at 16.

[97] *Alaska*, 192 IBLA at 194; *id.* at 194-96.

[98] *Id.* at 189-91, 195.

[99] *Id.* at 195.

with the 1955 Maps, State Exhibit 3 and the 1951 Flaxman Island Map similarly depict the Staines as the westernmost distributary originating from the main forks of the Canning on the system's path to the coast.[100] And as discussed at greater length above, the 1951 Flaxman Island Map's depiction of the relevant monuments identified in the description of the boundary's path from Brownlow Point leads to the same conclusions derived from the 1955 Flaxman Island Map.[101] The 1955 Map's actual documentation of the ANWR boundary following the Staines River was not something that was before the drafters at the time of drafting,[102] but it nevertheless remains a depiction of the intended boundary as understood from the metes and bounds description during the relevant time period.

Accordingly, we accept the parties' current consensus that the 1955 Maps were not available to the drafters in 1957 and modify the Decision accordingly. However, contrary to the State's assertions on remand, the premise that the 1955 Maps were available to the drafters in 1957 was not the central foundation of the Decision with everything else being discountable as "secondary" or "anecdotal" or "merely bolstering."[103] Our analysis relied upon the collective weight of a host of record elements available during the drafting of PLO 2214[104] and developed over time during

---

[100] *See id.* at 182-83; State Ex. 7; *see also* Remand SOR, State Ex. 4 (Mt. Michelson quadrangle depicting the diffuse branching of the Canning River system on its approach toward the coast and the area depicted in State Ex. 7); Tischler Decl., Attached Ex. 3 (USGS map dated 1954 depicting the Staines River as the westernmost branch of the Canning River system, without distinct identification).

[101] *See supra* notes 36-75 and accompanying text; *Alaska*, 196 IBLA at 198-99; *see also, e.g.*, *id.* at 199 (observing that a nine-mile course following the shore from Brownlow Point (as described in the initial draft of the metes and bounds description) terminates well west of the State's preferred channel and in proximity to the mouth of the Staines).

[102] *See* Remand SOR at 15-16.

[103] *See, e.g.*, Remand Reply at 17-18.

[104] *See, e.g.*, *Alaska*, 196 IBLA at 157-59, 183 (referring to the Metes and Bounds Map (AR 000154) as "perhaps the strongest evidence of contemporaneous drafter intent" and discussing its depiction of the Staines as a distinct river but the westernmost distributary of the Canning River system, and its mapping of the call points and boundary along the Staines); *id.* at 160, 183-84 (discussing the "meaningful indications of the intent behind PLO 2214 in the Secretary's issuance of PLO 2215 on the same day," which described the ANWR boundary as a river with its mouth at a longitude and orientation to a named monument in close proximity to the Staines and well west of the State's preferred channel (citing 25 Fed. Reg. 12,599 (Dec. 9, 1960))); *id.* at 179 n.162, 183 (discussing 1906 USGS Geographic Dictionary of Alaska suggesting that English explorer Sir John Franklin in 1826 "gave the names Canning and Staines rivers to two mouths of what later came to be understood as the same river (i.e., the Canning)" (AR 000125-27)); *id.*

implementation of PLO 2214.[105] Neither the introduction of the 1951 Maps nor the modified understanding of the 1955 Maps alters the overall conclusions drawn from the record as a whole or leads to the reversal in outcome for which the State advocates.[106]

IV.     The State's Collateral Attacks on the Remainder of the Record Evidence Do Not Carry Its Burden

Although largely outside the scope of the Court's remand order, the State challenges the remainder of the contemporaneous record considered by the Board as "random evidence that easily supports an alternative conclusion."[107] While we generally decline the parties' invitation to revisit and relitigate the significance of those items on this targeted remand, and instead reaffirm our analysis of and conclusions drawn from those materials unless expressly stated otherwise, we briefly address the remaining State arguments that challenge aspects of the Decision based on new evidence.

