TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl (Bar No. 2108081)
Ryan E. Farnsworth (Bar No. 2305047)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov
        ryan.farnsworth@alaska.gov
Attorneys for the State of Alaska

Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Nicholas R. Peppler (*pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
        gail.wurtzler@davisgraham.com
        mark.champoux@davisgraham.com
        nick.peppler@davisgraham.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00078-SLG |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, DEB HAALAND, in her | ) | |
| official capacity as Secretary of the | ) | |
| Department of the Interior, INTERIOR | ) | |
| BOARD OF LAND APPEALS, STEVEN | ) | **PLAINTIFF'S MOTION FOR** |
| J. LECHNER, in his official capacity as | ) | **SUMMARY JUDGMENT** |
| Acting Chief Administrative Judge of the | ) | |
| Interior Board of Land Appeals, BUREAU | ) | |
| OF LAND MANAGEMENT, TRACY | ) | |
| STONE-MANNING, in her official | ) | |
| capacity as Director of the Bureau of Land | ) | |
| Management, BUREAU OF LAND | ) | |
| MANAGEMENT ALASKA STATE | ) | |
| OFFICE, and THOMAS HEINLEIN, in | ) | |
| his official capacity as Acting State | ) | |
| Director of the Bureau of Land | ) | |
| Management Alaska State Office, | ) | |
| | ) | |
| Defendants. | ) | |

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 1 of 63

<h1 style="text-align: center">TABLE OF CONTENTS</h1>

<u>Page</u>

BACKGROUND ......................................................................................................... 1

I.      Establishment of the Arctic National Wildlife Range (1957–1960) ....................... 1

II.     Alaska's Statehood and Land Selections and the BLM's Survey of the 1964 State Selections (1958–1974) ............................................................................................... 4

III.    The Alaska National Interest Lands Conservation Act (1980–1983) ..................... 5

IV.    The BLM's Survey of the 1968 State Selection (2003–2016) ................................ 7

V.     The BLM's Decisions (2016) ................................................................................. 9

        A.     The February 2016 Decision ......................................................................... 9

        B.     The November 2016 Decision .................................................................... 10

VI.    The IBLA Decisions (2020–2024) ....................................................................... 10

STANDARD OF REVIEW ....................................................................................... 12

ARGUMENT .............................................................................................................. 13

I.      PLO 2214 Unambiguously Establishes the Canning River as the Refuge's Northwest Boundary .............................................................................................. 14

        A.     The Court Must Independently Ascertain and Apply the Plain Meaning of PLO 2214's Text. ..................................................................................... 14

        B.     A Court May Not Look Beyond the Four Corners of a PLO unless the Text is Ambiguous. ............................................................................................ 15

        C.     PLO 2214 Unambiguously Designates the Canning River as the Boundary. ................................................................................................ 17

        D.     The IBLA's Interpretation of PLO 2214 Contradicts the Order's Plain Language. ................................................................................................... 18

II.     The IBLA Improperly Looked Beyond the Four Corners to Reach Its Contradictory Interpretation of PLO 2214. .......................................................... 21

        A.     The IBLA May Not Look Beyond the Four Corners of a PLO When the Text Is Unambiguous. .............................................................................. 22

B.     The IBLA Did Not Find PLO 2214 Was Ambiguous.................................. 23

III.   The IBLA's Reinterpretation of PLO 2214 Ignores and Circumvents Established Procedures to Adjust the Boundary.......................................................................... 26

A.     Procedures to Adjust Boundaries of Withdrawals Require Publication in the Federal Register...................................................................................... 27

B.     Procedures to Adjust Boundaries of Conservation Areas Established by ANILCA Require Notice to Congress. ....................................................... 28

C.     The IBLA's Decision Adjusts the Refuge's Boundary Without the Required Process........................................................................................... 28

IV.   Even if PLO 2214 Is Ambiguous, the IBLA Wrongly Concluded that the Staines River Is the Refuge's Intended Northwest Boundary. ........................................... 29

A.     The Court Owes No Deference to the IBLA's Finding of Intent Behind PLO 2214. ................................................................................................. 30

B.     The IBLA Arbitrarily Concluded the "Collective Weight" of Record Elements Support the Staines River as the Refuge's Boundary. ................ 31

1.     The IBLA Improperly Discounted Record Evidence Demonstrating that the Canning River Is the Intended Northwest Boundary. ......... 31

2.     The IBLA Arbitrarily Moved the Location of Brownlow Point to Justify Its Preferred Boundary. ........................................................ 36

3.     The IBLA Places Too Much Weight on a Hand-Drawn Map. ........ 44

4.     The Anecdotal Evidence Relied on by the IBLA Does Not Establish that the Staines River Is the Intended Boundary.............................. 46

V.   The Surveyed Northwest Boundary Does Not Support the BLM's Conclusion that the Staines River Is the Northwest Boundary. ....................................................... 50

CONCLUSION ................................................................................................. 54

# TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ............................................................ 13, 51

*Aera Energy LLC v. Salazar*,
  691 F. Supp. 2d 25 (D.D.C. 2010) ............................................................ 30

*Alabama v. Georgia*,
  64 U.S. 505 (1860) ............................................................ 19

*Bank of America Nat'l Trust & Sav. Ass'n v. 203 North Lasalle St. P'ship*,
  526 U.S. 434 (1999) ............................................................ 25

*Bolton v. Constr. Laborers' Pension Trust*,
  56 F.3d 1055 (9th Cir. 1995) ............................................................ 25

*Carey Canada, Inc. v. Columbia Cas. Co.*,
  940 F.2d 1548 (D.C. Cir. 1991) ............................................................ 26

*Chickaloon-Moose Creek Native Ass'n v. Norton*,
  360 F.3d 972 (9th Cir. 2004) ............................................................ 25

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................ 14, 15, 21

*Ford City v. United States*,
  345 F.2d 645 (3d Cir. 1965) ............................................................ 20

*Howard v. Ingersoll*,
  54 U.S. 381 (1852) ............................................................ 19

*Idaho Power Co. v. FERC*,
  312 F.3d 454 (D.C. Cir. 2002) ............................................................ 14, 15

*John v. United States*,
  247 F.3d 1032 (9th Cir. 2001) ............................................................ 25

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ............................................................ 12, 14

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................................ 14, 16

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ............................................................... 42

*Mountain Cmtys. for Fire Safety v. Elliott*,
  25 F.4th 667 (9th Cir. 2022) ............................................................... 12

*Nat. Res. Def. Council v. Env't Prot. Agency*,
  31 F.4th 1203 (9th Cir. 2022) ............................................................. 13

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003) ............................................................................ 30

*Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*,
  418 F.3d 1068 (9th Cir. 2005) ............................................................ 30

*S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*,
  620 F.3d 1227 (10th Cir. 2010) .......................................................... 15

*Stacey v. Zinke*,
  692 F. App'x 363 (9th Cir. 2017) .................................................. 12, 13

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) ................................................................. 30

*Udall v. Oelschlaeger*,
  389 F.2d 974 (D.C. Cir. 1968) ............................................................ 23

*United States v. Alaska*,
  521 U.S. 1 (1997) ................................................................................ 23

*United States v. Gila Valley Irrigation Dist.*,
  961 F.2d 1432 (9th Cir. 1992) ............................................................ 25

*Yellowstone Pipe Line Co. v. Kuczynski*,
  283 F.2d 415 (9th Cir. 1960) .............................................................. 19

**Administrative Decisions**

*Robert R. Perry*,
  87 IBLA 380 (1985)....................................................................... 22, 23

*Robert W. Piatt*,
  73 IBLA 244 (1983)............................................................................ 22

*Sierra Club, Angeles Chapter, Santa Clarita Group, et al.*,
  156 IBLA 144 (2002)......................................................................... 30

*State of Alaska*,
89 I.D. 321 (1982) ........................................................................................ 23

*Appeal of State of Alaska*,
86 I.D. 381 (1979) ........................................................................................ 23

*State of Alaska Forest Serv., U.S. Dep't of Agric.*,
127 IBLA 1 (1993) ....................................................................................... 23

*The Coast Indian Cmty.*,
3 IBLA 285 ................................................................................................... 22

## Statutes

5 U.S.C. § 706 .................................................................................................... 12

5 U.S.C. § 706(2)(A) .......................................................................................... 12

16 U.S.C. § 3103(a) .............................................................................................. 6

16 U.S.C. § 3103(b) .................................................................................. 6, 28, 29

43 U.S.C. § 1635(c)(1) .......................................................................................... 6

Act of June 25, 1910, Pub. L. No. 61-303, §§ 1, 3, ch. 421, 36 Stat. 847,
848 (1910) .................................................................................................... 27

Alaska National Interest Lands Conservation Act (1980–1983), Pub. L. No.
96-487 § 303(2)(A), 94 Stat. 2371, 2390 (1980) ......................................... 5

Alaska National Interest Lands Conservation Act (1980–1983), Pub. L. No.
96-487 § 305, 94 Stat. 2371, 2395 (1980) .................................................... 5

Alaska Statehood Act, Pub. L. No. 85-508 § 6(b), 72 Stat. 339, 340 (1958) ................. 4, 9

Federal Land and Policy Management Act, 43 U.S.C. §§ 1701–1785 ............................ 27

## Other Authorities

43 C.F.R. § 4.410(a) (2024) ............................................................................... 30

43 C.F.R. § 2311.1-3(a) (1964) .................................................................... 27, 28

43 C.F.R. § 2311.1-4(d) (1964) .......................................................................... 27

17 Fed. Reg. 4831 (May 28, 1952) ............................................................... 27, 28

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 6 of 63
v

17 Fed. Reg. 4831 (May 28, 1952) ...................................................................... 29

23 Fed. Reg. 364 (Jan. 21, 1958) ........................................................................ 2

48 Fed. Reg. 7890 (Feb. 24, 1983) ...................................................................... 6

81 Fed. Reg. 10274 (Feb. 29, 2016) .................................................................... 10

1 Rocky Mountain Min. Law Found., *American Law of Mining* §
    14.02[2][a] (2d ed. 2022) ............................................................................ 27

12 Am. Jur.2d Boundaries § 2 (2022) .............................................................. 22

BLM, *Glossaries of BLM Surveying and Mapping Terms* (1980), available
    at https://www.blm.gov/sites/default/files/cadastralglossary.pdf ................. 50

