TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
MICHAEL K. ROBERTSON
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Phone 202-305-9609
Fax 202-305-0506
michael.robertson@usdoj.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR, *et al*.<br><br>               Defendants. | Case No. 3:22-cv-00078-SLG |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

I.    Factual and Legal Background....................................................................... 1

    A.    Establishment of the Arctic National Wildlife Range ...................... 1

        1.    The Fish and Wildlife Service Proposes the Arctic Wildlife Range ................................................................. 1

        2.    The BLM Processes the Arctic Wildlife Range Withdrawal Application ........................................................... 7

        3.    Public Land Orders 2214 and 2215 Establish the Arctic National Wildlife Range ...................................................... 8

    B.    The Alaska Statehood Act and Alaska's Selection of Lands Near the Northwestern Boundary of the Range ................................. 9

        1.    The Alaska Statehood Act........................................................ 9

        2.    Alaska Selects Lands Near the Northwestern Boundary of the Range ...................................................................... 10

        3.    The BLM Surveys the 1964 Selections................................. 12

    C.    Congress Establishes the Arctic National Wildlife Refuge ............. 14

        1.    The Alaska National Interest Lands Conservation Act......... 14

        2.    The FWS Publishes a Map and Legal Description of the Refuge in the Federal Register............................................. 16

    D.    Procedural Background.................................................................... 17

II.    Standard of Review ..................................................................................... 20

III.    Argument..................................................................................................... 21

    A.    The IBLA Correctly Determined that PLO 2214 Unambiguously Placed the Northwestern Boundary of the Range Along the Staines River ..................................................... 211

        1.    The Text ................................................................................ 222

        2.    History .................................................................................... 25

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.        i
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 2 of 48

3.      Structure ................................................................... 28

4.      Purpose .................................................................... 29

5.      Alaska Relies on a Flawed Plain-Meaning Analysis ........... 30

B.      The IBLA Correctly Concluded that Congress Endorsed Interior's Placement of the Northwestern Boundary of the Range Along the Staines River ........................................ 31

C.      The IBLA Correctly Determined that Congress Delegated Authority to the Secretary of the Interior to Establish the Precise Boundaries of the Refuge and Reaffirm its Interpretation of PLO 2214 ............................................ 34

D.      The State's Arguments are Without Merit ...................................... 39

CONCLUSION ............................................................................. 42

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

ii

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 3 of 48

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Al Otro Lado v. Exec. Off. for Immigr.*,
120 F.4th 606 (9th Cir. 2024) ......................................................................... 30

*Amazon.com, Inc. v. Comm'r of Internal Revenue*,
934 F.3d 976 (9th Cir. 2019) .................................................................... 30, 31

*Badgerow v. Walters*,
596 U.S. 1 (2022)............................................................................... 24, 26, 27

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023)............................................................................. 23, 24, 31

*Boston Sand & Gravel Co. v. United States*,
278 U.S. 41 (1928).......................................................................................... 30

*Carcieri v. Salazar*,
555 U.S. 379 (2009)........................................................................................ 32

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974)........................................................................................ 39

*Greenleaf v. Goodrich*,
101 U.S. 278 (1880).......................................................................... 39, 40, 41

*Kisor v. Wilkie*,
588 U.S. 558 (2019)...................................................... 20, 22, 29, 31, 36

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024).............................................................................. 35, 41

*Minnick v. Comm'r*,
796 F.3d 1156 (9th Cir. 2015) ....................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................................... 20

*Pauley v. BethEnergy Mines, Inc.*,
501 U.S. 680 (1991)........................................................................................ 22

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989)........................................................................................ 30

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)........................................................................................ 32

*Alaska v. United States Dep't of the Interior*                                                    iii
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG     Document 41     Filed 12/13/24     Page 4 of 48

*State of Alaska (On Judicial Remand)*,
   198 IBLA 218 ........................................................................................................ 19

*State of Alaska*,
   196 IBLA 155 ........................................................................................................ 18

*Turtle Island Restoration Network v. U.S. Dept. of,*
   *Comm.*, 878 F.3d 725 (9th Cir. 2017) ................................................................ 20

*United States v. Alaska*,
   521 U.S. 1 (1997) ................................................................................................ 29

*United States v. Am. Trucking Ass'ns.,*
   *Inc.*, 310 U.S. 534 (1940) .................................................................................. 30

*United States v. Ermoian*,
   752 F.3d 1165 (9th Cir. 2013) ............................................................................ 23

*United States v. Hansen*,
   599 U.S. 762 (2023) ............................................................................................ 39

*Van Buren v. United States*,
   593 U.S. 374 (2021) ............................................................................................ 23

*Wisc. Cent. Ltd v. United States*,
   585 U.S. 274 (2018) ...................................................................................... 23, 39

*Williams v. King*,
   875 F.3d 500 (9th Cir. 2017) .............................................................................. 23

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................................................... 19, 20

5 U.S.C. §§ 701-06 .............................................................................................. 20

Pub. L. No. 85-508, 72 Stat. 339 (1958) .............................................................. 9

Pub. L. No. 96-487, 94 Stat. 2371 (1980) ...................................... 14, 33, 36, 39

**Regulations**

17 Fed. Reg. 4831 (May 26, 1952) ........................................................................ 2

23 Fed. Reg. 364 (Jan. 21, 1958) .................................................................... 7, 27

25 Fed. Reg. 12598 (Dec. 9, 1960) ............................................ 8, 22, 28, 29, 37

48 Fed. Reg. 7890 (Feb. 24, 1983) .............................................. 16, 17, 36, 37

81 Fed. Reg. 10274 (Feb. 29, 2016) .................................................................... 18

*Alaska v. United States Dep't of the Interior*             iv
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 5 of 48

## INTRODUCTION

This case presents a boundary dispute between the State of Alaska and the United States. Both parties agree that the dispute is governed by the intent conveyed by a public land order establishing the Arctic National Wildlife Range—the precursor to the Arctic National Wildlife Refuge.

The Department of the Interior concluded that the order placed the boundary of the Range (and later the Refuge) along the westernmost distributary of the Canning River known as the Staines River. The public land order withdrew and reserved for the United States the lands within the boundary, thereby prohibiting those lands from becoming State-owned lands of Alaska. Alaska challenged this conclusion before the Department of the Interior's Board of Land Appeals which issued an opinion affirming the agency's decisions and did the same on remand. Alaska now challenges these decisions before this Court.

The public land order is unambiguous. The text, structure, history, and purpose of the public land order all support the Board of Land Appeals' conclusion. Other actions taken by Congress and the Department of the Interior only embrace and reaffirm this result. Thus, the Board of Land Appeals' decision must be upheld.

## I. Factual and Legal Background

### A. Establishment of the Arctic National Wildlife Range

#### 1. The Fish and Wildlife Service Proposes the Arctic Wildlife Range

Executive Order 10355 delegated to the Secretary of the Interior the authority to "withdraw or reserve lands . . . in the continental United States or Alaska for public

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
NO. 3:22-CV-00078-SLG

1

purposes . . . ."  17 Fed. Reg. 4831 (May 26, 1952).[1]  In accordance with that authority, the Alaska regional office of the Fish and Wildlife Service's Bureau of Sport Fisheries and Wildlife ("FWS") submitted a proposal for the Secretary of the Interior to withdraw lands in the far northeastern corner of the Territory of Alaska for the creation of an "Arctic Wildlife Range."  AR000137-42; AR000145-50.  This June 24, 1957 proposal included metes and bounds describing the boundary of the Range ("June 1957 Metes and Bounds Description").[2]

The June 1957 Metes and Bounds Description connects twenty-three points which delineate the proposed boundary of the Range.  Three consecutive points mark the start of the boundary and then continue in a counterclockwise direction to establish the northwestern corner of the boundary:

> 1.  Beginning at the level of mean high tide on a point of land (Point 1) on the Arctic Seacoast known as Brownlaw [*sic*] Point, being approximately at 145° 51' Long. and 70° 10' N. Lat.;
>
> 2.  thence following the shore in a southerly and westerly direction at the said level of mean high tide for approximately nine (9) miles to the mean high water mark of the extreme west bank of the Canning River (Point 2);

---

[1] This authority flowed from the Pickett Act's authorization for the President to make withdrawals of public lands in certain cases.  Act of June 25, 1910, ch. 421 36 Stat. 847 (1910).

