TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl (Bar No. 2108081)
Zjok Durst (Bar No. 1311080)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov
         zjok.durst@alaska.gov

Attorneys for the State of Alaska

Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Nicholas R. Peppler (*pro hac vice*)
Davis Graham & Stubbs LLP
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
         gail.wurtzler@davisgraham.com
         mark.champoux@davisgraham.com
         nick.peppler@davisgraham.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00078-SLG |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, DEB HAALAND, in her | ) | |
| official capacity as Secretary of the | ) | |
| Department of the Interior, INTERIOR | ) | |
| BOARD OF LAND APPEALS, STEVEN J. | ) | **PLAINTIFF'S REPLY IN** |
| LECHNER, in his official capacity as | ) | **SUPPORT OF MOTION FOR** |
| Acting Chief Administrative Judge of the | ) | **SUMMARY JUDGMENT** |
| Interior Board of Land Appeals, BUREAU | ) | |
| OF LAND MANAGEMENT, TRACY | ) | |
| STONE-MANNING, in her official capacity | ) | |
| as Director of the Bureau of Land | ) | **ORAL ARGUMENT REQUESTED** |
| Management, BUREAU OF LAND | ) | |
| MANAGEMENT ALASKA STATE | ) | |
| OFFICE, and THOMAS HEINLEIN, in his | ) | |
| official capacity as Acting State Director of | ) | |
| the Bureau of Land Management Alaska | ) | |
| State Office, | ) | |
| | ) | |
| Defendants. | ) | |

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment

Case 3:22-cv-00078-SLG   Document 44   Filed 01/27/25   Page 1 of 36

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

ARGUMENT ............................................................................................................... 1

I.      The Department Misapplies the Law of Textual Interpretation to Disregard
        and Override the Plain Meaning of the Term "Canning River." ........................ 2

II.     Although the Court and IBLA Cannot Look Beyond PLO 2214's Plain
        Text, Extrinsic Evidence Does Not Support the Conclusion that the Staines
        River is the Refuge's Northwest Boundary ....................................................... 7

        A.      The Text ................................................................................................ 8

                1.      PLO 2214's Reference to "the Canning River" .............................. 8

                2.      PLO 2214's Reference to "the Extreme West Bank of the
                        Canning River" ...................................................................... 11

                3.      The "Location, Direction, and Distance" Between Brownlow
                        Point and the Canning and Staines Rivers ............................... 11

        B.      History ................................................................................................ 16

                1.      The Hand-Drawn Map .............................................................. 16

                2.      Textual Changes ..................................................................... 19

        C.      Structure ............................................................................................. 19

        D.      Purpose .............................................................................................. 21

        E.      The Surveyed Northwest Boundary ..................................................... 23

III.    ANILCA's Enactment and Implementation Did Not Establish the Staines
        River as the Refuge's Northwest Boundary. ................................................. 23

        A.      The IBLA Did Not Find that ANILCA and Its Implementation
                Control the Determination of the Refuge's Northwest Boundary. ......... 24

        B.      Congress Did Not "Endorse" the Department's Interpretation of
                PLO 2214. ......................................................................................... 26

CONCLUSION ......................................................................................................... 29

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page i
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 2 of 36

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
    120 F.4th 606 (9th Cir. 2024) ...................................................................... 6

*Amazon.com, Inc. v. Comm'r*,
    934 F.3d 976 (9th Cir. 2019)........................................................................ 6

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
    464 F.3d 1003 (9th Cir. 2006) ...................................................................... 3

*Ass'n of Civilian Technicians v. Fed. Labor Rels. Auth.*,
    269 F.3d 1112 (D.C. Cir. 2001) .................................................................. 24

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*,
    366 F.3d 692 (9th Cir. 2004) ........................................................................ 5

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004) ...................................................................................... 5

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...................................................................... 5

*Ctr. for Biological Diversity v. Everson*,
    435 F. Supp. 3d 69 (D.D.C. 2020) .............................................................. 13

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ...................................................................... 24

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) .................................................................... 24

*Kernco Drilling Co. et al.*,
    71 IBLA 53 (1983)......................................................................................... 8

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) .................................................................................. 5, 6

*League of Cal. Cities v. FCC*,
    118 F.4th 995 (9th Cir. 2024) .................................................................... 24

*Minnick v. Comm'r*,
    796 F.3d 1156 (9th Cir. 2015) ...................................................................... 6

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                    Page ii
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 3 of 36

*Mt. Cmtys. for Fire Safety v. Elliott*,
25 F.4th 667 (9th Cir. 2022) ................................................................ 6

*Pardini v. Unilever United States Inc.*,
65 F.4th 1081 (9th Cir. 2023) .............................................................. 5

*Pine Grove Farms*,
126 IBLA 269 (1993) ........................................................................... 8

*Public Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ............................................................................. 6

*Safe Air for Everyone v. EPA*,
475 F.3d 1096 (9th Cir. 2007) ......................................................... 2, 5

*Whetzel v. Mineta*,
364 F. Supp. 2d 1077 (D. Alaska 2005) ............................................ 13

**Statutes**

16 U.S.C. § 668dd note ...................................................................... 27

Alaska National Interest Lands Conservation Act (1980-1983) ................................ *passim*

Alaska National Interest Lands Conservation Act (1980-1983), § 103(b) ...................... 28

Alaska National Interest Lands Conservation Act (1980-1983), § 103(c) ...................... 26

Alaska National Interest Lands Conservation Act (1980-1983), § 302 .......................... 27

Alaska National Interest Lands Conservation Act (1980-1983), § 303 .......................... 27

2017 Tax Cut and Jobs Act, Pub. L. No. 115-97, § 20001(a)(1), 131 Stat.
2054 (Dec. 22, 2017) .......................................................................... 28

**Regulations and Administrative Authorities**

43 C.F.R. § 4.415 (2024) ..................................................................... 8

Public Land Order 2214 ................................................................. *passim*

Public Land Order 2215 ................................................................. 20, 21

**Other Authorities**

3 *Am. L. of Mining* § 71.02[c][i] (2d ed. 2024) ....................................... 26, 27

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                    *Page iii*

Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 4 of 36

ANWR Map – Plates 1 and 2, Legend .............................................................. 29

*Black's Law Dictionary* (12th ed. 2024) ........................................................ 10

Cong. Record H10527, 10543 (Nov. 12, 1980) ...................................... 27, 28