The State first repeats its argument that, because the USGS maps of the time period "identify and label the 'Staines River' independently of the Canning River," the drafters "[p]resumably" would have referenced the Staines instead of the Canning if that were their intended boundary.[108] We addressed this argument in our Decision,[109] and neither the modified understanding of how the 1955 Maps fit within the historical record nor the introduction of the 1951 Maps alters our analysis on this point. Indeed, the relevant maps from each year identify and label the rivers consistently.[110]

Next, the State renews its criticisms of the map that accompanied the 1957 metes and bounds description in the record, discounting it as "crude," "unreliable," "undated," and "hand-drawn."[111] As we explained in our Decision, this document represents "perhaps the strongest evidence of contemporaneous drafter intent" in that it was "created alongside and to accompany the metes and bounds descriptions developed by

---

at 188 (discussing the consistency between the Staines River boundary and the FWS's stated purposes in recommending the establishment of ANWR); *id*. at 198 (discussing 1955 aerial photography (AR 000361-62)).

[105] *See, e.g.*, *supra* note 94; *Alaska*, 196 IBLA at 161-66.

[106] *See* Remand SOR at 24 (arguing that the Board's reliance on the 1955 Maps begs reversal with respect to the State's modern analyses of circumstances on the ground decades later, or the propriety of BLM's 2012 survey instructions).

[107] *Id.*

[108] *Id.* at 25.

[109] *Alaska*, 196 IBLA 180-86.

[110] *Compare* State Ex. 7, *with* AR 000620. *See also* Remand SOR at 25 (conceding that "both the 1951 Maps and 1955 Maps identify and label the 'Staines River' independently of the Canning River").

[111] Remand SOR at 25; Reply re Mot. to Supp. at 10.

Case 3:22-cv-00078-SLG   Document 31-1   Filed 04/09/24   Page 19 of 23

FWS in connection with the withdrawal process."[112] It "depicts each of the main branches of the Canning River and identifies the Staines River by name," while plotting the ANWR boundary following the Staines with numbered landmarks corresponding to the numbered call points in the metes and bounds description.[113] The Court similarly acknowledged it as an "accompanying map USFWS prepared in 1957" in connection with development of the metes and bounds description.[114]

The State first discounts its significance by arguing that it "could not have been used to draft the legal description because it is not at the scale that the historical record indicates characterized the maps used in drafting the legal description."[115] But this misconstrues the context of the map in the record. The evidentiary significance of that map is not as a drafting reference or resource, but rather as a contemporaneous response from the drafters of the metes and bounds description to a request that they graphically depict the course and markers that they were describing, providing clear representation of their intent.[116] Second, the State revives questions about the provenance of the map, while conceding that "the map was found with the FWS's draft metes and bounds description in a National Archives file of correspondence related to the Refuge."[117] We addressed this issue and the related parts of the historical record in our Decision,[118] and nothing about the supplemental materials or issues raised on remand alters that analysis. And contrary to the State's assertion that the map contains "indecipherable notations,"[119] we find the notations readily decipherable as attempting to cross-reference the

---

[112] *Alaska*, 196 IBLA at 183.

[113] *Id.* (discussing AR 000154 (Metes and Bounds Map)); *id.* at 157-59 (discussing development of the metes and bounds description and accompanying maps in the latter half of 1957).

[114] Remand Order at 3.

[115] Remand SOR at 25; *see also* Remand Reply at 12-13 (noting that it "lacks the features and topography that substantiate the detailed calls in the metes and bounds description" and "is also at the wrong scale to adequately perform measurements with a ruler and compass and, for example, obtain distances to the ½ mile as described in the legal description"); Reply re Mot. to Supp. at 8 (arguing that the Board's reliance on the FWS Metes and Bounds Map "ignore[s] that the . . . map does not contain many of the features reflected in the calls in the boundary description in PLO 2214"); *id.* at 10 (criticizing the map as "a crude, hand-drawn map with a few of the features identified in the metes and bounds description").

[116] *See* Remand Answer at 18 ("[T]he Metes and Bounds Map contains a hand-drawn set of 23 points and connecting boundary line segments corresponding precisely with the 23 points described in the initial metes and bounds description . . . .").

[117] Remand Reply at 13.

[118] *Alaska*, 196 IBLA at 157-59.