1967 Dictionary of Alaska Place Names ................................................... 32, 33

Executive Order No. 10355, 17 Fed. Reg. 4831 (May 28, 1952) ............... 27, 28

G.H. Wattles, *Writing Legal Descriptions* 5.5 (1979) ...................................... 39

Public Land Order 2213, 23 Fed. Reg. (Jan. 21, 1958) .................................... 18

Public Land Order 2214, 25 Fed. Reg. 12598 (Dec. 8, 1960) .................... *passim*

Public Land Order 2215, 25 Fed. Reg. 12599 (Dec. 8, 1960) .............. 46, 47, 49

Public Land Order 3400, 29 Fed. Reg. 7094 (May 29, 1964) ........................... 27

Solicitor Opinion M-36911, 86 I.D. 151, 161 (Dec. 12, 1978) ........................ 23

*Specifications for Descriptions of Tracts of Land for Use in Executive
    Orders and Proclamations* ........................................................................... 32

Walter G. Robillard, *Brown's Boundary Control and Legal Principles* 501
    (8th ed. 2023) .............................................................................................. 48

When the Secretary of the Interior issued a public land order in 1960 describing the boundary of what would later be known as the Arctic National Wildlife Refuge, he unequivocally defined that area's northwest boundary as "the Canning River." In subsequent decades, the Department of the Interior ("Department") has imaginatively interpreted the words "the Canning River" to mean "the Staines River," even though the Staines is an entirely distinct river located west of the Canning, thereby expanding the Refuge's territory (and decreasing the lands available to the State of Alaska) by over 20,000 acres. The United States' unilateral revision of an unambiguous land order has no legal basis, is contrary to the order's plain and ordinary meaning, and is premised entirely on improper and incorrect post hoc rationalizations that attempt to create ambiguity in the simple phrase "Canning River." And the circumstances on the ground underscore the United States' error, because much of the northwest boundary does not follow any river whatsoever. For the reasons set out herein, this federal land grab is unlawful and must be overturned.

## BACKGROUND

### I.    Establishment of the Arctic National Wildlife Range (1957–1960)

On November 18, 1957, the Bureau of Sport Fisheries and Wildlife applied to the Secretary of the Interior ("Secretary") for a public land order to withdraw land "to establish an Arctic Wildlife Range" in northeastern Alaska. AR002106. This application included a metes and bounds description of the proposed Arctic Wildlife Range (the "Range"). AR000000624. As relevant here, the northwest boundary of the proposed Range was described as running:

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 1 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 8 of 63

westerly along the . . . line of extreme low water, including all offshore bars, reefs, and islands to a point of land on the Arctic Seacoast known as Brownlow Point at approximate Long. 145º51'W. and Lat. 70º10'N.;

thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River;

thence southerly up the said west bank of the Canning River along the mean high water mark approximately seventy (70) miles to the mouth of Marsh Fork of Canning River . . . .

AR002108–09. The application was not accompanied by a map.

On January 21, 1958, the Bureau of Sport Fisheries and Wildlife published a "Notice of Proposed Withdrawal and Reservation of Lands" in the Federal Register, providing the same legal description of the northwest boundary along the Canning River. 23 Fed. Reg. 364 (Jan. 21, 1958). The notice did not include a map.

In response to the application, the Bureau of Land Management ("BLM") completed a preliminary Field Report on April 11, 1958. AR000639–62. The Field Report described the area proposed for withdrawal as "[a]n area lying between the Canning River and the United States-Canadian boundary[.]" AR000639. Maps attached to the Field Report reflect the northwest boundary of the proposed Range as the Canning River:

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 2 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 9 of 63



AR000663 (note area within red dashed circle clearly depicting Staines River to the west of the Range boundary at the Canning River).

On December 6, 1960, the Secretary issued Public Land Order ("PLO") 2214, establishing the Arctic National Wildlife Range. AR000668–69. PLO 2214 provided the same legal description as the withdrawal application, again referencing the Canning River as part of the Range's northwest boundary. AR000668. The order did not include or refer to a map.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 3 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 10 of 63

## II. Alaska's Statehood and Land Selections and the BLM's Survey of the 1964 State Selections (1958–1974)

On July 7, 1958, Congress passed the Alaska Statehood Act, admitting Alaska to the Union. Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958). Alaska was then entitled to select up to 102,550,000 acres of "public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection[.]" *Id.* § 6(b), 72 Stat. at 340.

In 1964, the State filed six selection applications for lands in six townships in northeastern Alaska ("1964 State Selections").[1] *See* AR000673–77. The BLM tentatively approved conveyance of the 1964 State Selections in 1964 and 1965.[2] *Id.* In 1968, the State filed a selection application for additional lands ("1968 State Selections").[3] AR000365–71. These state selections abutted the newly established, and not yet surveyed, Range.

The BLM subsequently surveyed the townships covered by the 1964 State Selections using Special Instructions and the 1947 *Manual of Instructions for the Survey of the Public Lands of the United States*. AR000783. Instead of instructing the surveyors to follow PLO 2214's metes and bounds description, however, the Special Instructions directed the surveyors to follow the Staines River, not the Canning River, to identify the northwest boundary, and to compile the "line of mean high water on the left limit of the

---

[1] Specifically, the State requested lands in Township 7 N., Range 23 E.; Township 7 N., Range 24 E.; Township 8 N., Range 24 E.; Township 8 N., Range 25 E.; Township 9 N., Range 24 E.; and Township 9 N., Range 25 E. AR000670.

[2] The BLM modified its decisions shortly thereafter to exclude land "withdrawn by Public Land Order 2214." AR000680–81.

[3] This application covered lands in Township 6 N., Range 23 E., among other lands. AR000366.

Staines River." AR000852; AR000783; AR000782. As a result, the survey plats and accompanying field notes that were submitted and approved by the BLM in October 1968 depicted the Staines River as the boundary, in contrast to the description in PLO 2214 and earlier maps of the Range. *See* AR000671; AR000682–87. In May 1969, the BLM officially filed the survey plats for these townships. AR002926.

The BLM partially vacated its tentative approvals for two 1964 State Selections and modified the others to conform to the newly proclaimed Range boundary. *See* AR000671; AR000688–94. The BLM also tentatively approved the 1968 State Selection but rejected the State's selection of any "lands . . . which are included within the [Range]." AR000365–66. Patents were then issued for the tentatively approved State land selections. *See, e.g.*, AR000671; AR000685–701.

## III.    The Alaska National Interest Lands Conservation Act (1980–1983)

On December 2, 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA"), expanding the Range to the south and the southwest, and redesignating it the Arctic National Wildlife Refuge (the "Refuge"). Pub. L. No. 96-487 § 303(2)(A), 94 Stat. 2371, 2390 (1980). ANILCA expressly provided that all public land orders currently in effect "with respect to units of the National Wildlife Refuge System in the State shall remain in force and effect except to the extent that they are inconsistent with this Act[.]" *Id.* § 305, 94 Stat. at 2395. "All land within the boundaries described or depicted in any such action shall . . . be included" in the Refuge. *Id.* ANILCA also confirmed the prior tentative approvals of State selections pursuant to the Alaska Statehood Act and vested "all right, title, and interest of the United States" in the State effective as of

the date of tentative approval, to be patented to the State "[u]pon approval of a land survey by the Secretary." 43 U.S.C. § 1635(c)(1). Section 906(d) of ANILCA reiterated that the conveyances of previously selected lands were limited to "vacant, unappropriated, and unreserved lands" not "within the boundaries of any conservation system unit," including the Refuge. *Id.* § 1635(d)(1).

As of December 2, 1980, the Refuge incorporated "the existing Arctic National Wildlife Range" along with additional lands "as generally depicted on a map entitled 'Arctic National Wildlife Refuge', dated August 1980," which the Act declared to be "controlling." 16 U.S.C. § 3103(a); *see* AR000922. The map again incorrectly depicted the Staines River as the Refuge's northwest boundary. AR003549.

On February 24, 1983, Fish and Wildlife Service ("FWS") published a Notice setting out the "legal descriptions of the external boundaries of" the Refuge, "effective as of December 2, 1980." AR000912 (National Wildlife Refuges in Alaska; Description of Boundaries, 48 Fed. Reg. 7890 (Feb. 24, 1983)). Section 103(b) of ANILCA provides that the legal description published in the Federal Register "shall have the same force and effect as if included in this Act[.]" 16 U.S.C. § 3103(b). In contrast to prior descriptions, the 1983 Notice described the relevant portions of the boundary in a clockwise direction, running from:

> along the mean high water line of the left bank of the Canning River, approximately 60 miles to the intersection of the extreme left bank with the mean high tide of the Arctic Ocean in section 15, T. 9 N., R. 24 E., Umiat Meridian;
>
> Thence on an approximate forward bearing of N. 56 1/2º E., approximately 3 1/4 miles to the line of extreme low water of the most westerly tip of the

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                   Page 6 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 13 of 63

most northwesterly island, westerly of Brownlow Point, section 6, T. 9 N., R. 25 E., Umiat Meridian[.]

48 Fed. Reg. at 7930. The map included with the Federal Register Notice again depicted the northwest boundary as following the Staines River, though the map does not label it as such. *Id.* at 7936.

## IV.    The BLM's Survey of the 1968 State Selection (2003–2016)

In summer 2003, FWS undertook another field reconnaissance of the northwest boundary to "determine the location of the extreme west bank of the Staines/Canning River system[.]" *See* AR000374 (Trip Report of Field Investigation). FWS observed no "evidence of any active or recently active channels," but only identified a non-flowing, "former channel breaking off from the Canning River." *Id.*

In September 2003, the BLM communicated with FWS regarding the process to survey the 1968 State Selection township. AR000405. No significant additional survey progress occurred until almost a decade later in 2012, when Amended Special Instructions were approved for the survey. AR000413–18. In accordance with those instructions, the survey was of a fixed and limiting boundary that "follows the physical features of the most westerly channel of the Canning River, now called the Staines River" . . . to the "intersection of the most westerly channel of the Staines River with the left bank of the Canning River, at the line of ordinary high water[.]" AR000293–96.