[2] A "metes and bounds description"—unlike a description based on reference to designated rectangular subdivisions of land (for example, by township and range)—describes the location and limits of land by reference to its boundaries.  It generally includes a point of beginning, followed by directions and distance to other reference points before returning to the point of beginning.  *See* Specifications for Descriptions of Land: For Use in Land Orders, Executive Orders, Proclamations, *Federal Register* Documents, and Land Description Databases, 4-5, 21, U.S. Dept. of the Interior, Bureau of Land Mgmt., Cadastral Survey (2017), available at https://www.blm.gov/sites/default/files/SpecificationsForDescriptionsOfLand.pdf.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

2

3. thence following up the said west bank of the Canning River along the mean high water mark for approximately Seventy (70) miles to a point (Point 3) at a main fork of the river at approximately 145° 53' Long. and 69° 12' N. Lat. and 10 ½ miles N. W. of Mt. Salisbury; . . . .

AR000138; AR000146.[3]

Later that year, by telegram dated September 18, 1957, the Washington, D.C. office of the FWS requested that the Alaska regional office "rush your recommendations on location, size, benefits, species covered, and other values" for a proposed wildlife refuge. AR000158. The telegram asked that the regional office "send best maps available." *Id.*

The Regional Director answered by letter the same day. AR000161-63. He responded that "we are attaching material on this proposal furnished us by the National Park Service and Wilderness Society," AR000162, and further added that "[w]e are forwarding two maps, on a scale of four miles to the inch, which are the most detailed available to us," AR000163. Enclosed with the letter was a document titled "Proposed Arctic Wildlife Range." AR000166-76; AR000177-86. That document provided a general description of the proposed boundary, discussed various values associated with the area, and explained that "[a] full description by metes and bounds, numbered to correspond to numbers shown on the map, is available." *Id.* at AR000167, AR000177.

The Regional Director also enclosed with the letter the two referenced maps: a

---

[3] The only apparent differences between the two versions of the June 1957 Metes and Bounds Description found in the Administrative Record are a red circle drawn around the "W." in the third reference point, and below it, a handwritten notation with "E?." Presumably, the differences correct for the fact that the described line lies to the northeast—not to the northwest—of Mt. Salisbury. AR000138; AR000146; *see* AR000154.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

3

numbered map corresponding to the June 1957 Metes and Bounds Description ("1957 Metes and Bounds Map"), AR000153-54; and a map depicting the entire Territory of Alaska, with the boundary and interior of the proposed range more generally identified. AR000190.[4]

The 1957 Metes and Bounds Map contained several important features. First, it located the point of beginning or Point 1 (*i.e.*, Brownlow Point) and added a hand-drawn longitude line identified as "145° 51'" that intersected with that point. AR000154. Second, it located Point 2 at the mouth of the distributary of the Canning River known as the Staines River and drew the segment between Points 2 and 3 southwards along the entire length of the Staines River until its connection with the main stem of the Canning River. *Id.* The relevant portion of the 1957 Metes and Bounds Map is reproduced below.

---

[4] These are the only two maps that were contained in the same folder as the Regional Director's September 18, 1957, letter at the U.S. National Archives in Seattle, Washington. *See* AR000105 n.19.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

4



*Id.*

       The next month, the Washington D.C. office of the FWS requested from the Alaska

regional office the "metes and bounds description of [the] proposed Arctic Wildlife Range

for use in completing [a] withdrawal application now in preparation."  AR000194.

The regional office responded on October 22, 1957, and sent "five copies of a full description by metes and bounds of the Arctic Wildlife Range." AR000198. The regional office explained that "[t]his description is numbered to correspond to the numbers shown on each of the maps of this area which were sent [to] you on September 18, 1957." AR000198.[5] The first three reference points in the October 22, 1957 "Proposed metes and bounds" ("October 1957 Metes and Bounds Description") are identical to the first three reference points in the June 1957 Metes and Bounds Description, except for a correction to the third reference point and its location "N. E. of Mt. Salisbury." AR000202; AR000208; *see supra* n.3.

After receipt of the 1957 Metes and Bounds Map and the October 1957 Metes and Bounds Description, the Washington, D.C. office moved the point of beginning east to the U.S.-Canada border. It also revised the description, including the first three reference points. *See* AR000213-16. Those revisions were then carried forward into the formal November 18, 1957 withdrawal application for the Arctic Wildlife Range ("Withdrawal Application") sent by the FWS to the Secretary of the Interior through the Bureau of Land Management ("BLM"). *See* AR001256-57; AR001270-73. The Withdrawal Application included the following relevant description:

> Beginning at the intersection of the International Boundary line between Alaska and Yukon Territory, Canada, with the line of extreme low water of the Arctic Ocean in the vicinity of Monument 1 of said International Boundary line;

---

[5] The Territory of Alaska map found at the U.S. National Archives did not contain any numbered reference points. AR000190. The 1957 Metes and Bounds Map, AR000154, is the only map in the record numbered to correspond to the metes and bounds description.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

6

thence westerly along the said line of extreme low water, including all offshore bars, reefs, and islands to a point of land on the Arctic Seacoast known as Brownlow Point, at approximate Long. 145°51' W. and Lat. 70°10'N.;

thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River;

thence southerly up the said west bank of the Canning River along the mean high water mark approximately seventy (70) miles to the mouth of [the] Marsh Fork of [the] Canning River at approximate Long. 145°53' W. and Lat. 69°12'N. and 10½ miles E. of Mt. Salisbury; . . . .

AR001270-71; *see also* AR000213-16. The Director of the BLM then instructed the BLM Fairbanks, Alaska office to process the Withdrawal Application and segregate the lands identified. AR001261-63.

## 2. The BLM Processes the Arctic Wildlife Range Withdrawal Application

Upon receipt of the Withdrawal Application, on January 21, 1958, the BLM published a "Notice of Proposed Withdrawal and Reservation of Lands" in the Federal Register. 23 Fed. Reg. 364 (Jan. 21, 1958). The notice repeated the metes and bounds description found in the Withdrawal Application and explained that the FWS sought to establish the "Arctic Wildlife Range for the preservation of the wildlife and wilderness resources of northeastern Alaska." *Id.*

Three months later, the BLM issued its own internal field report on the Withdrawal Application. AR001976-99. The BLM explained that when it received the Withdrawal Application, it plotted the description on a map to estimate the total acreage of the withdrawal. AR001976-77. The BLM estimated that the area of the proposed withdrawal

was roughly 6,400,000 acres. AR001977. The report contained a "Map of Proposed Withdrawal" and a "Map of Alaska." AR001992. Unlike the FWS's 1957 Metes and Bounds Map, the BLM depicted the northwestern boundary of the proposed withdrawal southeast of the Staines River. AR002000-01. The BLM made clear its report was "FOR ADMINISTRATIVE USE ONLY." AR001976. There is no indication anyone outside the BLM ever received its report. *See* AR001973-75; AR001992.

### 3. Public Land Orders 2214 and 2215 Establish the Arctic National Wildlife Range

On December 6, 1960, the Secretary of the Interior issued Public Land Orders ("PLO") 2214 and 2215. Establishing the Arctic National Wildlife Range, 25 Fed. Reg. 12598, 12599 (Dec. 9, 1960); Revoking Public Land Order No. 82 of January 22, 1943 (Northern Alaska), 25 Fed. Reg. 12599 (Dec. 9, 1960). PLO 2214 withdrew "approximately 8,900,000 acres" in northeastern Alaska and reserved their use for "the United States Fish and Wildlife Service as the Arctic National Wildlife Range" ("Range"). 25 Fed. Reg. at 12598. The withdrawal served to "preserv[e] unique wildlife, wilderness and recreational values . . . ." *Id*. PLO 2214 described the boundary of the Range using the identical metes and bounds descriptions as the FWS's Withdrawal Application and the BLM's Notice of Proposed Withdrawal and Reservation of Lands. *Id*.