Donald J. Orth, USGS, *Dictionary of Alaska Place Names* (1967) ............... 9, 10, 20, 21

G.H. Wattles, *Writing Legal Descriptions* (1979) ............................................ 14

United States Geological Survey, *Geographic Dictionary of Alaska* (2d ed. 1906) ................................................................................................ 8, 9

Nat'l Hurricane Ctr., Cent. Pac. Hurricane Ctr., "Latitude/Longitude Distance Calculator" ............................................................................... 21

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                    Page iv
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 5 of 36

# ARGUMENT

In their attempt to defend the Interior Board of Land Appeals' ("IBLA") decisions finding that the Staines, rather than the Canning, River is the Arctic National Wildlife Refuge's ("the Refuge") northwest boundary, the Federal Defendants ("the Department") only confirm that the IBLA decisions are wrong and should be vacated. *See* Mem. in Opp. to the State's Mot. for Summ. J., Dkt. 41 (hereinafter "Response"). Given the challenge of arguing that the phrase "the Canning River" actually means the Staines River if focusing on Public Land Order ("PLO") 2214's plain meaning, the Department contorts Supreme Court precedent to argue that this Court's interpretive analysis must include examination of selective extrinsic evidence regardless of the text's plain meaning. In fact, Supreme Court and Ninth Circuit case law confirm that interpretation of a facially unambiguous text does not allow consideration of extrinsic evidence, and the Department failed to identify any ambiguity in PLO 2214's reference to the "Canning River." And, despite the Department's efforts to bypass a textual examination of the PLO, the Department's survey of extrinsic evidence related to PLO 2214's "text, history, structure, and purpose" arrives at the same conclusion—the drafters intended to designate the Canning River, not the Staines, as the Refuge's northwest boundary.

Perhaps recognizing that neither PLO 2214's text nor extrinsic evidence supports the IBLA's decisions, the Department then engages in post hoc rationalization to argue that Congress, through the Alaska National Interest Lands Conservation Act ("ANILCA"), and the United States Fish and Wildlife ("FWS"), in its implementation of ANILCA, conclusively established the Staines River as the northwest boundary. The

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                 Page 1 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 6 of 36

IBLA, however, did not make this determination. Moreover, ANILCA and its implementing actions could not have changed and did not change or endorse PLO 2214's boundary. Accordingly, the Court should vacate the IBLA's decisions and declare the Canning River to be the Refuge's northwest boundary.

## I. The Department Misapplies the Law of Textual Interpretation to Disregard and Override the Plain Meaning of the Term "Canning River."

Like the IBLA's decisions, the Department's interpretive analysis uses extrinsic evidence to contradict the plain meaning of PLO 2214's text. This results-oriented approach misapplies and mischaracterizes controlling Ninth Circuit law. The words "Canning River" have a plain meaning on their face; the Department's efforts to twist out some other meaning contravenes the directive that an interpretive analysis must "begin with a look toward the plain meaning of the [order or regulation] *and stop there if the language is clear.*" *Safe Air for Everyone v. EPA*, 475 F.3d 1096, 1103 (9th Cir. 2007) (emphasis added).

While purporting to engage in a close analysis of the text, the Department's argument begins by abruptly disregarding the actual words of PLO 2214 to justify resorting to selective extrinsic evidence. In particular, the Department argues—without analysis—that the term "Canning River" is not "defined" in PLO 2214 and does not "lend[] itself to a common or ordinary meaning." Resp. at 23.[1] As such, so the Department's argument goes, the Court should consult other sources to determine "how

---

[1] References to the Department's Response and to the State's Motion for Summary Judgment cite native pagination rather than ECF pagination.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                    Page 2 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 7 of 36

the 'Canning River' was understood by the Secretary and the FWS at the time of drafting in 1960." *Id.* The Department's argument is wrong for numerous reasons.

First, there is no justification for concluding that a public land order's reference to a specific known body of water does not "lend[] itself to a common or ordinary meaning"—i.e., that the "Canning River" does not plainly refer to the Canning River rather than the Staines River. The Department does not dispute that, at the time of PLO 2214's drafting, the Staines was identified as and publicly understood to be a distinct river. *See* Mot. for Summ. J., Dkt. 39 ("Mot.") at 31–32. Yet, the Department contends that, because some documents identified the Staines as a distributary of the Canning, the term "Canning River" could refer to any and all of its tributaries, distributaries, and branches. Taken to its logical conclusion, the Department's position seems to be that any reference to a named river in a public land order—or at least to any river with tributaries, distributaries, or other branches—is facially unclear and must always be open to interpretation. Such an argument would, absurdly, cast doubt on the plain meaning of likely thousands of public land orders that refer to named rivers with distributaries and branches. *Cf. Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("[W]ell-accepted rules of . . . construction caution us that . . . interpretations which would produce absurd results are to be avoided." (cleaned up)). More importantly here, the argument also ignores that PLO 2214 consistently uses named rivers and creeks when referring to such rivers and creeks and by comparison specifically calls out tributaries and branches of such rivers and creeks when referring to them as

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 3 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 8 of 36

such. *See* Mot. at 17 (identifying examples within PLO 2214, including references to the "Marsh Fork of Canning River" and an "unnamed fork of the Canning River").

The Department fails entirely to engage with how PLO 2214 identifies rivers and their corresponding branches. For example, the Department cites nothing within PLO 2214 to support its assumption that a reference to a named river could be interpreted as referring to a tributary or distributary of that river even though that river bears another known name. Indeed, the Department fails to cite a single example where PLO 2214 operates in such an oblique and confusing fashion. Nor can the Department explain how this one reference in PLO 2214—of all that order's references to bodies of water—lacks a plain and ordinary meaning when, by law, public land orders are required to be unambiguous on their face and capable of construction without reference to extrinsic materials. *See* Mot. at 15–16; AR003447 (directing that land descriptions in land orders must be "*susceptible of only one interpretation*" (emphasis added)); AR003462 (directing that, when the boundaries of a tract are defined by natural monuments, "it is essential that each boundary be described so definitely and specifically that there is *no uncertainty as to its identification*" (emphasis added)).

In implicit recognition that it cannot demonstrate that "Canning River" lacks a textual plain meaning, and contrary to Departmental guidance requiring clarity in land descriptions, the Department argues that this Court is *required* to consult other sources beyond the text to determine the purported "unambiguous" meaning of PLO 2214. Indeed, the Department accuses the State of using an "overly restrictive framing of the law" and argues that the Court *must* consider not just the text but also the "structure,

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 4 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 9 of 36

history, and purpose of a regulation" to determine the regulation's meaning. Resp. at 30–31. But it is the Department that is mischaracterizing the law of textual interpretation.