[119] Remand Reply at 14.

numbering system in the draft metes and bounds descriptions it accompanied in the record.[120]

The Board precedent relied upon by the State on this front does not change the result. With respect to the "hand-drawn, undated, and unsigned" map in the record in *Mayland*, the Board did not find that the map, nor certainly all similar maps as a general principle, constituted inherently unreliable evidence. To the contrary, the Board considered the map; it simply found that that particular map did not convey the particular factual information necessary to answer the questions at issue in that appeal.[121] That fact-specific resolution offers little precedential value here. Similarly, in *Lawton*, the "unsigned and undated" fragment of an accounting entry was deemed insufficient to sustain BLM's decision because that decision depended entirely on the date that BLM received a payment, and the document fragment included in the record did not contain that information.[122] It does not stand for the proposition that any piece of evidence that is "unsigned and undated" is inherently unreliable for any purpose.[123]

Finally, the State questions our conclusion that the description of the ANWR boundary in a separate PLO issued by the Secretary on the same day favors the Staines.[124] That PLO—PLO 2215—describes the boundary as following a river with "its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W."[125] The State asserts that this "'approximate' longitude could refer to either the Staines River or Canning River" and "[w]ithout a reference to minutes or seconds" is not specific enough to distinguish between the two.[126] The State points to "the gridline running north-south and labeled '4'" on State Exhibit 3, noting that it "intersects the east edge of Flaxman Island" and that "[t]he mouth of the westernmost channel of the Canning River at the Arctic Ocean is just east of this gridline."[127] However, gridline "4" is not the line of longitude 146° W.[128] Rather, that gridline lies to the east of 146° W longitude.[129] On both State Exhibit 3 and the 1951 Flaxman Island Map (which does not contain such

---

[120] *See* Answer for IBLA 2017-0055, Attached BLM Exs. E, F (AR 00138-41, 00146-49).
[121] 141 IBLA 155, 157 (1997).
[122] 36 IBLA 178, 179-80 (1978).
[123] Remand Reply at 14.
[124] Remand SOR at 15 (discussing Decision's analysis of PLO 2215).
[125] 25 Fed. Reg. 12,599 (Dec. 9, 1960).
[126] Remand SOR at 25-26.
[127] Remand Reply at 15.
[128] *See id.* at 4 n.5 (explaining that the gridlines "represent the Military Grid Reference System (MGRS)").
[129] *See* State Ex. 3 (showing markers for 146° W longitude on top and bottom margins lying west of gridline 4, and "+" markers tracking the course of 146° W longitude across the map west of gridline 4); State Ex. 7 (showing "+" markers tracking the course of 146° W longitude across the map, with no gridlines).

gridlines), a line following the marked course of 146° W longitude runs through the heart of Flaxman Island (almost directly over the "Flaxman" horizontal control point) to a location very close to the mouth of the Staines River, and substantially west of the State's preferred channel. The State, by contrast, points to a military gridline on a map unavailable during drafting that lies east of the longitude line referenced in the PLO, catches the east edge of the referenced landmark, and still makes landfall west of the State's preferred channel. This does not carry the State's burden to prove error.

The State also asserts that the lack of "a more exact reference containing degrees, minutes, and seconds" means that the reference to the "approximate" longitude can't be relied upon to distinguish between the Staines and the Canning.[130] As BLM points out, however, "elsewhere in the very same sentence, PLO 2215 identifies specific locations in both degrees and minutes," indicating that the absence of minutes in the call to 146° W longitude is best understood to be a reference to that line itself, with the "approximate" modifier simply allowing for a limited amount of deviation between that line and the targeted river mouth.[131] We agree. Given the near-precise alignment between 146° W longitude and the Staines River mouth,[132] and the location of the State's preferred channel well to the east of that line, as described above, the State's arguments again do not alter our analysis or conclusions in the Decision.

We have considered the State's arguments about the remainder of the record to the extent that they were founded on matters relevant to the remand, and we conclude that they do not carry the State's burden to show error in BLM's decisions or otherwise require modification of the Decision.

---

[130] Remand Reply at 14-15; *see also* Remand SOR at 26 ("Without a reference to minutes or seconds, the reference to approximate longitude 146˚[ ]W cannot be read as specific to either the Staines or the Canning River.").

[131] Remand Answer at 20-21.

[132] *See also* Answer for IBLA 2017-55, Attached BLM Ex. C, 1967 Dictionary of Alaska Place Names (AR 000131) (placing the mouth of the Staines River 15 seconds to the east of 146° W longitude).

CONCLUSION

After consideration of the new materials added to the record and their impact on other elements of the record and our analysis thereof, we modify the Decision in part and affirm it in part. We continue to find that the State has not met its burden to demonstrate error in the appealed BLM decisions or in BLM's performance of the surveys underlying those decisions.

_____          I concur: _____
Matthew T. Ballenger                               Amy B. Sosin
Administrative Judge                                Administrative Judge