Ultimately, the BLM's surveys of the 1964 and 1968 State Selections did not place much of the Refuge's northwest boundary along any discernible river channel:



Disputed ANWR Boundary Map

- – – – · U.S. Fish & Wildlife Service Assertion of PLO 2214 Boundary *
- ———— Boundary as Described in PLO 2214 (Refer to Pre-Statehood Application)
- Area of Disagreement
- National Hydrography Dataset
- U.S. Survey 11149
- State of Alaska Patented or Tentatively Approved Land
- PLSS Township
- PLSS Section

F xxxx Bureau of Land Management Case File Number
GS xxxx State of Alaska General Grant Case File Number
* USF&WS source data from www.fws.gov/gis/data, published 9-26-2014

Map Location

NORTH

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 8 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 15 of 63

*See* Compl., Ex. A at Dkt. 34-1. As the State explained to the Interior Board of Land Appeals ("IBLA"):

> Starting at the Arctic coast, BLM's line follows a trickle, easily crossed in a stride without wetting one's feet, which then disappears into unremarkable open tundra with no indicia of a river channel or high water mark . . . then continues for some distance over that open tundra, crossing discontinuous topographic features, before finally descending a 9-foot bank to intersect the mean high water mark of the Canning River.

AR000040 (quoting AR000069); *see* AR000332–33; AR000364; AR000621; *see also* AR000302–64 (State's expert report). Despite these on-the-ground realities, the survey plat and accompanying field notes (AR000283 (plat); AR000288 (field notes)) were submitted and approved by the BLM in July 2015. AR000300.

## V.    The BLM'S Decisions (2016)

### A.    The February 2016 Decision

On October 17, 2014, the State requested priority conveyance of "certain lands west of" the Refuge—i.e., "west of the mean high water mark of the extreme west bank of the Canning River"—based on its 1964 State Selections under Alaska Statehood Act Section 6(b) and top filings under ANILCA Section 906(e).[4] AR000780–81. In February 2016, the BLM responded that "there are no remaining State-selected lands" available for conveyance in these townships because the BLM had conveyed all "available lands" through patents issued in 1974 ("February 2016 Decision"). AR000670. The BLM

---

[4] Through multiple filings between 1981 and 1993, the State submitted reassertions as "topfilings" on all six townships included in the 1964 State Selections.

reiterated that the "boundary of [the Refuge] is the same as the boundary of the Range which was surveyed in 1965 and the survey plats approved in 1968." AR000671.

## B. The November 2016 Decision

In February 2016, the BLM published a "Notice of Filing of Plats of Survey; Alaska" in the Federal Register for the township at issue in the 1968 State Selection. 81 Fed. Reg. 10274 (Feb. 29, 2016). On May 25, 2016, the State submitted a protest. AR003561–72. The State challenged the BLM's adoption of a boundary along the Staines River rather than the Canning River. *Id.* In November 2016, the BLM denied the State's protest, asserting that the "intent of the most westerly boundary" was to follow "the Staines River, a named distributary channel of the Canning River," and that no evidence of contrary intent had been identified ("November 2016 Decision"). AR000421.

## VI. The IBLA Decisions (2020–2024)

The State appealed the February 2016 Decision and the November 2016 Decision (collectively, "the 2016 Decisions") to the IBLA, contending that the BLM erred by pronouncing the Staines River as the northwest boundary. AR002406–08 (February 2016 Decision); AR000903–05 (November 2016 Decision). The appeals were subsequently consolidated. AR000880.

In 2020, the IBLA issued a single decision affirming the 2016 Decisions ("the 2020 Decision"), denying (1) the State's appeal for conveyance of certain 1964 State Selections that were the subject of the February 2016 Decision; and (2) the State's protest of the survey plat for land included in the 1968 State Selection that was the subject of the November 2016 Decision. AR000006–57 (196 IBLA 155 (2020)). The IBLA concluded that "the

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 10 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 17 of 63

drafters of PLO 2214 . . . intended for the boundary . . . to follow the topographic features depicted on contemporaneous maps as the Staines River distributary of the Canning River system." AR000007–8.

In 2022, the State initiated this litigation and challenged the 2020 IBLA Decision. *See* Complaint, at Dkt. 1. The State moved to supplement the administrative record with U.S. Geological Survey ("USGS") quadrangle maps the State contended were available to the drafters of PLO 2214 (the "1951 Maps"). *See* Pl.'s Mot. to Suppl. Admin. Rec., at Dkt. 23. This Court granted the State's motion to supplement the administrative record but remanded the maps to the IBLA for further consideration. Order re Mot. to Supp. Admin. Rec., at Dkt. 29.

On remand, the IBLA issued a second decision ("2024 Decision"). The IBLA modified the 2020 Decision in part to reflect that certain maps were not available to the drafters of PLO 2214. AR005416–37 (198 IBLA 218, 232 (2024)). The IBLA, however, determined that the 1951 Maps, and an additional map that the State provided,[5] did not "[m]aterially [a]lter the [a]nalysis or [c]onclusions" in its 2020 Decision and thus affirmed the 2020 Decision. AR005422; AR00005432–33; AR005437.

The State amended its Complaint to appeal both the 2020 Decision and 2024 Decision. The State now asks the Court to vacate those decisions.

---

[5] In its motion to supplement the administrative record, the State presented an Army Map Service copy of a 1951 USGS Flaxman Island 1:250,000 Quadrangle Map. Pl.'s Mot. to Supp. Administrative Record, at Dkt. 23 Ex. 1, Gervelis Decl. ¶ 14. Before the IBLA on remand, the State presented the 1951 USGS Flaxman Island 1:250,000 Quadrangle Map on which the Army Map Service based its copy. AR005412.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") directs that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law . . . and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The meaning of an unambiguous agency order or regulation is a question of law for which an agency is accorded no deference. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (An agency regulation or order "just means what it means—and the court must give it effect, as the court would any law."); *see, e.g.*, *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022) (declining to accord deference to Forest Service regulatory interpretation because "[i]f the regulation is unambiguous and there is only one reasonable construction of a regulation, then we have no business deferring to any other reading") (cleaned up).

With respect to agency factual findings, the APA specifies that courts should "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also Stacey v. Zinke*, 692 F. App'x 363, 364 (9th Cir. 2017) (reviewing courts in the Ninth Circuit will reverse an IBLA decision "if that decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law") (quoting *Hjelvik v. Babbitt*, 198 F.3d 1072, 1074 (9th Cir. 1999)). Agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*350 Montana v. Haaland*, 50 F.4th 1254, 1263 (9th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). "It is fundamental that the agency must have considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Nat. Res. Def. Council v. Env't Prot. Agency*, 31 F.4th 1203, 1207 (9th Cir. 2022) (internal quotation marks omitted). When evaluating whether an IBLA decision is supported by substantial evidence, the court must "carefully search the entire record to determine whether it contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' and whether it demonstrates that the decision was based on a consideration of the relevant factors." *Stacey*, 692 F. App'x at 364 (quoting *Hjelvik*, 198 F.3d at 1074).

## ARGUMENT

The IBLA erred at every step of its analysis to conclude that the Staines River marks the Refuge's northwest boundary. First, and most significant, PLO 2214 unambiguously establishes the Canning River as the boundary. Second, because PLO 2214 is unambiguous, the IBLA improperly examined extrinsic evidence to attempt to discern drafters' intent. Third, by concluding PLO 2214 establishes the Staines River as the boundary despite plain language to the contrary, the IBLA improperly amends PLO 2214. Finally, even though PLO 2214 is not ambiguous, the IBLA erred by concluding that extrinsic evidence shows the drafters intended to designate the northwest boundary as the Staines River.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Page 13 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 20 of 63

## I.    PLO 2214 Unambiguously Establishes the Canning River as the Refuge's Northwest Boundary.

As an initial matter, the Court must independently interpret PLO 2214 as a matter of law and, further, may not look beyond PLO 2214's text because it is unambiguous. Here, PLO 2214 unambiguously designates the Canning River as the northwest boundary, and the IBLA's conclusion otherwise contradicts the Order's plain text.

### A.    The Court Must Independently Ascertain and Apply the Plain Meaning of PLO 2214's Text.

The meaning of a written legal instrument, like PLO 2214, is a question of law, and to determine such a document's meaning, courts begin with the language contained within the document's four corners. *See, e.g.*, *City & Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1238–39 (9th Cir. 2018) ("[T]he interpretation of an Executive Order begins with its text[.]") (internal quotation marks omitted). Because "the APA require[s] reviewing courts to exercise independent judgment on questions of law," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024), it is the court's job independently to determine whether the text of an agency order is ambiguous and to determine the meaning of the text when it can be reasonably ascertained. *See Kisor*, 588 U.S. at 573 (cautioning that courts must use "all the standard tools of interpretation" to independently determine the meaning of agency regulations and orders); *see, e.g.*, *Idaho Power Co. v. FERC*, 312 F.3d 454, 461–62 (D.C. Cir. 2002) ("If the tariff's language is unambiguous, this court need not defer to FERC's interpretation. After all, a court need not accept an agency interpretation that black means white.") (internal quotation marks omitted); *San Francisco*, 897 F.3d at 1242 (rejecting agency interpretation of Executive Order that was contrary to its unambiguous text).

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 14 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 21 of 63

Therefore, discerning the meaning of the legal description in PLO 2214 is a question of law on which the Court must exercise its independent judgment based on the text within the four corners of the Order.

### B.    A Court May Not Look Beyond the Four Corners of a PLO unless the Text is Ambiguous.

It is axiomatic that an unambiguous agency order must be applied according to the plain meaning of its text. "An order, if it is not ambiguous, must be enforced according to its plain meaning." *S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1237 (10th Cir. 2010); *see also Idaho Power*, 312 F.3d at 461–62. When the language of an agency's order is unambiguous, the inquiry ends there. A court may not go further than applying the plain meaning of the text regardless of the agency's position. *S. Utah Wilderness All.*, 620 F.3d at 1237; *Idaho Power*, 312 F.3d at 461–62 ("It would be a great challenge indeed to devise a more backward interpretation of the tariff than that which FERC urges on the court."). It is only when the language used in an agency order "is 'capable of being understood in two or more possible senses or ways'" and "has several plausible meanings in the context of the facts of the case," that the language can be determined to be ambiguous so that extrinsic evidence can be used to determine the meaning of the language. *S. Utah Wilderness All.*, 620 F.3d at 1238 (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001)).