But there was a problem: the lands contained within PLO 2214 (and millions of other acres in Alaska) had previously been withdrawn under PLO 82 for the prosecution of the war effort during World War II. *See* 25 Fed. Reg. at 12599. Accordingly, the Secretary simultaneously issued PLO 2215, revoking PLO 82. *Id*. Paragraph 3 of PLO 2215 clarified

that lands that had been withdrawn under PLO 82 were now part of the FWS's Withdrawal Application for the creation of the Range. *Id*.

Whereas PLO 2214 generally described the northwestern corner of the Range as being "approximately three (3) miles" from Brownlow Point at the "mean high water mark of the extreme west bank of the Canning River," PLO 2215 put a finer point on that location. PLO 2215 identified the same point as being located at "[the Canning River's] mouth on the Arctic Ocean at Flaxman Island" and with "approximate longitude 146° W." Together, these reference points place the boundary of the Range at the distributary of the Canning River known as the Staines River. *See, e.g.*, AR000618, AR000620, AR005245; *see also* AR000131 (U.S. Geological Survey (USGS) *Dictionary of Alaska Place Names* identifying in 1967 the Staines River as a distributary of the Canning River and placing its mouth at a mere 15 longitudinal seconds east of 146° West).

### B. The Alaska Statehood Act and Alaska's Selection of Lands Near the Northwestern Boundary of the Range

#### 1. The Alaska Statehood Act

Meanwhile, on January 3, 1959, Alaska was admitted to the Union as a State pursuant to provisions in the Alaska Statehood Act. Pub. L. No. 85-508, 72 Stat. 339 (1958). Section 6(b) of the Alaska Statehood Act authorized the State of Alaska to select "one hundred and two million five hundred and fifty thousand acres from the public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection[.]" *Id*. § 6(b), 72 Stat. at 340. Under the Alaska Statehood Act, selections must be made "in conformity with such regulations as the Secretary of the Interior may

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

9

prescribe." *Id*. § 6(g), 72 Stat. at 341.

### 2. Alaska Selects Lands Near the Northwestern Boundary of the Range

In 1964, after the establishment of the Range through PLO 2214, Alaska filed with the BLM applications for general grant lands in several townships, including six townships near the northwestern boundary of the Range under Section 6(b) of the Alaska Statehood Act (collectively, the "1964 Selections"). *See* AR000670-72 (summarizing history of events associated with the 1964 Selections). Running west to east and south to north, the six 1964 Selections consisted of Township 7 North, Range 23 East; Township 7 North, Range 24 East; Township 8 North, Range 24 East; Township 8 North, Range 25 East; Township 9 North, Range 24 East; and Township 9 North, Range 25 East.[6] *See* AR000782. For ease of reference, the six relevant townships that were a part of the 1964 Selections, enlarged from a monument map created the year after, are shown below.

---

[6] For the sake of simplicity, the United States will simply refer to the relevant townships using the designation "Township #-#."

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

10

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 15 of 48



AR000782.

At first, the BLM tentatively approved the conveyance of the six 1964 Selections either in whole or in part.  *See* AR000673-77.  After Alaska raised some uncertainty about the boundaries of its selections, AR000678, the BLM acknowledged that "the northern boundary of the [Range] was not correctly plotted on the records."  AR000679.

By letters dated February 4, 1965, the BLM issued two decisions modifying its prior tentative approvals.  Those decisions excluded from selection lands south and east of the

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

11

Staines River that were unavailable because they had been withdrawn by PLO 2214 for

establishment of the Range. AR000680-81; *see also* Alaska Statehood Act § 6(a).[7]

### 3. The BLM Surveys the 1964 Selections

Prompted by the State's selections, in 1965, the BLM surveyed various lands near

and along the northern coast of Alaska. *See* AR000782; AR000790-802; AR000803-12.

This effort included that portion of the northwestern boundary of the Range that ran along

the Staines River in Township 7-23—the township directly north of Township 6-23 in

which the Staines and Canning diverge. AR000790-802.[8] The surveyor noted multiple

reference points (or "witness points") as "[t]he extreme W. bank of the Canning (Staines)

River." AR000796, AR000798. The surveyor also remarked that "[t]he Staines and

Canning Rivers flow northeasterly through the southeast corner of the township."

AR000800; *see also* AR000783. The survey plat similarly identifies the "(Staines River)"

and notes the Staines River as "a distributary of the Canning River" forming the boundary

of the Range. AR000783.

_____

[7] In the first letter, the BLM excluded from tentative approval lands in Township 9-24, Township 9-25, and Township 9-26—townships that the BLM had mistakenly believed were entirely outside the Range Boundary. AR000679-80. In the second letter, the BLM excluded lands in Township 7-23, Township 7-24, Township 8-24, Township 8-25, and Township 8-26—townships that the BLM had initially believed were bisected by the boundary, but in fact, were either entirely within the boundary or contained more acreage within the boundary than initially determined.

[8] Together, Township 6-23 and the six townships included in the 1964 Selections noted above on p.10, constitute the seven townships at issue in this litigation (the "Subject Townships"). For reference, the Staines separates from the main stem of the Canning in Township 6-23. *See, e.g.*, AR000926. They continue to flow northwest through Township 7-23, Township 7-24, *id*., and Township 8-24, AR000923, before continuing to diverge into separate townships near the coast. *Id*.; *see also* AR000782. Field notes and survey files for the other townships can be found in the record at AR0002910-3772.

In 1968, the BLM accepted the survey plats for the six townships from the 1964 Selections: Township 7-23, Township 7-24, Township 8-24, Township 8-25, Township 9-24, and Township 9-25.  AR000783-89.[9]

On February 7, 1969, as amended on February 19, the BLM issued two decisions further vacating and modifying its 1964 decisions and tentative approvals to conform to the survey plats that were accepted in 1968.  AR000671; AR000723-24; AR000725-29.

At no point in the decades that immediately followed did the State object, appeal, or otherwise challenge the BLM's 1965 decisions, the BLM's 1965 surveys plats that were accepted in 1968, or the BLM's 1969 decisions.  In fact, Alaska concurred with Interior's interpretation of the boundary running along the Staines River before a Special Master of the Supreme Court.  *See* AR000017; AR000222-229.

In 2012, the BLM surveyed the rest of the Range's boundary along the Staines River in Township 6-23.  AR000283.  In preparation for the survey, the BLM issued amended special instructions to establish a fixed boundary along the southernmost 1.6-mile segment of the Staines River rather than treat it as an ambulatory boundary.  AR000413-18.  The survey plat again notes that the boundary "follows the physical features of the most westerly channel of the Canning River, now called the Staines River."  AR000283.  The BLM accepted the survey plat for Township 6-23 in 2015.  *Id*.

---

[9] An amended plat for Township 9-24 was filed in 1992 to segregate meanderable water within the township and adjust the acreage charged against the State of Alaska's land entitlement.  AR000788.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

13

## C. Congress Establishes the Arctic National Wildlife Refuge

### 1. The Alaska National Interest Lands Conservation Act

On December 2, 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA"). Pub. L. No. 96-487, 94 Stat. 2371 (1980). ANILCA redesignated certain lands within Alaska as units of the National Wildlife Refuge System, including the Arctic National Wildlife Refuge ("Refuge"). *Id*. § 303(2). To establish the Refuge, Congress combined "the existing Arctic National Wildlife Range . . . and an addition of approximately nine million one hundred and sixty thousand acres of public lands, as generally depicted on a map entitled 'Arctic National Wildlife Refuge,' dated August 1980." *Id*. Congress made clear that all lands within the boundaries of existing public land orders that pertained to redesignated lands (*i.e.*, lands within the Range) would be included in the corresponding newly created Refuge. *See id.* § 305. The relevant portion of a photograph of Congress's August 1980 Arctic National Wildlife Refuge map ("1980 ANILCA Map") is reproduced below.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

14



AR000135; *see also* AR000133-34.

Congress also directed the Secretary of the Interior to publish "a map and legal description of each change in land management status effected by [ANILCA] . . . in the Federal Register . . . ." *Id*. § 103(b). "[E]ach such description" would then have "the same force and effect as if included in [ANILCA] [.]" *Id*.