The interpretation of an order "begins with its text." *See City & Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1238–39 (9th Cir. 2018). If the Court can ascertain the text's plain and ordinary meaning by analysis from within the four corners of the document, the Court must apply that plain meaning and go no further. *See Safe Air for Everyone*, 475 F.3d at 1103 ("In interpreting [an agency document], we begin with a look toward the plain meaning . . . and stop there if the language is clear."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the . . . text, and ends there as well if the text is unambiguous."); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) ("A regulation should be construed to give effect to the natural and plain meaning of its words."); *Pardini v. Unilever United States Inc.*, 65 F.4th 1081, 1087 (9th Cir. 2023) ("We interpret regulations, like statutes, based on their plain language.").

The Department misapplies *Kisor v. Wilkie*, 588 U.S. 558 (2019), to argue that a court must, in all cases, evaluate extrinsic evidence from an order's structure, history, and purpose before determining the order's meaning. That is not what *Kisor* holds. In *Kisor*, the Supreme Court admonished courts not to abandon their constitutional duty to interpret the law in deference to an agency's interpretation of its own regulations and orders. The Court explained that deference to agencies' interpretations should occur only if a regulation or order is genuinely ambiguous even "after exhausting all the 'traditional tools' of construction" such as consideration of "the text, structure, history, and purpose"

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                     Page 5 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 10 of 36

of the regulation. 588 U.S. at 559. In other words, *Kisor* requires that courts exhaust all these traditional interpretive tools before reaching a conclusion that an order is ambiguous and thus deserving of agency deference, but the decision *does not require* the use of any tools beyond the text if the text's plain meaning is clear. *See Mt. Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022) (relying on *Kisor* and holding that a court must apply a regulation's plain textual meaning "[i]f the regulation is unambiguous and there is only one reasonable construction . . . ."); *see also Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015) ("If the meaning of the regulation is clear, the regulation is enforced according to its plain meaning.").

The authorities the Department cites do not suggest otherwise. In *Amazon.com, Inc. v. Commissioner*, 934 F.3d 976, 984 (9th Cir. 2019), the court recognized that analysis of a regulation "begin[s] with the [regulation's] language" and that, "[i]f the regulation is unambiguous, its plain meaning governs." In that case, the court went to the other tools in the interpretive "toolkit" only after determining that the "regulatory text alone does not definitively resolve the question here." *Id.* at 985. In *Al Otro Lado v. Executive Office for Immigration Review*, 120 F.4th 606, 615 (9th Cir. 2024), the court's reference to not construing text "in a vacuum" indicated the uncontroversial need to evaluate a phrase's meaning in light of the entire text's body rather than in isolation; it was not an endorsement of using extrinsic evidence to overturn a text's plain meaning. And in *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 454 (1989), the Supreme Court simply acknowledged the "absurd results" exception to the plain meaning rule—i.e., that "[w]here the literal reading of a statutory term would compel an odd

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                    Page 6 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 11 of 36

result, we must search for other evidence of congressional intent to lend the term its proper scope." That exception has no application here since not even the Department argues that construing "Canning River" to mean the Canning River would compel an absurd result.

Ultimately, the Department recognizes the need to resort to extrinsic evidence to support the non-textual conclusions reached by the IBLA; but because the IBLA never found PLO 2214 to be ambiguous as a justification for such extrinsic evidence, the Department wants this Court to believe that such evidence *must* be considered even if it contradicts the text's plain meaning. No case cited by the Department supports such an approach. Nor does the Department meaningfully rebut the State's argument that "Canning River" can plainly be understood to refer to the Canning River, not the Staines River. Accordingly, the Court should construe PLO 2214 based on its plain meaning reference to the Canning River as establishing the Refuge's northwest boundary.

## II. Although the Court and IBLA Cannot Look Beyond PLO 2214's Plain Text, Extrinsic Evidence Does Not Support the Conclusion that the Staines River Is the Refuge's Northwest Boundary.

Even if the Court were to consider extrinsic evidence, as the Department invites the Court to do, this evidence confirms that PLO 2214's reference to the Canning River means the Canning River. The Department asserts that a survey of extrinsic evidence demonstrates that PLO 2214's "text, history, structure, and purpose" unambiguously reflects an intent to designate the Staines River as the Refuge's northwest boundary. In

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                Page 7 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 12 of 36

fact, this evidence demonstrates the opposite.[2] Furthermore, the Department ignores the fact that the BLM's surveyed boundary does not follow the Staines River. Accordingly, extrinsic evidence supports the conclusion that the Canning River is the northwest boundary.

### A.      The Text

The Department looks to extrinsic "contemporary sources" to justify its erroneous interpretation of PLO 2214's text. *See* Resp. at 23–25. Specifically, the Department relies on contemporary sources to assert that PLO 2214's use of the terms "Canning River" and the "extreme west bank" of that river, and that the "location, direction, and distance" between Brownlow Point and the Canning River, reflect an intent to designate the Staines River as the Refuge's northwest boundary. In fact, these sources compel the opposite conclusion.

### 1.      PLO 2214's Reference to "the Canning River"

The Department, like the IBLA, relies on two geographic dictionaries to contend that PLO 2214's use of the term "Canning River" should be interpreted to mean the "Staines River." First, the Department points to the 1906 United States Geological Survey's ("USGS") *Geographic Dictionary of Alaska* (2d ed.), which described the

---

[2] In its Response, the Department asserts that the IBLA's decisions reflect factual determinations by an expert agency and therefore are entitled to deference. *See* Resp. at 41. The IBLA, however, is not the expert agency; neither it nor BLM drafted PLO 2214. *See* Mot. at 30. Moreover, the IBLA only makes factual determinations in limited circumstances and instead refers to administrative law judges those cases requiring resolution of material issues of fact. *See Pine Grove Farms*, 126 IBLA 269, 275 (1993); *Kernco Drilling Co. et al.*, 71 IBLA 53, 56 (1983); 43 C.F.R. § 4.415 (2024). Accordingly, the Court should not defer to the IBLA's determinations.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment            Page 8 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 13 of 36