Moreover, unlike statutes—which are sometimes intentionally drafted to be ambiguous, *see, e.g.*, *Loper Bright*, 144 S. Ct. at 2296—public land orders such as PLO 2214 are instruments that are required to be unambiguous on their face and capable of

construction without reference to extrinsic materials. For example, Departmental guidance existing at the time PLO 2214 was issued states that descriptions of tracts of land in orders and proclamations "should be susceptible of one and only one interpretation" and should be "a model of precision just as far as the available survey data permit."[6] *See Specifications for Descriptions of Tracts of Land* (1931, re-issue, 1941), p. 2. To achieve this goal for boundaries based on natural features such as a river, "the purpose should be to describe the boundary unmistakably, in a manner free from debatable elements." *Id.* at 20. "The description of the tract or tracts of land involved should be technically competent, definite, and susceptible of only one interpretation. It should furnish sufficient information for the identification of the land on the ground." *See* AR003447 (*Specifications for Descriptions of Tracts of Land* (1943, re-issue, 1960). When a natural monument such as a stream is used to define a boundary, "it is essential that each boundary be described so definitely and specifically that there is no uncertainty as to its identification." AR003462.

Given the Court's responsibility to exercise independent judgment as well as the backdrop of guidance under which PLO 2214 was drafted that required its text to be unambiguous, the Court's analysis must begin by ascertaining the plain meaning of PLO 2214's text.

---

[6] For example, the BLM's November 2016 Decision observed that a "patent" ambiguity requires "an uncertainty that clearly appears on the face of an instrument" such that a court "would not be able to derive [from the instrument's language] the intention of the parties" and that such a situation did not apply to PLO 2214. AR000421 n.4.

## C. PLO 2214 Unambiguously Designates the Canning River as the Boundary.

On its face, PLO 2214 designates the "Canning River," and not the Staines River, as the Refuge's northwest boundary. In fact, the Order specifies the Canning River in multiple courses of the boundary description – "Canning River"; the "Marsh Fork of Canning River"; and an "unnamed fork of the Canning River 14 miles from the Marsh Fork." *See* AR003151–52 (third, fourth and fifth courses). When PLO 2214 references rivers and creeks other than the Canning River, it—as one might expect—uses their specific names, such as Chandalar River, Old Woman Creek, Monument Creek, Sheenjak River, Coleen River, and Bilwaddy Creek. AR003151 (seventh – sixteenth, eighteenth – twenty-second courses). And when PLO 2214 references tributaries as part of the boundary description, it identifies those tributaries as such and identifies the precise locations at which they connect to a named river or creek. *Id.* (eighth, fifteenth, sixteenth, nineteenth, twentieth courses). In other words, on its face, PLO 2214 does exactly what one would expect given the guidance that boundaries be drafted in an unmistakable and undebatable way—it uses the actual names of the rivers and creeks that help make up the boundary, and it also describes relevant tributaries of such rivers and creeks with specificity.

What PLO 2214 does *not* do is make any reference whatsoever to the Staines River, nor does it ever use the term "distributary." On its face, then, the express term "Canning River" is unambiguous in denoting the actual Canning River rather than the separate and distinct Staines River or some other asserted distributary of the Canning. Indeed, as discussed below, *see* § IV.B.2, *infra*, maps of the area at the time when PLO 2214 was

drafted nearly universally identified both the Canning and Staines Rivers as separate and distinct. As such, the unambiguous meaning of the term "Canning River" in PLO 2214 is the Canning itself.

Moreover, if the drafter of PLO 2214 had any concern that the text description of the boundaries was not sufficiently clear, a map could have been prepared and included or referenced to illustrate the boundaries. *See* AR003467–69 (*Specifications for Descriptions of Tracts of Land* (1943)). If a map was used and attached, the relevant guidance provides that "[t]he text of the Executive order . . . should include a clause, reading substantially as follows: the boundaries . . . shown upon the map attached hereto and made a part hereof . . . ." AR003467. Alternatively, a map could be cited as an "official supplement" and incorporated by reference in the order. AR003448; AR003469. For example, PLO 2213, published in the same issue of the Federal Register as PLO 2214, included a reference to such a map supporting the description of the lands it withdrew. AR000962 (Public Land Order 2213, 23 Fed. Reg. (Jan. 21, 1958)). PLO 2214, however, did not attach a map or incorporate one by reference, further confirming that the order's boundary description was meant to be and, at the time, understood to be, perfectly unambiguous.

On its face then, PLO 2214 unambiguously provides that the Canning River, and not the Staines River, should be understood as the Refuge's northwest boundary.

### D.    The IBLA's Interpretation of PLO 2214 Contradicts the Order's Plain Language.

The IBLA transformed the straightforward phrase "extreme west bank of the Canning River" (stated in the third course of the PLO 2214 description) into the very

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 18 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 25 of 63

different phrase "westernmost channel of the Staines River"—in so doing converting "Canning" into "Staines" and "west bank" into "westernmost channel." *See* AR000030; AR000033. This transformation not only disregards the plain and obvious meaning of "Canning River," as discussed above, but it also results in an interpretation that cannot be squared with the plain text of PLO 2214.

For example, PLO 2214 never refers to a "channel" in connection with the Canning River or any other description of a river or stream referenced as part of the boundary description. Instead, PLO 2214 refers to "the mean high water mark of the extreme west bank" for the Canning River as well as several other rivers included in the boundary description. *See* AR003151. That makes sense because the terms "bank" and "channel" each have a well-understood meaning:

> The bed of a river is a definite and commonly a permanent channel and consists of the soil which is permanently submerged by the water. The banks of the stream are the elevations of land which confine the waters to their natural channel when they rise to the highest point at which they are still confined to a definite course and channel. The channel is the passageway between the banks through which the water of the stream flows.

*Yellowstone Pipe Line Co. v. Kuczynski*, 283 F.2d 415, 421 (9th Cir. 1960) (internal quotation marks omitted). In other words, "bank" is the "fast land which confines the water of the river in its channel or bed in its whole width." *Howard v. Ingersoll*, 54 U.S. 381, 417 (1852). The channel or bed is the place where the river flows. *See Alabama v. Georgia*, 64 U.S. 505, 513–14 (1860). Similarly, "high-water mark" has a well-understood meaning— it is "the line which the water impresses on the soil by covering it for sufficient periods to deprive it of vegetation." AR004011 (citing *Raide v. Dollar*, 203 P. 469, 471 (Idaho 1921));

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                Page 19 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 26 of 63

*see also Ford City v. United States*, 345 F.2d 645, 648 (3d Cir. 1965) (Ordinary high-water line is "a clear line, as shown by erosion, and other easily recognized characteristics such as shelving, change in the character of the soil, destruction of terrestrial vegetation, and litter."). The high-water mark appears on the "bank." *See* AR004011 (citing *Alabama v. Georgia*, 64 U.S. 505 (1860)); *see also* AR004014. As such, the IBLA's attempt to transform "bank" into "channel"—in service of its effort to turn "Canning" into "Staines"—has no basis in those terms' plain meaning.

Relatedly, when distinct features associated with a river or stream are integral parts of the boundary description, PLO 2214 expressly refers to them. For example, the seventh course is "southeasterly down the west and south banks of a stream which is tributary to the east fork of the Chandalar River," and the ninth course refers to "the crest of a mountain at the head of a branch of Old Woman Creek." AR03151. Likewise, when tributaries were included in the boundary description, PLO 2214 expressly called them out. For example, the seventh course specifically calls out a "tributary." Other examples are found in the eighth ("a point opposite the south bank of a tributary stream which flows from the southeast"), fifteenth ("to its junction with a tributary which flows from the east" at a stated longitude and latitude), and nineteenth ("following down the west bank of the Coleen River . . . to its junction with the tributary stream which flows into the Coleen River from the east" at a stated longitude and latitude). *Id.* PLO 2214 never refers to a feature designated as a "distributary."

Because "Canning River" has a plain and obvious meaning—the Canning River, not Staines River—the IBLA's reinterpretation of PLO 2214 should be rejected as contrary to

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                   Page 20 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 27 of 63

law and arbitrary and capricious because "it is plainly erroneous [and] inconsistent with the order." *See, e.g.*, *San Francisco*, 897 F.3d at 1242 (internal quotation marks omitted).

## II. The IBLA Improperly Looked Beyond the Four Corners to Reach Its Contradictory Interpretation of PLO 2214.

Perhaps in acknowledgement that the plain textual meaning of PLO 2214 was inconsistent with the BLM State Director's decisions regarding the location of the northwest boundary, the IBLA began its review of the State's consolidated appeals by seeking to "discern the intent of the drafters who crafted the language used in PLO 2214, based on the resources then available and relied upon." AR000033. The "resources" the IBLA considered to "discern the intent of the drafters" included several maps and a field report from the BLM files, a metes and bounds description and map found in the National Archives, excerpts from Alaska geographic dictionaries and Alaska place name dictionaries, as well as other documents prepared before or after PLO 2214 was issued. *See* AR000034–38. On remand, the IBLA acknowledged that the so-called 1955 maps it relied upon in its initial decision were not available to the drafters in 1957 but stated that those maps were not "the central foundation of the Decision." AR005432. Instead, the IBLA's "analysis relied upon the collective weight of a host of record elements available during the drafting of PLO 2214 and developed over time during implementation of PLO 2214." AR005432–33 (internal citations omitted).

The IBLA never evaluated whether—let alone found that—the text of PLO 2214 is ambiguous. Instead, the IBLA omitted making that threshold determination and

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 21 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 28 of 63

immediately turned to examining extrinsic evidence to discern the meaning of PLO 2214. That was improper.

### A. The IBLA May Not Look Beyond the Four Corners of a PLO When the Text Is Unambiguous.

Just like a court, the IBLA may only look beyond the four corners of a public land order to discern the drafter's intent as to what is conveyed or withdrawn when there is ambiguity, such as inconsistent or conflicting descriptive calls, in the order's text. *See, e.g.*, *Robert R. Perry*, 87 IBLA 380, 385 (1985) ("The primary rule which the courts apply in construing and interpreting a conveyance where the location of a boundary line is uncertain by reason of inconsistent or conflicting descriptive calls in the conveyance is that the intention of the parties controls and is to be followed."); *accord The Coast Indian Cmty.*, 3 IBLA 285, 291 (citing 12 Am. Jur.2d Boundaries § 2 (2022)); *Robert W. Piatt*, 73 IBLA 244, 246 (1983) ("The language of the [public land] order was clear and unambiguous in its intent."). If there is no ambiguity in the descriptions used in the conveyance, then those descriptions are "to be taken as the conclusive evidence of the intention of the parties." 12 Am. Jur.2d Boundaries § 2 (2022).