*Alaska v. United States Dep't of the Interior*                                                    15
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 20 of 48

## 2. The FWS Publishes a Map and Legal Description of the Refuge in the Federal Register

In accordance with Congress's directive, on February 24, 1983, the FWS published a legal description and a corresponding map of the Refuge in the Federal Register. National Wildlife Refuges in Alaska; Description of Boundaries, 48 Fed. Reg. 7890, 7929-36 (Feb. 24, 1983). The FWS described the Refuge boundary much the same as it had the boundary for the Range in PLO 2214, though in a <u>clockwise</u> direction and with the lands added by Congress in ANILCA. The FWS described the relevant portion of the boundary as running east-to-west along a straight line until intersecting with

> the line of mean high water on the west bank of the Canning River, Tps. 1 and 2 S., R. 25 E., Umiat Meridian;
>
> Thence northerly, along the mean high water line of the left bank of the Canning River, approximately 60 miles to the intersection of the extreme left bank with the mean high tide of the Arctic Ocean in section 15, T. 9 N., R. 24 E., Umiat Meridian;
>
> Thence on an approximate forward bearing of N. 56 ½° E., approximately 3 ¼ miles to the line of extreme low water of the most westerly tip of the most northwesterly island, westerly of Brownlow Point, section 6, T. 9 N., R. 25 E., Umiat Meridian . . . .

*Id.* at 7930 (hereinafter "1983 Refuge Description"). The 1983 Refuge Description noted that several "USGS quadrangle maps were used to prepare the legal description for the [ANWR]." *Id.* at 7935. One of those maps was a 1955 Flaxman Island (A-4) map, drawn on a 1:63,360 scale. *Id*. A version of that map (featuring subsequent hydrographic data and topography) is included in the Administrative Record and the relevant portion is reproduced below.



AR000620.

The FWS also published a map of the Refuge alongside the legal description. *Id.* at 7936. That high-level map traces the northwestern corner of the boundary along the Canning River until continuing along an unlabeled distributary of the river located where the Staines River is located and empties into the Arctic Ocean just south of Flaxman Island. *Id.*

### D. Procedural Background

By letter dated October 17, 2014, the State requested priority conveyance of lands within the six townships that were included within its 1964 Selections and were the subject

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

17

of the BLM's related decisions and survey plats in the 1960s.  AR000780-81.

On February 2, 2016, the BLM responded and explained that there were no lands remaining available for selection within the six townships.  AR000670-72.  All lands within those townships were either conveyed to the State or were "within the boundary of the Arctic National Wildlife Range . . . , created by Public Land Order (PLO) 2214." AR000670.

Meanwhile, the BLM had accepted the plat and field notes from the 2012 survey of Township 6-23 on July 24, 2015.  AR000300.  After responding to the State's inquiry, the BLM published a Notice of Filing of Plats of Survey for Township 6-23.  81 Fed. Reg. 10274 (Feb. 29, 2016).   The State submitted a timely protest.  AR003604.  On November 8, 2016, the BLM denied the State's protest.  AR000419-24.

The State appealed the BLM's February 2, 2016 letter explaining that no lands remained available for selection within the six townships from its 1964 Selections (IBLA 2016-109) to the Department of the Interior's Board of Land Appeals ("IBLA").  The State separately appealed the BLM's denial of its protest to the survey of the seventh township, Township 6-23 (IBLA 2017-55).  Both matters turned on the proper interpretation of PLO 2214 and whether the intended boundary of the Range (now Refuge) ran along the Staines River or another channel of the Canning River further east.

After consolidation, on November 9, 2020, the IBLA issued a decision denying the State's request for priority conveyance of the six townships and denying the State's protest to the official filing of the survey plat for Township 6-23.  AR000006-57 (196 IBLA 155). In a thorough fifty-two-page opinion, the IBLA carefully detailed the history of the Range

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

18

and Refuge, and the history of the parties' dealings concerning the Subject Townships. *See* AR000008-23. The IBLA rejected the United States's argument that the State's appeal of the 1960 decisions was barred by the doctrine of administrative finality. *See* AR000024-28. The IBLA then explained that the text of PLO 2214, and historical and modern evidence in the record, supported the United States's position that the Secretary, in issuing PLO 2214 intended to place the boundary of the Range along the Staines River. *See* AR000028-40; AR000045-47. The IBLA then rejected the State's arguments based on its own observations, modern fieldwork, and its criticisms of the BLM's monumentation and survey. *See* AR000040-45; AR000047-46. The IBLA concluded that the State had failed to satisfy its burden of demonstrating error in the BLM's decisions and survey that found the relevant lands were within the boundary of the Range and unavailable for selection by the State in 1964. *See* AR000057.

The State then filed a Complaint on April 6, 2022, appealing the IBLA's decision to this Court. Compl., ECF No. 1. The Court remanded the case and directed the IBLA to consider twenty USGS maps that the State had failed to present to the IBLA in the first instance. Order granting 23 Mot. to Suppl. Admin. R., ECF No. 29. On remand, the IBLA considered those maps and reaffirmed its prior decision. AR005416-37 (198 IBLA 218). The State then filed a one-count Amended Complaint, alleging that the IBLA's initial decision and reaffirmation on remand were arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Am. Compl., at 23, ECF No. 34.

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

19

## II.    Standard of Review

Judicial review of IBLA and BLM decisions is governed by the APA, 5 U.S.C. §§ 701-06.  The APA directs that reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  *Id*. § 706(2)(A).

When reviewing an agency interpretation of its own pronouncements, first, the court must determine whether the pronouncement is "genuinely ambiguous" using all available tools of interpretation, including its "text, structure, history, and purpose . . . ."  *Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019).  If it is not, then the agency pronouncement "just means what it means—and the court must give it effect, as the court would any law."  *Id*. at 575.

Against this framework, to survive APA scrutiny, an agency decision interpreting its own pronouncements must still "articulate a satisfactory explanation for its action." *Turtle Island Restoration Network v. U.S. Dept. of Comm.*, 878 F.3d 725, 732 (9th Cir. 2017) (internal quotation marks omitted) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Such an explanation will be lacking, and a court may find an IBLA decision or other agency action arbitrary and capricious, if the agency relied on unintended factors, overlooked an important factor, "offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*. at 732-33 (internal quotation marks omitted).

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

20

## III.    Argument

At its core, the question before the Court is simple: Where did the Secretary intend to place the northwestern boundary of the Range when he issued PLO 2214?  The IBLA correctly found that the "intended boundary follows the Staines River."  AR000038.

Three reasons confirm this result.  First, PLO 2214 unambiguously placed the boundary along the Staines River.  Contrary to the State of Alaska's superficial and decontextualized reading of PLO 2214, proper analysis of the text, structure, history, and purpose of PLO 2214, requires this result.  Second, in passing ANILCA, Congress ratified Interior's interpretation of PLO 2214.  Even if there were any doubt regarding the placement of the boundary—and there was not—Congress laid it to rest.  Finally, Interior's construction of PLO 2214 and Congress's endorsement is reaffirmed elsewhere in ANILCA by Congress's express delegation to the Secretary of authority to describe the new Refuge boundary, after which Interior continued to consistently place it along the Staines River.

Alaska misreads the applicable law and relevant texts in violation of various canons of construction and ignores interpretive tools like the history of the creation of the Range and the Refuge.  Accordingly, the IBLA's decision concluding that the State failed to "demonstrate error in the appealed Decisions or in BLM's performance of the surveys underlying those Decisions," AR000057, must be affirmed.

### A.  The IBLA Correctly Determined that PLO 2214 Unambiguously Placed the Northwestern Boundary of the Range Along the Staines River

The Range was a conservation unit managed by Interior and established through the

publication of PLOs 2214 and 2215 in the Federal Register.  25 Fed. Reg. 12598, 12599 (Dec. 9, 1960).  PLO 2214 described the boundary of the Range, in a counterclockwise direction, beginning at the U.S.-Canada border, then running west along the Arctic Seacoast to "Brownlow Point, at approximate Long. 145°51' W. and Lat. 70°10'N."  *Id.* at 12598.  From there, the boundary continued "in a southwesterly direction approximately three (3) miles to  . . . the extreme west bank of the Canning River" then "southerly up the said west bank of the Canning River . . . approximately seventy (70) miles . . . ."  *Id.*  Neither the term "the extreme west bank of the Canning River" nor "the Canning River" were defined.