Staines and Canning Rivers as "two mouths of the same river." Resp. at 24; AR000034 n.191; AR005432 n.104 (all citing AR000126). But the Department only speculates that PLO 2214's drafters utilized this definition or, more generally, shared this understanding of the Canning River. *See* Resp. at 24. The record establishes that the drafters utilized maps and that contemporaneous maps identified the Staines and Canning as distinct rivers. *See, e.g.*, AR000198; AR005412. These maps provide more reliable, contemporary authority than a 1906 dictionary. In fact, when the USGS released its updated *Dictionary of Alaska Place Names* in 1967, the USGS suggested that the 1906 dictionary was no longer a reliable source, stating that "[six] decades have passed" since that dictionary was published, "Alaska has now been completely mapped at the scale of 1:250,000 and extensively mapped at the scale of 1:63,360," and "[t]hese maps provide a wealth of geographic-names information." Donald J. Orth, USGS, *Dictionary of Alaska Place Names* v (1967). The Department cannot assume that, because the 1906 dictionary *existed* when the FWS drafted the metes and bounds description, the drafters disregarded updated information in favor of an outdated definition of the "Canning."[3]

Second, the Department relies on the 1967 *Dictionary of Alaska Place Names* to suggest that the "Canning River" was understood to include the Staines River. *See* Resp.

---

[3] In fact, the Department may not assume from the existence of the 1906 dictionary that the drafters utilized the dictionary's definition of the "Canning." Such logic contradicts the IBLA's rationale in its 2024 Decision. There, although the 1951 Flaxman Island Map was available to PLO 2214's drafters, the IBLA refused to conclude that the drafters utilized this map when drafting the metes and bounds description. *See* AR005421–22; *but see* AR000163 (describing maps "on a scale of four miles to the inch" or 1:250,000).

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                                    Page 9 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 14 of 36

at 24; AR000034 n.191 (both citing AR000583). In passing, the Department observes

that the dictionary "continued to recognize the Staines as a 'distributary of [the] Canning

River.'" Resp. at 24 (citing AR000583). But even if a river is a distributary or tributary of

another river, the two rivers are not described as one.[4] *See* § I, *supra*; Mot. at 32–33.

Moreover, the 1967 *Dictionary of Alaska Place Names* omitted the Canning River from

the list of "variant names" for the Staines River, which the dictionary defines as "[*a*]*ll

known* variant spellings and other names that have *at any time* been applied to the entry

feature[.]" Orth, *supra*, at 1 (emphasis added). The 1967 dictionary lists the "Sir T.

Staines River" as the river's only variant name. *See* AR000583. The 1967 dictionary's

failure to list the "Canning River" among the variant names for the Staines River

confirms that, in 1967, the term "Canning River" was not understood to encompass the

Staines River.[5] For these reasons, the Department incorrectly argues, and the IBLA

incorrectly found, that PLO 2214's reference to the "Canning River" included the Staines

River.

---

[4] The State continues to maintain that the Staines River is not a distributary of the
Canning River. *See* AR005407 n.17; Mot. at 50–53.

[5] The 1967 dictionary defines the Staines River as "distributary of Canning River" and
sets forth the single variant name for the Staines River. *See* AR000583. After setting forth
this definition and its variant, the 1967 dictionary then includes an entry for the Staines
River that simply states, "see Canning River." A dictionary's use of the "see" signal can
be used to refer to closely related terms. *See Black's Law Dictionary* xxii (12th ed. 2024)
("Guide to the Dictionary"). Given that the dictionary (erroneously) defines the Staines
River as a distributary of the Canning River, *see* AR000583, the dictionary appropriately
uses a "see" signal to refer to two rivers that are distinct but understood to be related. The
use of the "see" signal does not reflect an intent to treat "Canning River" as a variant of
"Staines River."

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 10 of 30

## 2. PLO 2214's Reference to "the Extreme West Bank of the Canning River"

Contemporaneous sources also undermine the Department's interpretation of PLO 2214's reference to "the extreme west bank of the Canning River." The Department asserts that "[t]he descriptor 'extreme west bank' implies multiple west banks[.]" Resp. at 24. The Department, however, ignores that the Canning River *does* have multiple banks. Contemporaneous maps reflect the Canning River as a highly braided river that split into multiple channels before reaching the Arctic Ocean. *See, e.g.*, AR005412. Therefore, PLO 2214's reference to the Canning River's "extreme west bank" can be reconciled with the Department's assertion that "extreme west bank" "implies multiple west banks." Contrary to the Department's assertion, however, the reference to the Canning River's "extreme west bank" cannot be contorted to mean "the westernmost channel of the Staines River." *See* Resp. at 24; *see generally* Mot. at 18–21.

## 3. The "Location, Direction, and Distance" Between Brownlow Point and the Canning and Staines Rivers

Finally, contemporaneous sources do not support the Department's theory that "the location, direction, and distance" between Brownlow Point and the Canning and Staines Rivers place the Refuge's northwest boundary along the Staines River. *See* Resp. at 24–25.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 11 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 16 of 36

First, the Department asserts that a hand-drawn map, which it terms the "1957 Metes and Bounds Map,"[6] "is the only map found in the Administrative Record that can be said with any confidence to have been before the drafters of the earlier Withdrawal Application replicated by the Secretary in PLO 2214." Resp. at 25. But the Hand-Drawn Map does not inform the analysis of the location, direction, and distance between Brownlow Point and the Canning and Staines Rivers whatsoever. The Hand-Drawn Map does not even depict the location of Brownlow Point. *See* AR000154. Additionally, the Hand-Drawn Map is of such a scale that the direction and distance between the alleged location of Brownlow Point[7] and the actual Canning River's western bank cannot be discerned. *See* Resp. at 5 (including an enlarged excerpt of AR000154). Moreover, as discussed in detail in section II.B., *infra*, the Administrative Record confirms that, to draft the metes and bounds description, PLO 2214's drafters used maps of a different scale than the Hand-Drawn Map. *See* AR000163 (referencing two maps "on a scale of four inches to the mile"). The Hand-Drawn Map therefore cannot inform "the location, direction, and distance" between Brownlow Point and the Canning and Staines Rivers.

---

[6] Although the Department characterizes this map as the "1957 Metes and Bounds Map," *see* Resp. at 4, the Department has no basis for this characterization, as addressed later. The State hereinafter refers to this map as the "Hand-Drawn Map."