The IBLA cites no authority to the contrary. Instead, its cited authorities (AR000031–33) resort to extrinsic evidence in situations where the language in the conveyance is determined to be ambiguous. For example, Solicitor Opinion M-36911, 86 I.D. 151, 161 (Dec. 12, 1978), cited at AR000032 n.179, concerned "descriptive language of the area withdrawn [that was] somewhat ambiguous," and for that reason the Solicitor looked to extrinsic evidence of the drafter's intent to determine the meaning of the language

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 22 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 29 of 63

in the withdrawal, i.e. whether it "might be construed broadly enough to include coastal submerged lands . . . or to limit the withdrawal to the coastline of the Arctic Ocean." *See also State of Alaska Forest Serv., U.S. Dep't of Agric.*, 127 IBLA 1, 5 (1993) (statute was ambiguous so extrinsic evidence properly consulted); *Perry*, 87 IBLA at 384 (section boundary line uncertain due to inconsistent or conflicting calls in surveys); *Appeal of State of Alaska*, 86 I.D. 381, 386 (1979) (applying Solicitor's Opinion M-36911 to submerged lands withdrawn before Alaska statehood by PLO 82 which was subsequently terminated); *but see Udall v. Oelschlaeger*, 389 F.2d 974, 976 (D.C. Cir. 1968) (meaning of "line of mean high tide" in PLO 576 disputed by parties but court did not find the language ambiguous requiring use of extrinsic evidence because other language in PLO 576 explained it).

Others of the IBLA's cited cases concern situations where the extrinsic evidence simply confirms the clear unambiguous language of the document being construed. *See United States v. Alaska*, 521 U.S. 1, 41 (1997) (1923 Executive Order withdrawing submerged lands was clear in its scope and confirmed by extrinsic evidence); *State of Alaska*, 89 I.D. 321, 327 (1982) (Secretary's withdrawal for ANS 131 and statutory authorization for same were both clear that there was no title transfer to the State). Thus, the IBLA, or the Court, may not look outside of PLO 2214 unless it first finds ambiguity.

## B. The IBLA Did Not Find PLO 2214 Was Ambiguous.

Neither the IBLA nor the BLM identified any inconsistent or conflicting descriptive calls within the text of PLO 2214 as would be required to show an ambiguity existed in the language of the order. By contrast, the State repeatedly maintained that PLO 2214 is

unambiguous on its face and therefore that the IBLA had no basis to examine extrinsic evidence bearing on the drafters' intent. *See* AR000275; AR000071; AR000080; AR005266 n.5.

The only time in the many years during which the State and the BLM have disagreed about the interpretation of PLO 2214 that the BLM addressed ambiguity is in two footnotes in the November 2016 BLM State Director decision appealed to the IBLA, AR000421 nn. 4–5 (BLM Dismissal of Protest of the Survey of Township 6 North, Range 23 East (Nov. 8, 2016)). In the first footnote, the BLM State Director observed that there was no "patent" ambiguity in PLO 2214 because such an ambiguity requires "an uncertainty that clearly appears on the face of an instrument" such that a court "would not be able to derive [from the instrument's language] the intention of the parties." AR000421 n.4. In the second footnote, the BLM State Director suggested that PLO 2214 could have a "latent" ambiguity defined as "an ambiguity that does not readily appear on the face of a document" and "becomes apparent only in light of knowledge gained from a collateral matter," in this case due to "the State's earlier public challenges to the [Refuge] boundary location." AR000421 & n.5.

The BLM Director's suggestion in the November 2016 BLM Decision offers a novel view of latent ambiguity because the fact that the State and the BLM (and the IBLA) disagree over the meaning of the calls in PLO 2214 defining the northwest boundary does not demonstrate any ambiguity in the order. Ambiguity is not created simply because parties have different interpretations and dispute the meaning of a writing. *United States v. Gila Valley Irrigation Dist.*, 961 F.2d 1432, 1441 (9th Cir. 1992) ("The fact that the parties

disagree as to the Decree's meaning does not in and of itself establish that the contract is ambiguous."); *see generally John v. United States*, 247 F.3d 1032, 1041 (9th Cir. 2001) ("[S]tatutory ambiguity cannot be determined by referring to the parties' interpretations of the statute. Of course, their interpretations differ. That is why they are in court."); *Chickaloon-Moose Creek Native Ass'n v. Norton*, 360 F.3d 972, 983 (9th Cir. 2004) ("[M]istaken views about an unambiguous agreement do not create ambiguity."); *see also Bank of America Nat'l Trust & Sav. Ass'n v. 203 North Lasalle St. P'ship*, 526 U.S. 434, 461 (1999) (Thomas, J., concurring in the judgment) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong.").

When a boundary description is "clear and complete" like the description in PLO 2214, different interpretations that arise after the fact do not make the description ambiguous. In contrast to PLO 2214, "[a] latent or extrinsic ambiguity exists when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen." *Bolton v. Constr. Laborers' Pension Trust*, 56 F.3d 1055, 1059 (9th Cir. 1995) (internal quotation marks omitted) (break-in-service rule limiting worker benefits was unclear whether it applied to involuntary breaks from the industry as well as voluntary breaks); *see also Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1556 (D.C. Cir. 1991) (explaining "where [a] party seeks to prove latent ambiguity, interpretation urged must be reasonable and resolve

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 25 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 32 of 63

*actual* ambiguity, not *create* one") (citing *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1362 (11th Cir. 1988)).

Thus, the BLM did not argue PLO 2214 was ambiguous, and the IBLA did not find it to be ambiguous. The IBLA therefore had no basis to examine extrinsic evidence concerning the intent of PLO 2214's drafters. Rather, in the absence of an ambiguity, the IBLA was required to apply the plain language of PLO 2214's text—and conclude that the Canning River—as the text specifies—is the Refuge's northwest boundary.

### III. The IBLA's Reinterpretation of PLO 2214 Ignores and Circumvents Established Procedures to Adjust the Boundary.

The IBLA's Decisions are not only legally incorrect as a matter of straightforward textual interpretation, but they are also fatally flawed procedurally because they make boundary adjustments outside of the process provided by Congress to do so. In its Decisions, the IBLA unilaterally adjusted the Refuge's northwest boundary by reinterpreting PLO 2214's reference to the Canning River to mean the Staines River. Since the time PLO 2214 was issued in 1960, however, neither the BLM nor the Department has attempted to adjust the written description of the northwest boundary to refer to the Staines River using established and required procedures that provide notice to the public and Congress. Rather, the reference to the Canning River in PLO 2214 as the northwest boundary remained intact for more than twenty years, was incorporated into ANILCA, and still stands today. The IBLA's unilateral adjustment of the northwest boundary improperly circumvents congressional oversight and public accountability processes.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 26 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 33 of 63

## A.  Procedures to Adjust Boundaries of Withdrawals Require Publication in the Federal Register.

Before the passage of the Federal Land Policy and Management Act in 1976, (codified at 43 U.S.C. §§ 1701–1785), the Secretary adjusted boundaries of land withdrawals using the same procedures that the Secretary used to effectuate the original withdrawals—through public land orders published in the Federal Register pursuant to Executive Order No. 10355. Exec. Order No. 10355 of May 26, 1952, § 1(b), 17 Fed. Reg. 4831 (May 28, 1952) (delegating withdrawal authority to the Secretary); 43 C.F.R. § 2311.1-4(d) (1964); *see, e.g.*, Public Land Order 3400, 29 Fed. Reg. 7094 (May 29, 1964) (adjusting boundaries of Kenai National Moose Range). The Department's regulations also required the BLM to publish notice of proposed withdrawals, and adjustments of withdrawals, to allow the public to "object to, or comment on" the proposed adjustments. 43 C.F.R. § 2311.1-3(a) (1964).

The Executive Order's requirement that the Secretary issue public land orders and publish them in the Federal Register ensured that the Secretary satisfied a statutory requirement to notify Congress of withdrawals. *See* 1 Rocky Mountain Min. Law Found., *American Law of Mining* § 14.02[2][a] (2d ed. 2022); *see generally* Act of June 25, 1910, Pub. L. No. 61-303, §§ 1, 3, ch. 421, 36 Stat. 847, 848 (1910) (authorizing the President to withdraw public lands for public purposes and requiring congressional notification of withdrawals). Moreover, the Department's regulations for public notice of withdrawals recognized the public's interest and right to participate in withdrawal decisions. 43 C.F.R.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 27 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 34 of 63

§ 2311.1-3(a) (1964). Read together, the Department's withdrawal authorities reinforce the importance of complying with procedural rules for adjusting withdrawals.

### B.   Procedures to Adjust Boundaries of Conservation Areas Established by ANILCA Require Notice to Congress.

In ANILCA, Congress established conservation areas, including the Refuge, but limited the Secretary's ability to modify their boundaries. Particularly, Congress allowed the Secretary to make "minor adjustments" to boundaries of conservation areas, so long as the adjustments did not increase or decrease the amount of land within an area by more than 23,000 acres. 16 U.S.C. § 3103(b). To make a minor adjustment, Congress required the Secretary to first notify Congress in writing of the intent to make such an adjustment. *Id.* Therefore, ANILCA reflects Congress' express intent to oversee and assert authority over withdrawals.

### C.   The IBLA's Decision Adjusts the Refuge's Boundary Without the Required Process.

By reinterpreting the reference to the "Canning River" in PLO 2214 to mean the "Staines River," the IBLA effectively adjusted the boundary but without following any of the required procedures. The Secretary never adjusted the boundary by issuing a public land order and publishing it in the Federal Register.[7] *See* Exec. Order No. 10355, 17 Fed. Reg. 4831 (May 28, 1952) of May 26, 1952, § 1(b), 17 Fed. Reg. 4831 (May 28, 1952). Similarly, after passage of ANILCA, the Secretary never adjusted the boundary with notice

---

[7] After January 15, 1965, the Department could not have adjusted the boundary because the BLM had tentatively approved the State's selection applications that covered lands northwesterly of the Canning River. AR000671; AR000673–75.

to Congress. *See* 16 U.S.C. § 3103(b). Now, however, the IBLA unilaterally adjusted the boundary to align with the Department's preference to use the Staines River as the boundary.