To determine the meaning of the Secretary's language identifying a point three miles southwesterly from Brownlow Point at the extreme west bank of the Canning River, the Court must first determine whether the text is capable of only one possible interpretation or is genuinely ambiguous and thus capable of multiple interpretations.  *See Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).  "To make that effort, a court must 'carefully consider[]' the text, structure, history, and purpose" of the law at issue.  *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)).  Each of these factors demonstrates that PLO 2214 is unambiguous and can only support one interpretation: that the Secretary intended the Staines River, as the then-understood westernmost distributary of the Canning River, to serve as the northwestern boundary of the Range.

### 1.  The Text

The starting point for any exercise in textual interpretation is the text at issue.  *See*

*Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) (quoting *Van Buren v. United States*, 593 U.S. 374, 381 (2021)). Two aspects of PLO 2214 demonstrate that the drafter intended the boundary to run along the Staines River: (1) the references in various forms to "the Canning River" and its contemporaneous definitions; and (2) the location, direction, and distance connecting the identified reference points.

First, PLO 2214 refers to the "extreme west bank of the Canning River" and "the Canning River." 25 Fed. Reg. at 12598. Although neither term is defined and neither lends itself to a common or ordinary meaning, "'[s]ometimes context indicates that a technical meaning applies'" to a given term. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) ("Scalia & Garner")). "Every field of serious endeavor develops its own nomenclature—sometimes referred to as *terms of art* . . . which often differ[ ] from common meaning." Scalia & Garner, at 73. But even where a word or phrase is not a term of art, it is entirely proper to consult contemporary sources to help explain the term's ordinary meaning. *See, e.g.*, *Wisc. Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018).

Therefore, to understand what the Secretary meant by the "Canning River" and in particular the "extreme west bank of the Canning River," it is necessary to look to how the "Canning River" was understood by the Secretary and the FWS at the time of drafting in 1960. *See Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017) ("[W]e examine contemporaneous sources to determine the legal meaning of the term at the time Congress employed it in the statute.").

In 1960, it was understood that the Staines River <u>was</u> a part of the Canning River—

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

23

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 28 of 48

it was one of many distributaries of the Canning River which became highly braided and formed a wide river delta as it emptied into the Beaufort Sea.  For example, the 1906 USGS Geographic Dictionary of Alaska described the Staines and Canning as "now thought to be two mouths of the same river."  AR000126; *see also* AR000127 (providing an entry for the Staines River that simply states "see Canning").  Even after the creation of the Range, the Department of the Interior continued to recognize the Staines as a "distributary of [the] Canning River."  AR000583.  Therefore, it is reasonable to conclude that the drafters understood that any reference to "the Canning River" would have necessarily included the Staines River, but the reverse would not have held true.  Contrary to the State's argument, the drafters' choice of "the Canning River" was not to the exclusion of the Staines River, but was intended to include the Staines River.  The IBLA recognized this historical understanding of the Staines and Canning Rivers and properly applied that understanding to the text.  *See* AR000034.

The text's modification of "the Canning River" with specific reference to the "extreme west bank" only buttresses this interpretation.  When a drafter chooses to include particular language in one section but omit it in another, courts "generally take the choice to be deliberate."  *Bartenwerfer*, 598 U.S. at 78 (quoting *Badgerow v. Walters*, 596 U.S. 1, 11 (2022)); *see* 25 Fed. Reg. 12598.  The descriptor "extreme west bank" implies multiple west banks and demonstrates that the Secretary intended for the furthest western distributary of the Canning River—the Staines River—to form the boundary.  Together, these terms support Interior's interpretation.

Second, the location, direction, and distance connecting the second and third

*Alaska v. United States Dep't of the Interior*                                              24
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 29 of 48

reference points place the boundary along the Staines River. Those reference points direct that the boundary run from "Brownlow Point, at approximate Long. 145°51' W. and Lat. 70°10'N.; thence in a southwesterly direction approximately three (3) miles." 25 Fed. Reg. 12598, 12599 (Dec. 9, 1960). The 1957 Metes and Bounds Map is the only map found in the Administrative Record that can be said with any confidence to have been before the drafters of the earlier Withdrawal Application replicated by the Secretary in PLO 2214. But using any relevant map in the Administrative Record that could have been available in 1960, a bound drawn from Brownlow Point in a southwesterly direction for "approximately three (3) miles" places the boundary at the mouth of the Staines River. By contrast, a bound drawn from Brownlow Point to other distributaries of the Canning River would have followed a southeasterly, due south, or, at best, a south-southwesterly course. *See e.g.* AR000154 (1957 Metes and Bounds Map); AR000618; AR005245; *see also* AR000620 (1955 USGS Flaxman Island Map).

## 2. History

Closely tied to the text of PLO 2214 is the history underlying its development. The metes and bounds description in PLO 2214 can be traced back from PLO 2214 to the BLM's 1958 Notice of Withdrawal, then to the FWS's 1957 Withdrawal Application, and ultimately to the Alaska regional office's original June 1957 Metes and Bounds Description. The contemporaneous materials before the FWS and the way the text changed (and did not change) based on those materials confirm that the Staines River was intended to be the northwestern boundary of the Range.

In 1957, the regional office sent to the Washington, D.C. office of the FWS several

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

25

Case 3:22-cv-00078-SLG   Document 41   Filed 12/13/24   Page 30 of 48

materials for use in developing PLO 2214. Those materials included a letter, AR000161-63; a general description of the proposed boundary, AR000166-87; the numbered 1957 Metes and Bounds Map showing the Staines River as the intended northwestern boundary of the proposed Range, AR000154; and the corresponding June 1957 Metes and Bounds Description. AR000197-99; AR000201-06.

The only maps before the FWS in 1957 that could help explain its intent when it drafted the Withdrawal Application are the numbered 1957 Metes and Bounds Map, AR000154, and the map depicting the Territory of Alaska, AR000190. But only the 1957 Metes and Bounds Map is of sufficient scale to be helpful here. *See* AR000154. Moreover, the 1957 Metes and Bounds Map is the only numbered map of the era found anywhere in the Administrative Record. It marks the proposed boundary running along the Staines River and was numbered to correspond to the Alaska regional office's June 1957 Metes and Bounds Description. *Id*.

Nearly the entirety of that metes and bounds description—and by extension its reliance on the 1957 Metes and Bounds Map—was carried forward into the Withdrawal Application by the FWS and adopted by the Secretary in PLO 2214. As the IBLA recognized, the 1957 Metes and Bounds Map is "perhaps the strongest evidence of contemporaneous drafter intent," and "[t]he fact that the FWS metes and bounds description was carried forward to the PLO demonstrates that this intent prevailed through the ultimate Secretarial action." AR000034. Alaska has not identified any other contemporaneous map that could have potentially been used to convey a contrary intent.

But the Alaska regional office's June 1957 Metes and Bounds Description was not

*Alaska v. United States Dep't of the Interior*                                        26
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG   Document 41   Filed 12/13/24   Page 31 of 48

transcribed verbatim into PLO 2214. With the regional office's 1957 Metes and Bounds Map and corresponding metes and bounds description in hand, the Washington, D.C. office made two key changes. First, the Withdrawal Application expanded the Range along the coast from the "level of mean high tide" to the "line of extreme low water." *Compare* AR000202 *with* AR000624-25. Second, it also expanded the Range by changing the boundary from "following the shore . . . for approximately nine (9) miles" between reference points (a distance already beyond the State's preferred location), to simply running "in a southwesterly direction approximately three (3) miles" across the Arctic Ocean. *Id*. The Withdrawal Application retained the reference points to "Brownlow Point" and the "extreme west bank of the Canning River." The same language was then transcribed by the BLM when it published the Notice of Proposed Withdrawal and Reservation of Lands, 23 Fed. Reg. 364 (Jan. 21, 1958), and finally in PLO 2214 by the Secretary of the Interior.