[7] Elsewhere in its Response, the United States asserts that the Hand-Drawn Map "located the point of beginning or Point 1 (i.e., Brownlow Point)[.]" *See* Resp. at 4. But the Hand-Drawn Map is at such a scale, and "Point 1" so crudely marked, that it is impossible to discern the location of Point 1 with any precision. *See* Resp. at 5 (including an enlarged excerpt of AR000154).

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment            Page 12 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 17 of 36

Second, the Department argues that "a bound drawn from Brownlow Point to other distributaries of the Canning River would have followed a southeasterly, due south, or, at best, a south-southwesterly course." Resp. at 25. Notably, the Department does not defend whatsoever the IBLA's conclusion that Brownlow Point is the low-lying, transient sand spit in the Arctic Ocean. *Compare* AR000049; AR005424 (concluding that locating Brownlow Point at the terminus of the peninsula would be inconsistent with the "historical record"), *with* Mot. at 36–44. Accordingly, the Department has conceded that Brownlow Point is located at the peninsula's terminus and not the sand spit.[8] *See, e.g.*, *Whetzel v. Mineta*, 364 F. Supp. 2d 1077, 1083 (D. Alaska 2005) ("By failing to refute defendant's assertions, plaintiff has conceded these points."); *see also, e.g.*, *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 86 (D.D.C. 2020) ("Plaintiffs point out in their reply brief that Federal defendants do not respond to plaintiffs' argument . . . . Accordingly, Federal defendants have conceded this argument.").

Given the Department's concession that Brownlow Point is the peninsula's terminus, a bound drawn from Brownlow Point would not have followed a "southeasterly, due south, or . . . south-southwesterly" course to reach the Canning River's western bank. The Canning River's western bank is not in a southeasterly direction from Brownlow Point:

---

[8] This position is consistent with an ANILCA map showing the boundary corner at the peninsula's terminus, not the end of the sand spit. *See* AR000135.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 13 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 18 of 36



AR005281 (excerpt of AR005245).[9] Furthermore, PLO 2214's drafters would not have

used the term "due south" to describe the direction between Brownlow Point and the

Canning River. The term "due" is disfavored when drafting legal descriptions.[10] *See* G.H.

Wattles, *Writing Legal Descriptions* 3.9 (1979) ("[A]lthough there will be many times

when you must analyze the effect of the use of the words 'due' and 'true,' you would do

well to limit yourself to the one word 'true' in creating descriptions."); AR003819 ("[I]t

[9] The map at AR005245 is a copy of the map at AR005412. *See* AR005245; AR005420–
21. The State recognizes that the IBLA concluded that the drafters of the metes and
bounds description did not consider the map at AR005245, *see* AR005421; however, the
State references it now because it is more legible than the version of the map at
AR005412 reproduced in the Administrative Record.

[10] To the extent the Department's use of the term "due" south intended to suggest that a
bound drawn from Brownlow Point would have followed a "true" south course, the
course is not true south; a true south course would follow the meridian. *See* AR003819;
AR004399 ("The public lands shall be divided by north and south lines run according to
the true meridian."). Furthermore, although "due south" can be interpreted as "southerly,"
*see* Wattles, *supra*, at 3.9, both "southwesterly" and "southerly" may acceptably be used
to describe the line drawn on the map above*, see id.* at 4.11.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 14 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 19 of 36

is intended that the direction of all lines will be stated in terms of angular measure referred to the true north or south at the point of record."). Similarly, the term "south-southwesterly" is not used to draft legal descriptions; only "southwesterly" or "southerly" may be used. *See* Wattles, *supra*, at 4.10 – 4.11. Accordingly, the Department wrongly contends that a bound drawn from Brownlow Point would have followed a "southeasterly, due south, or . . . south-southwesterly" course to reach the Canning River.

Finally, the Department erroneously asserts that, "using *any* relevant map in the Administrative Record that could have been available in 1960, a bound drawn from Brownlow Point in a southwesterly direction for 'approximately three (3) miles' places the boundary at the mouth of the Staines River." *See* Resp. at 25 (emphasis in original). The Department offers absolutely no support for the assertion that contemporary maps reflect the Staines River as being located three miles from Brownlow Point. *See id.* As the State detailed in its opening brief, Brownlow Point is more than four miles from the mouth of the Staines River. *See* Mot. at 40–41 (citing AR005282; AR005245). Accordingly, "the location, direction, and distance" between Brownlow Point and the Canning and Staines Rivers do not place the Refuge's northwest boundary along the Staines River.

For these reasons, the extrinsic, "contemporaneous" sources on which the Department relies demonstrate that the Canning River is the Refuge's northwest boundary.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment                                Page 15 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 20 of 36

## B. History

The Department relies on two arguments in support of its contention that the "history" underlying PLO 2214 evidences that its drafters intended to designate the Staines River as the Refuge's northwest boundary. Resp. at 25. First, the Department points to "contemporaneous materials before the FWS" when PLO 2214 was drafted, which is the unsigned, undated Hand-Drawn Map that the BLM located in the National Archives during the IBLA appeal. Second, the Department points to textual changes in PLO 2214 as evidence of drafter's intent. These arguments, however, only undermine the Department's position.

### 1. The Hand-Drawn Map

The Department argues that the "[t]he *only* maps before the FWS in 1957 that could help explain its intent when it drafted the Withdrawal Application are the numbered 1957 Metes and Bounds Map, AR000154, and the map depicting the Territory of Alaska, AR000190." Resp. at 26. In support of this argument, the Department contends that the Regional Director of the Bureau of Sport Fisheries and Wildlife included the Hand-Drawn Map in a September 18, 1957 letter to its Washington, D.C. office. *See* Resp. at 3–4; *see also id.* at 25–26. But the Administrative Record contradicts this contention. Although the September 18, 1957 letter enclosed two maps, they were both "on a scale of four miles to the inch"—or a scale of 1:250,000. AR000163; *see* Decl. of Gwen M. Gervelis in Supp. of Pl.'s Mot. to Supp. Administrative R., at Dkt. 23-1, p. 2 ¶ 5. As a point of fact, the 1951 Maps are on this scale. *See id.* pp. 2–3, 5 ¶¶ 5–6, 12;

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 16 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 21 of 36

AR005412. The Hand-Drawn Map is not. Accordingly, the September 18, 1957 letter did not enclose the Hand-Drawn Map.