The Court cannot allow the Department to circumvent required procedures in this manner. If the Court allows the Department to reinterpret withdrawals and conservation areas to effectively redraw their boundaries, the Court would delegate near-unlimited authority to the Department to unilaterally expand or contract boundaries of withdrawals and conservation areas without any oversight from Congress or the public. Therefore, the Court should reject the IBLA's reinterpretation of PLO 2214 and vacate the IBLA's decisions.

## IV.   Even if PLO 2214 Is Ambiguous, the IBLA Wrongly Concluded that the Staines River Is the Refuge's Intended Northwest Boundary.

Even if PLO 2214 is ambiguous, which it is not, the Court must set aside the IBLA's conclusion that the Staines River is the Refuge's intended northwest boundary. As an initial matter, the Court owes the IBLA no deference when reviewing this conclusion. The IBLA arbitrarily concluded that the "collective weight" of record elements support the Staines River as the intended boundary. Indeed, the record shows the error in the IBLA's determination, and facts revealed through on-the-ground investigation confirm the State's position that the intended boundary was, and remains, the Canning River and not the Staines River.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 29 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 36 of 63

**A.    The Court Owes No Deference to the IBLA's Finding of Intent Behind PLO 2214.**

Not only does the Court owe the IBLA no deference when interpreting an unambiguous agency order such as PLO 2214, *see supra*, the Court also owes the IBLA no deference when discerning the FWS's intent behind the withdrawal application because the IBLA has no authority to review, or expertise in reviewing, FWS decisions. Courts will not defer to agency interpretations of laws the reviewing agency does not administer. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808–09 (2003); *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 750 n.3 (9th Cir. 2021); *accord Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 418 F.3d 1068, 1071 n.5 (9th Cir. 2005); *see also Aera Energy LLC v. Salazar*, 691 F. Supp. 2d 25, 28 (D.D.C. 2010) (declining to defer to IBLA legal interpretation of a statute that IBLA does not administer).

Here, the IBLA lacks authority to review FWS decisions. *See, e.g.*, *Sierra Club, Angeles Chapter, Santa Clarita Group, et al.*, 156 IBLA 144, 165 (2002) ("The administrative review authority delegated to this Board encompasses decisions made by BLM, but does not include review of findings or decisions made by FWS."); *see also* 43 C.F.R. §§ 4.410(a) (2024) (providing that the IBLA reviews decisions of "the Bureau or Office"), 4.400 (defining "Bureau or Office"). Thus, although the question of the intent of PLO 2214 turns on the FWS's intent when drafting the withdrawal application, the IBLA has no expertise in determining this intent. Accordingly, the Court may not defer to the IBLA's interpretation of FWS's intent when drafting PLO 2214.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 30 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 37 of 63

**B.     The IBLA Arbitrarily Concluded the "Collective Weight" of Record Elements Support the Staines River as the Refuge's Boundary.**

In its 2024 Decision, the IBLA asserted that "the collective weight of a host of record elements available during the drafting of PLO 2214 and developed over time during implementation of PLO 2214" allowed it to conclude that the Staines River is the intended boundary. AR005432–33; *see* AR005432 n.104 (citing bases for the IBLA's conclusion). This conclusion is arbitrary for several independent reasons.

First, the IBLA improperly discounted information that squarely supports the Canning River as the boundary. Second, the IBLA moved the location of a natural monument—Brownlow Point—to align with its preferred interpretation of PLO 2214. Third, the IBLA placed too much weight on a hand-drawn map. Finally, a smattering of anecdotal evidence cited by the IBLA does not support the conclusion that the Staines River is the intended boundary.

**1.     The IBLA Improperly Discounted Record Evidence Demonstrating that the Canning River Is the Intended Northwest Boundary.**

To find that the Staines River was the intended northwest boundary, the IBLA discounted the fact that numerous contemporaneous maps identified the Staines River as distinct and separate from the Canning River. Additionally, the IBLA disregarded the BLM's 1958 field report, which identified the Canning River as the northwest boundary.

**a)     The IBLA Disregarded Contemporary Maps Identifying the Staines River as Distinct from the Canning River.**

Nearly every map presented to the IBLA identifies the Staines River as separate and distinct from the Canning River. Specifically, these maps separately label the Staines and

Canning Rivers, including the 1951 Flaxman Island map that the IBLA assumed was available when PLO 2214 was drafted. *See* AR005412 (1951 Flaxman Island map); AR000135; AR000154; AR000219; AR000229; AR000426; AR000617; AR000620; AR000663; AR005245; *cf.* AR000133 (illegible); AR000190 (rivers not labeled); AR000664 (limited-detail map identifies Canning River but not Staines River).

The fact that nearly all maps identify both the Staines and Canning as separate rivers reinforces that, had the drafters of PLO 2214 intended to designate the Staines as the boundary, they would have referenced it rather than the Canning. The IBLA's conclusion that the drafters, when faced with maps that identify both rivers, would have chosen to reference the Canning when intending to mean the Staines is illogical.

To justify this illogical conclusion, the IBLA points to the 1967 Dictionary of Alaska Place Names, which identified the Staines River as a distributary of the Canning River. AR000013; AR000021; AR000030 nn.161–62; AR000034; AR005431 n.94; AR005436 n.132; AR000131. Whether or not a river is a distributary of another river, however, is irrelevant when naming it in a legal description. Otherwise, under the IBLA's rationale, any reference to a river would necessarily include all tributaries and distributaries of that river system. For example, a reference to the "Mississippi River" could be interpreted to mean any and all of its tributaries, which include the Missouri, Ohio, and Red Rivers. To avoid this absurd result, the Department's *Specifications for Descriptions of Tracts of Land for Use in Executive Orders and Proclamations* directs that, when defining boundaries with natural monuments, "it is essential that each boundary be described so definitely and specifically that there is no uncertainty as to its identification."

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                        Page 32 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 39 of 63

AR003462. Thus, the fact that the 1967 Dictionary of Alaska Place Names identified the Staines River as a distributary of the Canning River does not compel the conclusion that a reference to the Canning River necessarily includes the Staines River.

The IBLA also observed that the 1967 Dictionary of Alaska Place Names "placed the Canning reaching Camden Bay at longitude 145°30'W, which is east of the described coordinates for Brownlow Point in the Withdrawal Application, the PLO, and the Dictionary itself." AR000013; *see also* AR005431 n.94; AR000130. This reference, however, is easily reconciled with the metes and bounds description. The Canning River is a wide, braided river, and its mouth's *eastern* bank is southeast of Brownlow Point. *See, e.g.*, AR005245. The metes and bounds description, however, references the Canning River's "extreme *west* bank," which is southwest of Brownlow Point. *See id.* (emphasis added). Accordingly, the characterization of the Staines River in the 1967 Dictionary of Alaska Place Names as a distributary of the Canning River does not defeat the metes and bounds description's explicit reference to the Canning River. Given that nearly all maps refer to the Staines River separately from the Canning River, the IBLA acted arbitrarily by conflating the two. A reasonable person looking at a contemporary map that distinctly labels the Staines and Canning Rivers would not have drafted a legal description referencing the Canning River when they actually meant the Staines River; the IBLA's decision to the contrary defies common sense and reason and does not meet the Department's standards for drafting legal descriptions.

### b) The IBLA Arbitrarily Disregarded the BLM's Field Report.

The IBLA arbitrarily dismissed the BLM's field report, in which the BLM determined that the Canning River is the intended boundary.[8] The BLM prepared this field report in April 1958, less than a year after the FWS wrote the metes and bounds description. *See* AR001974–2000. A map included in the field report depicts the Canning River, rather than the Staines River, as the northwest boundary. AR002000. Importantly, in the field report, the BLM concluded that "[t]he description of the proposed area . . . is sufficiently clear so that it may be plotted on maps commonly available." AR001977. Thus, the BLM found that the metes and bounds description referred to the Canning River, rather than the Staines River, as the northwest boundary.

With thin reasoning, the IBLA rejected the field report. First, the IBLA speculated, "[m]ost importantly," the FWS may not have been aware of it. AR000035–36. Similarly, the IBLA speculated the BLM does not appear to have consulted the FWS about its intended northwest boundary when drafting the field report. *Id.* But the BLM need not have consulted the FWS or made the FWS aware of the report. The BLM found that "[t]he description of the proposed area . . . is sufficiently clear so that it may be plotted on maps commonly available." AR001977. The BLM's finding reinforces that a BLM expert interpreting the metes and bounds description shortly after it was drafted determined that the description unequivocally referenced the Canning River as the northwest boundary.

---

[8] The 2020 Decision describes the April 1958 field report as "preliminary," *see* AR000035; however, the administrative record contains a "final" field report dated April 1958, *see* AR001974.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 34 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 41 of 63

Given that the BLM was the United States' expert agency in interpreting and applying legal descriptions, *see* AR003773, the IBLA acted arbitrarily by disregarding the BLM's own field report simply because the BLM had not conferred with the FWS.

Second, the IBLA dismissed the field report because the report had recommended rejection of the FWS's withdrawal application. AR000035. The IBLA, however, mischaracterized the report's recommendations. The BLM based its recommendation to reject the FWS's withdrawal application on its finding that the FWS had not justified the *need* for the withdrawal, not based on any errors in the legal description. *See* AR001991. More importantly, this recommendation was one of four; two recommendations proffered management measures if the withdrawal proceeded. AR001991–92; *see also* AR001974. Thus, the IBLA inappropriately dismissed the field report based on its incorrect characterization of the report's recommendations.

Third, the IBLA discounted the field report because the BLM had requested it be kept confidential—but again mischaracterized the record. *See* AR000035. The cited correspondence reveals that the BLM sought to keep the report's recommendations confidential because of the controversy surrounding the withdrawal. *See* AR000035 n.198; AR001122–23 (describing "highly sensitive matter with far-reaching effects"); AR001973 (directing that personnel should not "discuss nature of our recommendations outside Bureau"). Nothing in these communications suggests that the BLM's location of the northwest boundary was preliminary or subject to dispute. *See* AR001122–23; AR001973.