The Washington, D.C. office did not change the reference point to the "extreme west bank of the Canning River." That phrase continued to place the reference point at the mouth of the Staines River—understood to be part of the Canning River—according to dictionary sources of the time and the 1957 Metes and Bounds Map. Instead, it made changes along the coast that <u>increased</u> the size of the Range in that area relative to the regional office's original description.

After the FWS submitted the Withdrawal Application to the BLM, the BLM served largely as an intermediary. The BLM published the same metes and bounds description crafted by the FWS. The BLM also developed its own map while processing the

*Alaska v. United States Dep't of the Interior*                                                                27
Defs.' Mem. in Opp.
NO. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 32 of 48

Withdrawal Application. Although the State relies heavily on BLM's map, *see, e.g.*, Pl.'s Mot. for Summ. J., 2-3, ECF No. 33, there is no indication in the record that the BLM's own internal map was ever provided to the FWS or the Secretary of the Interior before the drafting of PLO 2214. This map is therefore irrelevant to understanding the FWS's or the Secretary's intent. The history of PLO 2214 reveals that the Secretary deferred to the FWS's intent when it drafted the Withdrawal Application based on the Alaska regional office's 1957 Metes and Bounds Map and its June 1957 Metes and Bounds description, and intended to place the boundary along the Staines River.

### 3. Structure

PLO 2214 was not issued alone; rather, its publication coincided with PLO 2215, which also supports Interior's unambiguous reading. 25 Fed. Reg. 12598, 12599 (Dec. 9, 1960). PLO 2215 revoked PLO 82 to free up lands for the Range that had previously been withdrawn because of World War II. *See id.* But PLO 2215 also provided additional details confirming the placement of the northwestern boundary of the Range along the Staines River.

PLO 2215 referred to the area withdrawn by PLO 2214 for use as the Arctic National Wildlife Range "as all lands lying east of [the] Canning River, extending from its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W., to its source in the Brooks Range . . . ." *Id.* (internal quotation marks omitted). As the IBLA accurately observed, "[t]his description identifies a location in immediate proximity to the mouth of the Staines River." AR000034. Maps of the era place the mouth of the Staines River at almost exactly longitude 146° W. *See, e.g.*, AR000154 (1957 Metes and Bounds Map);

AR000618; AR005245; AR000663-64; *see also* AR000620 (1955 USGS Flaxman Island Map).

Moreover, just a few years after PLO 2215, the USGS Dictionary of Alaska Place Names located the mouth of the Staines River flowing into Lion Bay at longitude "145°59'45" W"—just 15 longitudinal seconds to the east of longitude 146° W. Accordingly, placing the boundary even further east, along the State's chosen distributary of the Canning River, would be inconsistent not only with the FWS's and the Secretary's description of the metes and bounds outlined in PLO 2214, but also with how the Secretary described the Range as a whole in PLO 2215.

### 4. Purpose

Finally, courts consider the overall purpose of legal texts when attempting to discern whether any genuine ambiguity exists. *Kisor*, 588 U.S. at 575.

The express purpose of PLO 2214 was for "preserving unique wildlife, wilderness and recreational values[.]" 25 Fed. Reg. 12598, 12599 (Dec. 9, 1960); *see also United States v. Alaska*, 521 U.S. 1, 52 (1997) (recognizing the importance of the habitats encompassed by the Range). The IBLA agreed that placing the boundary at the Staines River is more consistent with that purpose from a management perspective and would keep the entire Canning River delta system within the Range. *See* AR000039. Plus, as maps of the era conveyed, drawing that line from the tip of Brownlow Point at the line of extreme low water would not risk splitting any reefs, islands, or bars between federal and state control. The State's proposed boundary, however, would sever geographic features in the area, including the peninsula from which Brownlow Point extends, leaving parts of those

*Alaska v. United States Dep't of the Interior*                    29
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG   Document 41   Filed 12/13/24   Page 34 of 48

features subject to management by the FWS and part subject to State control.  There is no evidence that the FWS or the Secretary intended to create such an arrangement.

### 5.  Alaska Relies on a Flawed Plain-Meaning Analysis

The foundational defect that permeates Alaska's opening brief is its misreading of the law on interpretation.  Alaska contends that the Court must look to the text—and only the text—to determine whether an agency's regulation, or in this case public land order, is ambiguous.  *See* Pl.'s Mot. 14-16.  But Alaska's overly restrictive framing of the law, limiting the Court's review to the "four corners" of the PLO relies on non-binding precedent, ignores three of the four factors courts must analyze when interpreting legal texts, is contrary to binding precedent from the Supreme Court and the Ninth Circuit, and is ultimately unpersuasive.  *See* Pl.'s Mot. 15 (premising its arguments on cases from the 10th Circuit and D.C. Circuit).

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction."  *Amazon.com, Inc. v. Comm'r of Internal Revenue*, 934 F.3d 976, 984 (9th Cir. 2019) (quoting *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015).  Contrary to Alaska's argument, courts do not construe legal texts in a vacuum.  *See, e.g.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 615 (9th Cir. 2024).  This is because "the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'"  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989) (quoting *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48 (1928)); *see also id.* (citing *United States v. Am. Trucking Ass'ns., Inc.*, 310 U.S. 534, 543-44 (1940) ("When aid to construction of the meaning of words . . .

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

30

is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'") (citations omitted).

Instead, as *Kisor* made clear, the Court's "'legal toolkit' includes careful examination of 'the text, structure, history, and purpose of a regulation.'" *Amazon.com, Inc.*, 934 F.3d at 984 (quoting *Kisor*, 139 S. Ct. at 2415). Alaska asks the Court to make the ambiguity call too early, without the aid of all the tools at the Court's disposal. But it is only after applying all of those tools that the Court should determine whether the text is genuinely ambiguous or capable of only one interpretation.

PLO 2214 is unambiguous. Its text, history, structure, and purpose all express an intent on the part of the drafter of PLO 2214 to place the northwestern boundary of the Range along the Staines River distributary of the Canning River. The IBLA reasonably reached this same conclusion, and its decision should be upheld.

### B. The IBLA Correctly Concluded that Congress Endorsed Interior's Placement of the Northwestern Boundary of the Range Along the Staines River

While the language of PLO is unambiguous, when it comes to questions of agency interpretation, Congress often has the last word. Congress passed ANILCA in 1980—twenty years after the creation of the Range. Among other things, ANILCA established the Arctic National Wildlife Refuge—the successor to the Range—using part of the Range's boundary to form part of the Refuge's boundary. Congress had the opportunity to overrule Interior's interpretation of PLO 2214 setting the Range boundary. Instead, the text of ANILCA reveals that Congress endorsed Interior's interpretation.

Matters of statutory interpretation start with the statutory text. *See Bartenwerfer v.*

*Buckley*, 598 U.S. 69, 74 (2023). When interpreting statutes generally, where the text of the statute is plain and unambiguous, courts must simply "apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Here, two key aspects of ANILCA demonstrate that Congress embraced Interior's interpretation of PLO 2214.

First, to create the Refuge, Congress added millions of acres of public lands to "the existing Arctic National Wildlife Range." *Id.* Congress could have, in essence, told Interior that Interior got it wrong when it implemented PLO 2214 and placed the Range's boundary along the Staines River. Congress could have made clear that the Range had, in fact, been bounded by a different distributary of the Canning River and that the Refuge was bounded by that distributary as well. But Congress made no such proclamation. Instead, acting with full knowledge of the history of the Range, its creation, and Interior's establishment of its boundaries, Congress incorporated the "existing" Range—that is, how Interior understood the Range to exist at that time—into the newly created Refuge.