Additionally, the Department asserts that the Hand-Drawn Map "is the only numbered map of the era found *anywhere* in the Administrative Record" and that "Alaska has not identified any other contemporaneous map that could have potentially been used to convey a contrary intent." Resp. at 26 (emphasis in original). But the fact the Hand-Drawn Map is in the Administrative Record does not mean it reflects PLO 2214's intent or even that the Hand-Drawn Map was used when drafting PLO 2214. Rather, the Administrative Record confirms that *different* numbered maps accompanied the proposed metes and bounds description. An October 23, 1957 letter from the Bureau of Sport Fisheries Alaska Regional Office to the Bureau's Washington D.C. office, which forwarded the proposed metes and bounds description, states that this description "is numbered to correspond to the numbers shown on each of the maps of this area which were sent you on September 18, 1957"—i.e., the two 1:250,000 maps that were included in the September 18, 1957 letter.[11] *See* AR000198. Therefore, although numbered maps were drafted to accompany the 1957 Metes and Bounds Description, the Hand-Drawn Map is not one such map. The fact that the Bureau of Sport Fisheries failed to retain the numbered maps that accompanied the 1957 Metes and Bounds Description does not somehow elevate the Hand-Drawn Map to be credible evidence of drafter intent.

---

[11] Notably, the IBLA did not conclude that the Hand-Drawn Map was transmitted with the September 18, 1957 letter. *See* AR000009; AR005434.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment     Page 17 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 22 of 36

In fact, the IBLA and Department merely speculate that the Hand-Drawn Map reflects drafter intent. The Department can only demonstrate that the Hand-Drawn Map was found in the National Archives, in a box titled "Arctic Wildlife Refuge Correspondence," and in a folder titled "Metes & Bounds Maps." AR00008 n.7. The fact that the map was located in this box, however, alone does not confirm its origins. Materials in this box expressly reference other materials the FWS did not author, including materials drafted by the National Park Service and Wilderness Society. *See* AR000162 ("[W]e are attaching material on this proposal furnished us by the National Park Service and Wilderness Society."); *see generally* AR000102 n.13 (describing materials located in National Archives). Furthermore, the map is unsigned and undated. It appears to have been drafted hastily, with stray lines and scribbles, as circled in green:



Fundamentally, the origins of the Hand-Drawn Map are unknown. It may have been a draft. It may have been hastily drafted and in error. It may not have been drafted

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 18 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 23 of 36

by the Bureau of Sport Fisheries at all. What is certain is that the Hand-Drawn Map raises more questions than it answers.

The IBLA, however, found that the Hand-Drawn Map is "perhaps the strongest evidence of contemporaneous drafter intent." AR000034; *see* Resp. at 26. The fact that what the IBLA views as the "strongest evidence" of drafter intent is riddled with uncertainty and ambiguity reinforces that the IBLA decisions are arbitrary. A document with such uncertain bona fides cannot support any conclusive determination of drafter intent.

### 2. Textual Changes

The Department points to the fact that the FWS changed some language in PLO 2214, but did not change the reference to the "extreme west bank of the Canning River," as somehow further evidencing an intent to designate the Staines River as the northwest boundary. *See* Resp. at 26–28. But the Department's theory simply does not make sense. Had PLO 22414's drafters intended to designate the Staines River as the Refuge's boundary, the FWS had multiple opportunities to revise the metes and bounds description to explicitly reference the Staines River. The FWS instead left the reference to the Canning River untouched in the metes and bounds description. Therefore, the textual changes to PLO 2214 support the conclusion that it references the Canning, rather than the Staines, River.

### C. Structure

To argue that PLO 2214's "structure" supports the Department's preferred interpretation, the Department relies on references to the longitudinal location of the

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 19 of 30
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 24 of 36

Canning River in PLO 2215 and the 1967 *Dictionary of Alaska Place Names*.[12] *See* Resp.

at 28–29. Initially, the Department recites the IBLA's erroneous interpretation of PLO

2215 and improperly equates PLO 2215's reference to "approximate longitude 146º W."

to mean "almost exactly longitude 146º W." *See* Resp. at 28; *compare* Resp. at 28, *with*

AR000034. The Department offers no meaningful response to the State's detailed

explanation of why this interpretation is wrong. *See* Mot. at 46–48.

The Department also observes that the 1967 *Dictionary of Alaska Place Names*

describes the Staines River as flowing into Lion Bay at longitude "145º59'45" W" and

that this location is "just 15 longitudinal seconds" east of 146º W.[13] *See* Resp. at 29. But

if PLO 2214's drafters had intended to reference the Staines River's location as described

by the 1967 dictionary, as the Department contends, then presumably the drafters would

have used the more precise longitude "145º59'45" W" rather than an "approximate

longitude of 146º W." Furthermore, as the State detailed in its opening brief, the

Department continues to ignore that a reference to "approximate longitude 146º W." also

---

[12] Notably, the Department offers no explanation of how descriptions of the Canning River's location in extrinsic sources relate to the "structure" of PLO 2214. *See* Resp. at 28–29.

[13] Although the IBLA's 2020 Decision referenced this longitudinal coordinate in its background discussion, *see* AR000013, the IBLA did not rely on the description of the location of the Staines River in the 1967 *Dictionary of Alaska Place Name* as justification for its decision, *see* AR000024–57.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 20 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 25 of 36

references the location of the Canning River.[14] *See* Mot. at 47. Accordingly, PLO 2214's purported "structure" does not support the Department's interpretation.

### D.     Purpose

Finally, the Department, like the IBLA, asserts that placement of the Refuge's boundary at the Canning River would "sever geographic features in the area" and would be inconsistent with the Refuge's purpose.[15] *See* Resp. at 29–30. The Department, however, ignores that placement of the Refuge's boundary at the Staines River would also "sever" geographic features in the area, most notably a knoll of land with the RUTH 1949 U.S. Coast Guard and Geodetic Survey marker:

---

[14] An area between longitudes 145'30" W. and 146'30" W., the center point of which is longitude of 146º W., near the Canning and Staines Rivers is an area approximately 24 statute miles wide. *See* Nat'l Hurricane Ctr., Cent. Pac. Hurricane Ctr., "Latitude/Longitude Distance Calculator," https://www.nhc.noaa.gov/gccalc.shtml (measuring distance between 145'30" W. and 146'30" W.).

[15] Assuming *arguendo* that ANILCA reflects an endorsement of the Department's boundary determination, then Congress unexplainably curved the Refuge's boundary to avoid "severing" a grouping of small islands, thus disregarding the legal description's reference to a straight line. See AR000135. The original metes and bounds description avoided this result by aligning the boundary to follow the coast; when the legal description was modified to follow a straight line and bearing instead of meandering along the shoreline, this "severing" of land necessarily resulted.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment            Page 21 of 30



AR005245.