Finally, the IBLA observed that, in 1965, the BLM modified its decisions, tentatively approving the State's applications under section 6(b) of the Act of July 7, 1958

to exclude certain acres because they were withdrawn by PLO 2214. *See* AR000035; *see* AR002290; AR002544–45; *see generally* AR003706; AR003709 (original tentative approvals). The IBLA further observed that, at that time, the BLM explained that "the northern boundary of the Reserve was not correctly plotted on the records" and "more of the lands selected . . . are within PLO 2214 than was previously shown on the protractions." AR000035 (alteration in original) (quoting AR002290). From this statement, the IBLA concluded that, in 1965, the BLM rejected its field report and then changed the northwest boundary from the Canning River to the Staines River. *See id.*

The record does not support this conclusion. When the BLM modified its tentative approvals of the State's applications, the BLM reduced the total area of the State's selections by 59,310 acres—nearly triple the number of the acres between the Staines River and Canning River. *See* AR002544 (26,800 acres); AR002545 (32,510 acres). Therefore, on its face, that boundary adjustment appears unrelated to the present issue of whether the Staines River or the Canning River was the intended northwest boundary.

For all these reasons, the IBLA arbitrarily rejected the BLM's field report that had mapped the boundary at Canning River rather than the Staines.

### 2. The IBLA Arbitrarily Moved the Location of Brownlow Point to Justify Its Preferred Boundary.

To conclude that the Staines River, rather than the Canning River, is the intended boundary, the IBLA moved the location of a natural monument referenced in the metes and bounds description—Brownlow Point—a mile to the west. The metes and bounds

description references the Canning River as being three miles in a southwesterly direction from Brownlow Point, stating, in part:

> thence westerly along the said line of extreme low water, including all offshore bars, reefs, and islands to **a point of land on the Arctic Seacoast known as Brownlow Point** at approximate longitude 145º51' W., and latitude 70º10' N.;

> thence **in a southwesterly direction approximately three (3) miles** to the mean high water mark of the extreme west bank of the Canning River; . . . .

AR000935 (emphases added).

The maps accompanying the BLM's surveys identify the boundary as running in a southwesterly direction from the end of a low-lying, transient island, or "sand spit," that extends from the terminus of a peninsula:



*See* AR000787; AR000789 (complete maps).

The State contended that the boundary begins at the terminus of the peninsula, which is known as Brownlow Point. *See* AR000612; AR003657. The IBLA, however,

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                      Page 37 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 44 of 63

determined that Brownlow Point is located at the western tip of the sandspit. *See* AR000049–50; AR005423–24. This conclusion is arbitrary.[9]

First, a government entity has recognized the peninsula as Brownlow Point. The U.S. National Geodetic Survey has two survey control points located on the peninsula, one of which is named "Brownlow Point." AR000854–57; *see* AR000602–03. The BLM's own survey map even identifies this survey control point as "U.S.C.&G.S. Brownlow":



*See* AR000789. Accordingly, the IBLA's conclusion is inconsistent with the official designation of this natural monument.

---

[9] In the 2020 Decision, the IBLA relied on the placement of the label "Brownlow Point" on the 1955 Flaxman Island Quadrangle map near the sand spit. *See* AR0000498. On remand, the State observed that the Army Map Services' copy of the 1951 Flaxman Island Quadrangle map placed the label near the peninsula, rather than the sand spit. AR005280. In the 2024 Decision, the Board clarified that its "observation" regarding the location of the label "is not a material element of the [2020] Decision's analysis or conclusions." AR005423.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                      Page 38 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 45 of 63

Second, the IBLA's location of Brownlow Point at a transitory feature such as a sand spit is inconsistent with principles governing surveys and the establishment of boundaries. These principles direct that "[a] good monument should possess the quality of being easily visible, certain of identification, stable in location, permanent in character, and nondependent on measurement for its location." AR000307 (quoting W.G. Robillard & D.A. Wilson, *Brown's Boundary Control and Legal Principles* 96–97 (5th ed. 2003)); *see also* AR000453 ("[I]t is essential that each boundary be described so definitively and specifically that there is no uncertainty as to its identification."); G.H. Wattles, *Writing Legal Descriptions* 5.5 (1979) ("Natural monuments refer to so-called permanent objects in nature" that do not "possess the habitude of being able to lose their permanency.").

These principles compel the conclusion that Brownlow Point, which rises approximately 10 feet above the Arctic Ocean, is the peninsula's terminus:



*See* AR003761; AR000360 (Picture P.1, Edge of Beaufort Sea, Looking Toward Brownlow Point). By contrast, the sand spit is a low-lying sandy area that is sometimes underwater and subject to wind and tidal forces:

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 39 of 54
Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 46 of 63



*See* AR000361 (depicting the sand spit from the vantage of the peninsula's terminus); AR000362. A conclusion that the metes and bounds description in PLO 2214 refers to the transitory, low-lying sand spit rather than the permanent and prominent peninsula rising above the ocean is inconsistent with basic survey and monumentation principles.

Once Brownlow Point is correctly located, the metes and bounds description demonstrates that the Canning River, rather than the Staines River, is the Refuge's northwest boundary. That description places the "Canning River" as approximately three miles in a southwesterly direction from Brownlow Point. *See* AR000935. A three-mile line running southwesterly from the peninsula (i.e., Brownlow Point), however, does not arrive at the west bank of the Staines River. Instead, the peninsula is approximately 4 ¼ miles from the Staines River[10]:

---

[10] The difference between "approximately three (3) miles" and 4 ¼ miles is significant. The metes and bounds description in PLO 2214 evidences that its drafters were more precise when crafting the legal description. For example, the description includes a call "to a fork in the stream one-half (½) mile above a one and one-half (1½) mile lake[.]" *See* AR000668;

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 40 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 47 of 63



AR005282; *see* AR005245.

By contrast, a three-mile southwesterly line from the peninsula arrives at the west

bank of the Canning River:



AR005281.

---

AR003151. Drafters who took care to identify such short and discrete distances would not
have described a 4¼-mile distance as "approximately three (3) miles."

In the 2020 and 2024 Decisions, the IBLA offered no meaningful justification for disagreeing with the State's conclusion that Brownlow Point is located at the peninsula's terminus, rather than the sand spit. Rather, the IBLA dismissed the State's objections simply as inconsistent with the "historical record." *See* AR000049 ("We have already concluded that the historical record shows otherwise."); AR005424 ("[T]he State's criticism that such a natural monument would be a poor choice for a metes and bounds description does not overcome the historical record evidence indicating that it was the monument chosen."). This rationale arbitrarily refuses to entertain the State's position because it is inconsistent with the IBLA's preferred outcome. *See generally Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024) (rejecting agency acknowledgment of a concern absent explanation).

Additionally, the IBLA rejected the State's position because locating the boundary as running from the terminus of the peninsula to the Canning River would "carve out from [the Refuge] the northwest portion of the peninsula, as well as another outcropping of the coastline between the peninsula and the State's preferred channel"—a result the IBLA reasoned to be inconsistent with the withdrawal's purposes. *See* AR005425. Yet the IBLA's reasoning ignores that PLO 2214 describes the boundary as following the "line of extreme low water, including all offshore bars, reefs, and islands" to Brownlow Point and then turning southwesterly to the mean high water mark of the Canning River's extreme west bank. AR000668. Nothing in the description suggests that the boundary stops following the extreme low water line between Brownlow Point and the Canning River. By

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                              Page 42 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 49 of 63

continuing to follow the extreme low water line, the boundary captures the peninsula in its entirety, contrary to the IBLA's conclusion.[11]

Moreover, the IBLA illogically asserts that the State's location of Brownlow Point "illustrates the leaps required to align the call from Brownlow Point with the State's preferred channel, which its consultant's report describes from historical maps as 'entering the sea right up against the west edge of Brownlow Point' and 'tight up against the western shore at the base of 'Pt. Brownlow.'" AR005425. As the maps reflect, however, Brownlow Point is located on a large peninsula. *See, e.g.*, AR005281. It is clear that the State's expert's report referenced the entirety of the peninsula, rather than its terminus. *Compare id.*, *with* AR005425. The IBLA also ignores that its location of Brownlow Point does not align with the call in PLO 2214. PLO 2214 refers to Brownlow Point at approximate longitude 145°51' W., and latitude 70°10' N., AR000668, but the IBLA's placement of Brownlow Point at the sand spit puts it approximately two minutes west of the referenced longitude and latitude, *see* AR005281. The IBLA's attempt to manufacture an inconsistency in the State's argument falls flat.

Finally, the IBLA offers no response to the State's assertion that the peninsula's terminus is approximately four and half miles from the Staines River and therefore inconsistent with the metes and bounds description's call to a river "approximately three (3) miles" from Brownlow Point. *See* AR005422; AR005426–27. The IBLA sidesteps the

---

[11] Furthermore, any effect of excluding a small amount of land from the Refuge does not justify rewriting the metes and bounds description to effectively move Brownlow Point a mile west into the Arctic Ocean. And this result is more reasonable than the BLM's surveyed location of the northwest boundary, much of which does not follow any river.

issue by concluding that the end of the sand spit is approximately three miles from the Staines River. *See id.* But the IBLA cannot move the location of Brownlow Point—which the United States otherwise has historically recognized to be at the terminus of the peninsula, not the sand spit—to align with its preferred interpretation of PLO 2214. The IBLA's conclusion that Brownlow Point is the sandspit is arbitrary and capricious.

### 3. The IBLA Places Too Much Weight on a Hand-Drawn Map.

The IBLA hinges its determination of drafter intent on an undated, unsigned map that the BLM's counsel found in the National Archives and produced during the administrative appeal process. AR000154. The IBLA concluded that this map constitutes "perhaps the strongest evidence of contemporaneous drafter intent." AR000034; *accord* AR005432 n.104; *see generally* AR000102–03 (citing AR000153). The map, however, raises more questions than it answers.

The IBLA concluded that the map is "a contemporaneous response from the drafters of the metes and bounds description to a request that they graphically depict the course and markers that they were describing, providing clear representation of their intent." AR005434. This conclusion requires multiple logical leaps. The administrative record lacks any information about who drafted the map or when or why. All that is known is that, during the administrative appeal, the BLM's counsel discovered the map with the FWS's draft metes and bounds description in a National Archives file of correspondence related to the Refuge. *See* AR000102; AR000008 & n.7. From this single fact, the IBLA infers that the map represents the final intent of PLO 2214's drafters. The uncertainties surrounding the map's origins do not support the IBLA's conclusion.