Second, when it incorporated the Range into the Refuge, Congress described the new general boundaries of the Refuge by reference to a specific map, "entitled 'Arctic National Wildlife Refuge,' dated August 1980." Pub. L. No. 96-487, 94 Stat. 2371, § 303(2) (1980). The United States has been unable to locate the original version of this August 1980 Refuge Map within its own records. The State of Alaska, however, is in

*Alaska v. United States Dep't of the Interior*                                              32
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

Case 3:22-cv-00078-SLG   Document 41   Filed 12/13/24   Page 37 of 48

possession of photographs depicting the August 1980 Refuge Map. Those photographs are found within the Administrative Record at AR000133-34, with the relevant portion of the northwestern corner of the refuge enlarged at AR000135.[10] The August 1980 Refuge Map depicted in these photographs matches Congress's description; it is titled "Arctic National Wildlife Refuge," AR000133, and is dated "August 1980," AR000134. Moreover, the State of Alaska concedes that these photographs "are scans of large format color negatives of the original maps used by Congress and referred to in Title III of [ANILCA]."[11] And, critically, the August 1980 Refuge Map depicts the northwestern boundary of the Refuge running along the Staines River. AR000135.

Alaska cannot inject ambiguity into the meaning of Congress's language where there is none. Alaska has identified no map entitled "Arctic National Wildlife Refuge," dated "August 1980," and showing its preferred boundary—another more easterly braid of the Canning River—as the proposed northwestern boundary for the Refuge.[12] In fact, all parties agree the map Congress referenced in ANILCA § 303(2) is the August 1980 Refuge

---

[10] The photographs found within the Administrative Record at AR000133-34 were originally found on the State of Alaska's Department of Natural Resources' website at http://dnr.alaska.gov/mlw/title/anilca/index.cfm. *See* AR000015. The same photographs can now be found at Alaska Department of Natural Resources, ANICLA Boundary Maps, https://dnr.alaska.gov/mlw/realty/anilca/ (last visited November 30, 2024).

[11] August 1980 Refuge Maps, https://dnr.alaska.gov/mlw/realty/anilca/ (last visited November 30, 2024). The State of Alaska describes the photographs depicting the August 1980 Refuge Map as "show[ing] the boundaries of the Conservation System Units created or expanded by ANILCA, as of December 2, 1980" and further notes that they were "taken by State personnel within several days of the December 2, 1980 passage of ANILCA." *Id.*

[12] The IBLA noted that other maps are similarly labeled in some form or another as "Arctic National Wildlife Refuge" and dated August 1980. AR000016 and n.66-67. But all those maps are consistent with the August 1980 Refuge Map in that they also depict the boundary as running along the Staines River. *See* AR0000923, AR000926, AR003538-39.

*Alaska v. United States Dep't of the Interior*                                                    33
Defs.' Mem. in Opp.
NO. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 38 of 48

Map depicted in the photographs at AR000133-35.

With respect to understanding Congress's intent in passing ANILCA, the controversy before the Court presents a choice between two distant features forming the northwestern boundary of the Range and, later, the Refuge. At that appropriately high level, the August 1980 Refuge Map is dispositive with respect to Congressional intent. It shows the northwestern boundary of the Refuge located along the Staines River. AR000133-35. This map, expressly referenced by Congress in the statutory text, provides the best evidence of Congress's intention to affirm Interior's placement of the boundary along the Staines River under PLO 2214.

Thus, while the August 1980 Refuge Map did not affect the pre-ANILCA boundary of the Range and the State of Alaska's selection rights, the IBLA correctly concluded that this map (and the only other maps similarly marked in the Administrative Record) indicated that Congress endorsed Interior's placement of the Range boundary following the Staines River. AR000037-38.

## C. The IBLA Correctly Determined that Congress Delegated Authority to the Secretary of the Interior to Establish the Precise Boundaries of the Refuge and Reaffirm its Interpretation of PLO 2214

Congress's unmodified reliance on the existing Range and the August 1980 Refuge Map demonstrate that Congress ratified Interior's interpretation of PLO 2214 and its use of the Staines River as the northwestern boundary of the Range as incorporated into the Refuge. But Congress went a step further and delegated authority to the Secretary of the Interior to set and describe the boundaries of the new Refuge. Consistent with its prior

*Alaska v. United States Dep't of the Interior*                                                                34
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG     Document 41     Filed 12/13/24     Page 39 of 48

interpretation of PLO 2214, Interior placed the same boundary along the Staines River.

*Loper Bright Enterprises v. Raimondo*, recognizes that, in some cases, the best meaning of a statute "may well be that the agency is authorized to exercise a degree of discretion"—for example, where Congress expressly delegates "the authority to give meaning to a particular statutory term" or "empower[s] an agency to proscribe rules to 'fill up the details' of a statutory scheme . . . or to regulate subject to limits imposed by a term or phrase that 'leaves agencies with flexibility[.]'" 144 S. Ct. 2244, 2263 (2024). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court's role is limited to "recognizing" the delegation, "fix[ing] the boundaries of [the] delegated authority," and "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.*

In § 103(b) of ANILCA, Congress directed the Secretary of the Interior (or, with respect to units of the National Forest System, the Secretary of Agriculture) to publish "a map and legal description of each change in land management status effected by [ANILCA]." Pub. L. No. 96-487, 94 Stat. 2371, § 103(b) (1980); *see also id.* § 304(a) (placing each refuge within the administration of the Secretary of the Interior). Congress declared that "each such description shall have the same force and effect as if included in [ANILCA]." *Id.* § 103(b). Congress lent further weight to the Secretary's determinations by mandating that in the event of acreage discrepancies, the Secretary's "maps shall be controlling[.]" *Id.* § 103(a). *See Loper Bright*, 144 S.Ct. at 2263.

The Secretary followed Congress's directive, and on February 24, 1983, the FWS published the legal descriptions of the external boundaries and a corresponding map for the

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

35

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 40 of 48

Refuge and other national wildlife refuges established by ANILCA. 48 Fed. Reg. 7890, 7929-7936 (Feb. 24, 1983). Again, using the full complement of interpretive tools—text, structure, history and purpose, *Kisor*, 588 U.S. at 575—those descriptions are best interpreted as setting the northwestern most boundary of the Refuge along the westernmost distributary of the Canning River, then known as the Staines River.

First, turning to the text, when describing that portion of the Refuge that had been the Range, the FWS retained language that kept the northwestern boundary of the Refuge along the Staines River, but made further clarifications. For example, the FWS carried forward the language describing the inland boundary as abutting "the west bank of the Canning River," or the "left bank of the Canning River" along the line of "mean high water." As discussed above, those descriptions were intended to set the northwesternmost boundary of the Range along the westernmost distributary of the Canning River, then known as the Staines River.

The FWS clarified, however, the boundary line that ran between Brownlow Point to the line of mean high water at the mouth of the river. As discussed, PLO 2214 described that boundary in a counterclockwise direction running "in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River." 25 Fed. Reg. 12598 (Dec. 9, 1960). The FWS's 1983 Refuge Description detailed that same boundary, though in a clockwise direction, as running from "the extreme left bank with the mean high tide of the Arctic Ocean in section 15, T. 9 N., R. 24 E., . . ." then "on an approximate forward bearing of N. 56 ½° E., approximately 3 ¼ miles to the line of extreme low water of the most westerly tip of the most northwesterly island,

*Alaska v. United States Dep't of the Interior*                                                                     36
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 41 of 48

westerly of Brownlow Point, section 6, T. 9 N., R. 25 E." 48 Fed. Reg. 7890, 7930 (Feb. 24, 1983). The mouth of the Staines is within section 15, T. 9 N., R. 24 E. *See, e.g.* AR000782; AR000620.

Moreover, the FWS's clarification that the end point is "the most northwesterly island, westerly of Brownlow Point" pushes that reference point further west to include the spit of land that was not visible on the original 1957 Metes and Bounds Map. *Compare* AR000154 *with* AR000620. Put simply, the FWS connected the two points starting in section 15, T.9 N., R. 24 E. using a line that ran in a direction slightly more easterly than true northeast. The <u>only</u> way that line can exist is if the boundary is placed at the line of mean high water along the left bank of the Staines River.