More significant, however, the Department places too much weight on the Refuge's purpose as determinative of its northwest boundary. In fact, when PLO 2214 was drafted, the Bureau of Sport Fisheries and Wildlife expressed ambivalence toward the Refuge's boundary, particularly at the Arctic Ocean. *See* AR00162. In his September 18, 1957, letter to the Director that transmitted the draft metes and bounds description, the Bureau's Regional Director observed that "[i]t might be argued the boundaries should be adjusted in some different manner[.]" AR000162. Particularly, he expressed a preference for eliminating areas "along the Arctic Coast where there are Early Warning

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 22 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 27 of 36

Radar installations" by possibly adjusting the boundary by "moving back a few miles from the coast (southward)." *Id.* Ultimately, he accepted the proposed boundary without adjustments at the Arctic Ocean, reasoning they "*would make little difference in the overall objective*." *Id.* (emphasis added). This ambivalence regarding the Refuge's boundary at the Arctic Ocean confirms that the Refuge's purposes do not demand placement of the Refuge's northwest boundary at the Staines River.

### E. The Surveyed Northwest Boundary

Finally, despite its reliance on extrinsic evidence to support its contention that the Staines River is the Refuge's northwest boundary, the Department ignores the most telling extrinsic fact—*the BLM's surveyed boundary does not follow the Staines River*. *See* Mot. at 50–53. The Department does not acknowledge, let alone explain, the fact that the surveyed boundary cannot be reconciled with the metes and bounds description.

For these reasons, the extrinsic evidence that informs the "text, history, structure, and purpose" of PLO 2214 confirms that the Canning, rather than the Staines, River was intended to be the Refuge's northwest boundary.

## III. ANILCA's Enactment and Implementation Did Not Establish the Staines River as the Refuge's Northwest Boundary.

The Department devotes almost a third of its argument to post hoc rationalization. Specifically, the Department argues its interpretation of the Refuge's northwest boundary must be affirmed because congressional and FWS actions in connection with passage and implementation of ANILCA 20 years or more after PLO 2214 "endorsed" that

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 23 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 28 of 36

interpretation. Resp. at 31–39. But the IBLA did not reach such a conclusion. And Congress could not have made such an endorsement and did not do so.

## A. The IBLA Did Not Find that ANILCA and Its Implementation Control the Determination of the Refuge's Northwest Boundary.

"Post-hoc rationalizations, developed for litigation are insufficient" grounds to affirm an agency decision. *Ass'n of Civilian Technicians v. Fed. Labor Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001). The regulatory interpretation cannot be a "convenient litigating position' or a '*post hoc* rationalization.'" *League of Cal. Cities v. FCC*, 118 F.4th 995, 1013 (9th Cir. 2024) (quoting *Kisor*, 588 U.S. 579). "In no case are [courts] to hypothesize the [agency's] rationales; nor are we to accept the [agency's] post hoc rationalizations because such explanations provide an inadequate basis for judicial review of the [agency decision]." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 n.7 (9th Cir. 2004). Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself rather than appellate counsel's post hoc rationalizations." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022) (internal quotation marks omitted).

The Department's ANILCA arguments should be rejected. The Department asserts Congress has "the last word" in interpreting PLO 2214, Resp. at 31—essentially arguing that ANILCA and its implementing actions control the determination of the Refuge's northwest boundary, regardless of PLO 2214's text. Specifically, the Department contends that Congress "endorsed," "embraced," and "ratified" the Department's interpretation of the Refuge's northwest boundary described in PLO 2214. *See* Resp. at

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 24 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 29 of 36

31, 32, 34. Likewise, the Department argues that Congress "delegated authority to the [Secretary] to set and describe the boundaries of the new Refuge." *Id.* at 34. In other words, the Department attempts to render PLO 2214 irrelevant in light of congressional action that happened 20 years later.

The IBLA, however, made no such findings. The IBLA did not adopt the BLM's argument that Congress endorsed the Staines River as the Refuge's northwest boundary.[16] Rather, the IBLA chose "to discern the intent of the drafters who crafted the language used in PLO 2214, based on the resources then available and relied upon." AR000033. Given its "primary focus" on discerning drafter's intent, *see id.*, the IBLA only pointed to ANILCA and its implementation as providing "*further support* for the agencies' longstanding interpretation of PLO 2214." AR000037 (emphasis added). And, the IBLA ultimately "agree[d] with the State that Congress and FWS did not alter the relevant portion of the ANWR boundary as defined by PLO 2214." AR000038–39.

In light of the IBLA's findings, the Court must reject the Department's post hoc arguments that ANILCA and the FWS's implementing actions control the determination of the northwest boundary.

---

[16] In its briefing before the IBLA, the BLM had argued that "in passing ANILCA, Congress statutorily established the Staines River as ANWR's northwestern boundary," AR005374, and "*embraced* the agencies' understanding of the ANWR boundary through ANILCA." AR000030 (emphasis added); AR000101; *see also* AR000115 n.65; AR005373.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 25 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 30 of 36

**B.     Congress Did Not "Endorse" the Department's Interpretation of PLO 2214.**

Even if given consideration, contrary to the Department's post hoc argument, Congress did not "endorse" or "embrace" or "ratify" the Department's interpretation of PLO 2214. *See* Resp. at 32, 34 (alterations omitted); AR000037.

First, the State's pending land selections prevented Congress from altering the boundary established by PLO 2214, even had Congress intended to do so. Because PLO 2214 established the Canning River as the Refuge's boundary, then any subsequent attempt by Congress to expand the Refuge into the disputed area could not affect the State's lawful selections, which must be protected as valid, existing rights. *See, e.g.*, ANILCA §§ 103(c) (directing that the Secretary could only include "public lands" in conservation system units such as the Refuge), 102(3)(A) (defining "public lands" to exclude the State's land selections). Only the State may voluntarily relinquish these selections; the United States cannot unilaterally destroy them by revising the boundary established by PLO 2214.