Furthermore, the IBLA treats the hand-drawn boundary as determinative of drafter intent while ignoring the questions it raises. *See* AR005435. The map contains stray lines and scribbles (circled in green) that bear no relation to PLO 2214's boundary:



AR000154. The IBLA did not acknowledge these discrepancies, let alone reconcile them with the metes and bounds description. AR005434–35 (finding the map's notations "readily decipherable as attempting to cross-reference the numbering system in the draft metes and bounds descriptions"). More telling, the IBLA disregarded these discrepancies and unquestionably accepted that the Staines River rather than the Canning River as the intended boundary. In fact, the unknown map maker could have also erroneously traced the Staines River rather than the Canning River as the boundary—a likely outcome given the map's scale and the fact that *it does not separately label the Canning River at its mouth*. Thus, the IBLA's conclusion that the map accurately and conclusively depicts drafter intent cannot be reconciled with the questions the map presents.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 45 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 52 of 63

### 4. The Anecdotal Evidence Relied on by the IBLA Does Not Establish that the Staines River Is the Intended Boundary.

Finally, the IBLA relies on a smattering of anecdotal evidence in support of its determination that the Staines River is the intended boundary, even though this evidence is ambiguous and inconclusive.

### a) PLO 2215 Does Not Support the IBLA's Interpretation of PLO 2214.

First, the IBLA points to PLO 2215, which was issued on the same day as PLO 2214, as providing "meaningful indications of the intent behind PLO 2214." AR005432 n.104; AR000034–35; *see also* AR005435–36. PLO 2215 revoked a prior PLO with respect to certain lands. *See* AR000669. In one broad sentence, PLO 2215 stated that approximately five million acres of land would remain segregated from disposal under the public land laws:

> An area . . . which may be described generally as "all lands lying east of Canning River, extending from its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W., to its source in the Brooks Range in approximate longitude 145°13'W, latitude 68°53'N.," and containing approximately 5 million acres.

*Id.*

The IBLA found that this description's reference to longitude 146° W. "identifies a location in immediate proximity to the mouth of the Staines River, while the identified landmark of Flaxman Island lies to the west of the main branches of the Canning River and directly in line with the Staines." AR000034–35. Specifically, the IBLA found that "a line following the marked course of 146° W longitude runs through the heart of Flaxman Island (almost directly over the 'Flaxman' horizontal control point) to a location very close to the

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 46 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 53 of 63

mouth of the Staines River, and substantially west of the State's preferred channel." AR005435–36 (citing AR005412; AR005245).

The IBLA's finding ignores the plain language of PLO 2215 by disregarding the reference to "approximate" longitude 146° W. *See* AR000669. Both the Staines and Canning Rivers are found at "approximate" longitude 146° W.:



AR005245.



AR005412.

Thus, a general reference to an "approximate" longitude could refer to either the Staines River or Canning River. *See, e.g.*, Walter G. Robillard, *Brown's Boundary Control and Legal Principles* 501 (8th ed. 2023) (describing "approximate" as denoting "uncertainty of dimensions to a greater degree than 'more or less' and to a lesser degree than 'about'"). The fact that PLO 2215 describes the longitude using only degrees—rather than using a more exact reference containing degrees, minutes, and seconds—reinforces that its reference to "approximate longitude 146° W." in fact means "approximate." The reference to approximate longitude 146°W. cannot be read as specific to either the Staines or the Canning Rivers and certainly does not resolve the controversy over the northwest boundary.

Because the IBLA erred by reading the legal description in PLO 2215 too rigorously, PLO 2215 does not support the IBLA's interpretation of PLO 2214.

**b)     A 1906 Reference to the Canning Does Not Evidence Drafter Intent.**

The IBLA observed that a 1906 USGS Geographic Dictionary of Alaska "suggest[s] that English explorer Sir John Franklin in 1826 'gave the names Canning and Staines rivers to two mouths of what later came to be understood as the same river (i.e., the Canning)[.]'" AR005432 n.104 (quoting AR000125–27); AR000030 n.162; AR000034. But numerous maps in existence when the FWS drafted PLO 2214 refer to the Canning and Staines Rivers as separate and distinct rivers. *See* § IV.B.2, *supra*. How a 1906 geographic dictionary described the rivers' treatment by an explorer in 1826 does not outweigh the contemporaneous evidence demonstrating that the rivers were perceived to be different rivers.

**c)     The Refuge's Broad Purpose Does Not Evidence Its Intended Northwest Boundary.**

Finally, the IBLA points to the FWS's general purpose for establishing the Refuge as support for its preferred boundary. AR005433 n.104; AR000039. Specifically, the IBLA asserted that the "purposes and justifications" for establishing the Refuge referred to the "north slope *river valleys*, such as the Canning . . . ." AR000039 (alteration in original) (quoting AR000630). From this statement, the IBLA concluded that "splitting the broad delta of the Canning River system with the boundary . . . makes no sense from a habitat or boundary management standpoint." *Id.* (internal quotation marks omitted).

The Staines River, however, cannot be characterized as part of the Canning River's "delta." A "delta" is "[t]he fan-shaped alluvial tract formed at the mouth of a river, when it deposits more solid material there than can be removed by tidal or other currents." BLM,

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 49 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 56 of 63

*Glossaries of BLM Surveying and Mapping Terms* (1980), p. 88, available at https://www.blm.gov/sites/default/files/cadastralglossary.pdf. The Staines River is not part of the "mouth" of the Canning River. Rather, vegetated upland exists between the two rivers separated by a nine-foot elevation change. *See, e.g.*, AR000335 (photo A.2–A.5); AR000346–51. Defining the Refuge's northwest boundary as the Canning River, rather than the Staines River, would not split the Canning River's "delta" and, moreover, would not defeat or undermine the Refuge's purpose.

Therefore, for all of these reasons, the IBLA incorrectly and arbitrarily concluded that drafters of PLO 2214 intended to designate the Staines River, rather than the Canning River, as the northwest boundary.

## V.    The Surveyed Northwest Boundary Does Not Support the BLM's Conclusion that the Staines River Is the Northwest Boundary.

Although the Department maintains that the Staines River is the northwest boundary, the BLM's boundary, as surveyed in 1965 and 2012, does not follow the Staines River. Rather, much of the BLM's surveyed boundary is a line that does not align with any river currently in existence or that existed in 1957. This result renders the decisions arbitrary and capricious. *See 350 Montana*, 50 F.4th at 1263 (agency decision is arbitrary and capricious when the agency "offered an explanation for its decision that runs counter to the evidence before [it]") (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Given that the BLM's boundary determination is inconsistent with both the on-the-ground realities and the plain language of PLO 2214, the Court should set it aside.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 50 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 57 of 63

Most egregious, at a critical point at which the BLM's surveyed boundary turns north away from the main channel of the Canning River in Township 6 N., Range 23 E., "the boundary appears to follow an ancient, vegetated channel that is separated from the active channel of the Canning River by a 9-foot bank." AR000602; *see also* AR000611; AR000334–35. This bank can be seen on the left side of the following picture, with the Canning River on the right side:



AR000335 (photo A4); *see generally* AR000333 (index map of photos). The bank also is apparent on the right side of the following picture:

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                    Page 51 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 58 of 63



AR000335 (photo A.5); *see also id.* (photos A.2 and A.3). Thus, where the BLM's surveyed boundary reflects the Staines River as turning away from the Canning River, no river exists whatsoever.

After, the BLM's surveyed boundary turns away from the Canning River, the boundary then runs 1400 feet into the tundra, not paralleling any river. *See* AR000601. The expanse of tundra can be seen below:



*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 52 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 59 of 63

AR000337 (C.1); *see also id.* (C.2 and C.3); AR000340 (E.1 and E.2); AR000341 (F.1 and F.2); AR000343 (G.1–G.7). Again, the BLM's boundary follows no river channel. For these reasons alone, the IBLA's decision to uphold the BLM's surveyed boundary are arbitrary and must be set aside.

Furthermore, the IBLA rejected the State's analysis of on-the-ground circumstances without meaningful reasoning. The IBLA dismissed the State's analysis because it was not available in 1960, when PLO 2214 was issued, and thus "offers little to no material insight into the meaning of PLO 2214." AR000047–48. The IBLA's rationale misses the point of the State's analysis. The State's analysis does not inform the question of drafter's intent but instead reinforces that the Staines River as the boundary cannot be reconciled with the metes and bounds description.

Fundamentally, the IBLA disregarded these inconsistencies so that the IBLA could justify its finding that the drafters of PLO 2214 intended to designate the Staines River as the Refuge's northwest boundary. *See* AR000048–49 ("In light of our prior conclusion that the record shows the PLO drafters intended for the ANWR boundary to follow the physical features identified on the USGS maps as the Staines River, the cumulative effect of these various observations is actually to confirm that the BLM was successful in its efforts to survey the boundary described in PLO 2214."). But much of the BLM's surveyed boundary does not align with any river, let alone the boundary described in PLO 2214.

Thus, not only does the surveyed boundary conflict with the plain language of PLO 2214, it conflicts with on-the-ground realities. The IBLA's decisions are arbitrary and must be set aside.

## CONCLUSION

For the foregoing reasons, the Court should determine that IBLA's decisions are contrary to law and arbitrary and capricious, vacate the IBLA's decisions, and declare the Canning River to be the Refuge's northwest boundary.

DATED: September 30, 2024.

TREG TAYLOR
ATTORNEY GENERAL

By: */s/ Ronald W. Opsahl*
Ronald W. Opsahl (Alaska Bar No. 2108081)
Ryan E. Farnsworth (Bar No. 2305047)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email: ron.opsahl@alaska.gov
        ryan.farnsworth@alaska.gov


By: */s/ Kathleen C. Schroder*
Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Nicholas R. Peppler (*pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
        gail.wurtzler@davisgraham.com
        mark.champoux@davisgraham.com
        nick.peppler@davisgraham.com

*Attorneys for the State of Alaska*

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                Page 54 of 54

Case 3:22-cv-00078-SLG   Document 39   Filed 09/30/24   Page 61 of 63

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Local Civil Rule 7.4(a)(1) and this Court's order on September 13, 2024, because, excluding the parts of the document exempted by Local Civil Rule 7.4(a)(4), this document contains 12,747 words.

*/s/ Kathleen C. Schroder*

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case 3:22-cv-00078-SLG  Document 39  Filed 09/30/24  Page 62 of 63

## CERTIFICATE OF SERVICE

I certify that on **September 30, 2024**, the foregoing document was served electronically on all parties listed on the CM/ECF system.

_/s/ Kathleen C. Schroder_