Second, the history again supports the clear placement of the boundary along the Staines River. The FWS was responsible for incorporating the existing Range into the Refuge, and as discussed above, Interior has consistently bounded the Range—from the Alaska regional office's original June 1957 Metes and Bounds Description and corresponding map to PLOs 2214 and 2215—along the Staines River. At the time the FWS crafted the Refuge boundary, the Staines River was considered the most western distributary of the Canning River. Surveys conducted in 1965 and later in 2012 consistently referred to the Staines River as the most westerly distributary of the Canning River. *See* AR000796; AR000783; AR000283. Moreover, the closest survey to the headwaters of the Staines River in existence at the time the FWS drafted the Refuge description noted that both "[t]he Staines and Canning Rivers flow northeasterly through the southeast corner of the township." AR000800; *see also* AR000783.

Third, the structure of Interior's 1983 Refuge Description reinforces Interior's position. Following the 1983 Refuge Description, the FWS explained that certain "USGS quadrangle maps were used to prepare the legal description" including three 1:63,360 scale maps of Flaxman Island: (A-1) from 1955 with minor revisions in 1977; (A-3) from 1955; and (A-4) from 1955. Although the parties could not locate maps with these designations alone, the Administrative Record contains a version of the 1955 Flaxman Island (A-4) map, with topography and hydrographic data from later years. AR000620. This map provides greater detail than any of the maps that were known to be before the FWS when it drafted the original metes and bounds description for the Range. That map shows the Staines River—and only the Staines River—within section 15, T. 9 N., 24 R. E. Plus, the map marks section 7 of T. 9 N., R. 25 E on a small island southwest of Brownlow Point and section 5 of the same township on the main peninsula leading out to Brownlow Point, leaving "the most westerly tip of the most northwesterly island, westerly of Brownlow Point" in section 6.

Finally, like the purpose underlying PLO 2214, Congress created the Refuge to, among other reasons, "conserve fish and wildlife populations and habitats in their natural diversity." Pub. L. No. 96-487, 94 Stat. 2371, § 303(2)(B)(i) (1980). A line running from the Staines River to the far end of the spit of land jutting west from the main peninsula of Brownlow Point would encapsulate all offshore islands in that vicinity and be more feasible from a fish and wildlife management perspective. A line drawn from that point to some other distributary of the Canning further east, however, would likely bisect islands and peninsulas along the coastline and arbitrarily split the Canning River watershed, thereby

*Alaska v. United States Dep't of the Interior*                                                                 38
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 43 of 48

violating, at least in part, Congress's express purpose for creating the Refuge. *See* Scalia & Garner, at 63 ("The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered.").

The IBLA reasonably relied on Congress's passage of ANILCA and Interior's subsequent reaffirming of that part of the Range turned Refuge boundary to further support Interior's interpretation of PLO 2214. AR000037-39.

### D. The State's Arguments are Without Merit

The State of Alaska makes several arguments in its opening brief but in doing so, misreads the relevant law and regulatory text. Alaska's position falls apart with the slightest inspection.

The Supreme Court has repeatedly remarked that when discerning a law's meaning, courts look to relevant definitions from the time of drafting. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 775 (2023); *Wisc. Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018). Of course, words may have common, ordinary definitions or may have specialized, technical definitions. "When words have several plausible definitions, context differentiates among them." *Hansen*, 599 U.S. at 775. And where a law employs technical, scientific, or other terms of art, "it (is) proper to explain them by reference to the art or science to which they (are) appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284 (1880) (alteration in original) (quotation marks omitted).

Although "Canning River" will not be found in any Oxford English Dictionary or Webster's Dictionary available in 1960, the Department of the Interior's 1906 USGS

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
No. 3:22-cv-00078-SLG

39

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 44 of 48

Geographic Dictionary of Alaska defined the "Canning" as a river that with the Staines, "are now thought to be two mouths of the same river." AR000126. Likewise, the same dictionary defined the "Staines" with simply a cross reference to the Canning. AR000127. Thus, even under Alaska's flawed framework, the term "Canning River" is capable of Interior's interpretation, an interpretation that would incorporate all of its distributaries, including the Staines River, as part of the "same river." AR000126. Assuming another interpretation—one in which the Canning River and its extreme west bank referred only to a single channel or some other channel—were plausible (and it is not), the Court must inevitably turn to the history, structure, and purpose of PLO 2214, which reveal that it unambiguously aligns with Interior's position.

Alaska also invents its own rule of interpretation that public land orders "are required to be unambiguous on their face," Pl.'s Mot. 15, and must therefore be considered in isolation devoid of context. Alaska cites Department of the Interior guidance noting that public land orders "should" be capable of clear interpretation. *Id*. But nothing in those aspirational instructions overrides the Supreme Court's directive that the court's analysis should be guided not only by the text and relevant definitions at the time of drafting, but also by its structure, history, and purpose.

Turning to the text of PLO 2214, Alaska is most critical of what it does not say, rather than what it says. For example, Alaska complains that PLO 2214 does not use the term "Staines River" or "distributary" and simply denotes the "actual Canning River." Pl.'s Mot. 17. But this is misleading. As the Canning River flows towards the Beaufort Sea, it is not confined to one channel and becomes highly braided. Identifying the appropriate

"extreme west bank of the Canning River" is therefore an exercise that necessarily requires choosing one among the Canning River's many distributaries, rather than simply pointing, as Alaska's oversimplified analysis purports to do, to one supposedly obvious channel. Alaska is simply advocating for its chosen distributary to serve as the reference point marking the boundary of the Range and now the Refuge.

Alaska also makes much of its argument that its own more recent investigations of the Canning and Staines rivers purportedly indicate that the Staines is not currently a distributary of the Canning River and could not have been at the time of drafting. Pl.'s Mot. 50. But Alaska's own factfinding decades after the drafting of the text is irrelevant to the drafter's intent. The IBLA relied on clear factual evidence including reference sources available at the time of PLO 2214's issuance, AR000126-27; supported by materials shortly after its issuance, AR000131, and contemporaneous surveys AR000800, AR000783, all of which showed the drafters considered the Staines to be the westernmost distributary of the Canning River.

In *Loper Bright*, the Court held that the APA and historical judicial practice "specifies that courts, not agencies, will decide '*all* relevant *questions of law*' arising on review of agency action[.]" 144 S. Ct. at 2261 (emphasis in original and added). *Loper Bright* does not overturn or modify the myriad decisions of this Court and others that have long applied deference to technically-based *factual* determinations made by expert agencies. To the contrary, *Loper Bright* stated that "Section 706 [of the Administrative Procedure Act (APA)] *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Id.* (emphasis in original).

*Alaska v. United States Dep't of the Interior*                                                      41
Defs.' Mem. in Opp.
No. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 46 of 48

The agency's factual determination that the Staines was the westernmost distributary of the Canning River is just the type of technical, fact-based determination that requires deferential review under the APA.

*** 

"[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."  Scalia & Garner, at 180.  The only way for PLO 2214 to be read harmoniously and consistently both internally and with maps of the era, its history, its companion public land order, and later actions by Congress and Interior, is to place the boundary of the Range and now the Refuge along the westernmost distributary of the Canning River known as the Staines River.  In a thoroughly detailed opinion, the IBLA reasonably reached this conclusion in accordance with the APA.

## CONCLUSION

For the reasons stated herein, the IBLA's decisions interpreting PLO 2214 and upholding the BLM's decisions were reasonable, not arbitrary and capricious, and its decisions must be affirmed.

Respectfully submitted December 13, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Michael K. Robertson*
MICHAEL K. ROBERTSON
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044

*Alaska v. United States Dep't of the Interior*
Defs.' Mem. in Opp.
NO. 3:22-CV-00078-SLG

42

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 47 of 48

Phone: 202-353-1389 || Fax 202-305-0506
michael.robertson@usdoj.gov

*Counsel for Defendants*

Of Counsel:

Mike Gieryic
Nicholas Moore
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
Phone: 907-271-1420
mike.gieryic@sol.doi.gov
nicholas.moore@sol.doi.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Michael K. Robertson*
MICHAEL K. ROBERTSON

*Alaska v. United States Dep't of the Interior*                                                 43
Defs.' Mem. in Opp.
NO. 3:22-CV-00078-SLG

Case 3:22-cv-00078-SLG    Document 41    Filed 12/13/24    Page 48 of 48