Second, nothing in ANILCA suggests that Congress intended to define the location of the Refuge's northwest boundary. ANILCA's treatment of the Refuge must be viewed in its statutory context. ANILCA is a sweeping piece of legislation, both in its size (nearly 200 pages) and the amount of land it affected. *See* 3 *Am. L. of Mining* § 71.02[c][i] (2d ed. 2024) ("[ANILCA] is a very complex and detailed act that attempts to balance many conflicting land use goals" and "affect[s] the status and management of virtually all federal lands in Alaska[.]"). With respect to lands in the National Wildlife

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 26 of 30
          Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 31 of 36

Refuge System, ANILCA established 16 new or expanded units covering more than 76 million acres. *See id.* § 71.02[3][c]; ANILCA §§ 302 and 303 (codified at 16 U.S.C. § 668dd note). Against this backdrop, the Department now argues that Congress paid particular attention to an approximately 25-mile stretch of the Refuge's northwest boundary.

Not surprisingly, neither ANILCA itself or its legislative history contains any language addressing PLO 2214, how to interpret the boundaries described in its metes and bounds calls, the precise location of those boundaries, or even the precise location of the boundaries of the expanded Refuge. ANILCA Section 303(2)(A) simply states that the Refuge "shall consist of the existing Arctic National Wildlife Range . . . and an addition of approximately nine million one hundred and sixty thousand acres of public lands, as *generally described* on a map entitled 'Arctic National Wildlife Refuge,' dated August 1980." (emphasis added). That map is never represented by Congress to be more than a general description of the Refuge's location.

All Congress expressly did in ANILCA Section 303(2) was expand the Range and redesignate it as the Refuge. Congress' purpose for redesignating the Range as the Refuge, like other such redesignations, was "to assure consistency in classification terminology used by the administering agencies but, also to confirm [its] longstanding status as part[] of the National Wildlife Refuge . . . System[]." Cong. Record H10527, 10543 (Nov. 12, 1980). Redesignation was not intended to resolve any disputes or make any changes to the status quo. "Redesignation of previously existing areas merely confirms what has been the case all along." *Id.*

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 27 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 32 of 36

Although Congress provided for the Secretary to prepare "a map and legal description of each change in land management status effected by this Act . . . shall be published in the Federal Register . . .", ANILCA and its legislative history do not indicate that the Secretary was authorized to employ the mapping and legal description process as a mechanism to set new boundaries, to determine if State selections were validly selected, or to resolve any competing claims or other land disputes. ANILCA § 103(b). The Secretary was authorized to do no more than provide a legal description and map to "confirm[] what has been the case all along." Cong. Record H10527, 10543 (Nov. 12, 1980); ANILCA § 103(b). For this reason, ANILCA does not support the Department's assertion that Congress delegated to the Secretary authority to establish "precise" boundaries that override the intent of PLO 2214. *See* Resp. at 34–39.

Finally, the notion that Congress "endorsed," "embraced," or "ratified" any boundary in ANILCA is squarely refuted by subsequent congressional actions. When Congress, in the 2017 Tax Cuts and Jobs Act, directed the Secretary to establish and administer a competitive oil and gas program in the Refuge's 1002 Area, Congress defined the 1002 Area by reference to maps of the Refuge but expressly declined to determine the placement of the northwest boundary.[17] *See* Pub. L. No. 115-97, § 20001(a)(1), 131 Stat. 2054, 2236 (Dec. 22, 2017) (referencing ANWR Map – Plates 1 and 2); ANWR Map – Plates 1 and 2, Legend ("This map is not intended to prejudice

---

[17] The IBLA describes these maps as an example of "modern support" for the Department's position. *See* AR000037–38. But Congress' express qualification attached to these maps compels the exact opposite conclusion—these maps cannot shed any light on this dispute.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment     Page 28 of 30

ongoing boundary litigation between the State of Alaska and the U.S. Department of the Interior, docketed IBLA 2016-109 and IBLA 2017-55 before the Office of Hearing and Appeals, at the U.S. Department of the Interior.").[18] The Department's argument regarding congressional action and intent in ANILCA should be rejected.

In sum, ANILCA, enacted 20 years after PLO 2214 was issued, provides no support for the Department's interpretation of PLO 2214. ANILCA and its legislative history contain no indication that Congress was aware of the contents of PLO 2214 or the State's land selections near the Refuge's northwest boundary, let alone that Congress interpreted the boundaries set forth in PLO 2214 to weigh in on that issue. The Department's ANILCA arguments should be rejected as lacking any factual basis and as, at best, post-hoc rationalization.

## CONCLUSION

For the foregoing reasons, and those set forth in the State's Motion for Summary Judgment, the Court should determine that IBLA's decisions are contrary to law and arbitrary and capricious, vacate the IBLA's decisions, and declare the Canning River to be the Refuge's northwest boundary.

---

[18] Available at https://www.fws.gov/r7/nwr/Realty/data/LegalDocuments/PL/PL-115-97.pdf.

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 29 of 30

DATED: January 27th, 2025.

TREG TAYLOR
ATTORNEY GENERAL

By:     _/s/     Ronald W. Opsahl_
Ronald W. Opsahl (Bar No. 2108081)
Zjok Durst (Bar No. 1311080)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email: ron.opsahl@alaska.gov
        zjok.durst@alaska.gov


By:     _/s/     Kathleen C. Schroder_
Kathleen C. Schroder (*pro hac vice*)
Gail L. Wurtzler (*pro hac vice*)
Mark E. Champoux (*pro hac vice*)
Nicholas R. Peppler (*pro hac vice*)
Davis Graham & Stubbs LLP
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
        gail.wurtzler@davisgraham.com
        mark.champoux@davisgraham.com
        nick.peppler@davisgraham.com

Attorneys for the State of Alaska

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment          Page 30 of 30
Case 3:22-cv-00078-SLG     Document 44     Filed 01/27/25     Page 35 of 36

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Local Civil Rule 7.4(a)(1) and this Court's order on September 13, 2024, Dkt. No. 38, because, excluding the parts of the document exempted by Local Civil Rule 7.4(a)(4), this document contains 7,481 words.

*/s/ Joanna A. Seiner*
Joanna A. Seiner

**CERTIFICATE OF SERVICE**

I certify that on January 27, 2025, the foregoing document was served electronically on all parties listed on the CM/ECF system.

*/s/ Joanna A. Seiner*
Joanna A. Seiner

*Alaska v. U.S. Dep't of the Interior, et al.*, Case No. 3:22-cv-00078-SLG
Plaintiff's Reply in Support of Motion for Summary Judgment
Case 3:22-cv-00078-SLG    Document 44    Filed 01/27/25    Page 36 of 36