# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

STATE OF ALASKA,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, *et al.*,

        Defendants.

Case No. 3:22-cv-00078-SLG

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This case involves a boundary dispute between the State of Alaska and the United States over approximately 20,000 acres in the northwest corner of the Arctic National Wildlife Refuge. Before the Court at Docket 39 is a Motion for Summary Judgment filed by Plaintiff State of Alaska ("the State"). Federal Defendants[1] responded in opposition at Docket 41, to which the State replied at Docket 44. For the reasons set forth below, the State's Motion for Summary Judgment is DENIED and judgment shall be entered for the United States.

## BACKGROUND

---

[1] Federal Defendants are the U.S. Department of the Interior; Doug Burgum, in his official capacity as the Secretary of the Interior; the Interior Board of Land Appeals ("IBLA"); Silvia Riechel Idziorek, in her official capacity as Chief Administrative Judge of the IBLA; the Bureau of Land Management ("BLM"); Tracy Stone-Manning, in her official capacity as the Director of BLM; the BLM Alaska State Office; and Kevin Pendergast, in his official capacity as State Director of the BLM Alaska State Office. Chief Administrative Judge Idziorek and Director Pendergast assumed these positions during the pendency of this litigation and are thus "automatically substituted" as parties. Fed. R. Civ. P. 25(d).

## I. Establishment of the Arctic National Wildlife Range

Executive Order 10355 issued in May 1952 delegated to the Secretary of the Interior the authority to "withdraw or reserve lands of the public domain and other lands owned or controlled by the United States in the continental United States or Alaska for public purposes."[2]  In accordance with that authority, on June 24, 1957, the Alaska Regional Office of the Fish and Wildlife Service's ("FWS") Bureau of Sport Fisheries and Wildlife ("Regional Office") submitted a proposal for the Secretary of the Interior to withdraw lands in the Territory of Alaska for the creation of an Arctic Wildlife Range ("the Range").[3]  The proposal included a metes and bounds description of the boundary of the Range ("June 1957 Metes and Bounds Description"), which describes the northwest corner of the boundary as follows:

1. Beginning at the level of mean high tide on a point of land (Point 1) on the Arctic Seacoast known as Brownlaw [sic] Point, being approximately at 145° 51' Long. and 70° 10' N. Lat.;

2. thence following the shore in a southerly and westerly direction at the said level of mean high tide for approximately nine (9) miles to the mean high water mark of the extreme west bank of the Canning River (Point 2);

3. thence following up the said west bank of the Canning River along the mean high water mark for approximately Seventy (70) miles to a point (Point 3) at a main fork of the river at approximately 145°

---

[2] Delegating to the Secretary of the Interior the Authority of the President to Withdraw or Reserve Lands of the United States for Public Purposes,17 Fed. Reg. 4,831, 4,831 (May 26, 1952).

[3] AR000137-42; AR000145-50; *see* AR000158.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 2 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 2 of 74

53' Long. and 69° 12' N. Lat. and 10 ½ miles N. W. of Mt. Salisbury; . . . .[4]

On September 18, 1957, the Washington, D.C. office of the FWS Bureau of Sport Fisheries and Wildlife ("Washington, D.C. Office") sent a telegram to the Regional Office, requesting that it "send best maps available" of the proposed Range.[5] The Regional Office Director responded that same day, "attaching material on this proposal" and "forwarding two maps, on a scale of four miles to the inch, which [we]re the most detailed available to [them]."[6] The enclosed document, titled "Proposed Arctic Wildlife Range,"[7] provides the following general description of the northwest portion of the proposed boundary:

> [T]he boundary can be described more briefly as following the <u>west</u> bank of the Canning River, from Brownlow Point (if the coast line is included), or else from the intersection of the DEW Line and the Canning River, southeasterly to 'Peak 7900' on the divide between the Canning River and a tributary of the East Fork, Chandalar River (point 6 on the map) . . . .[8]

The document notes that "[a] full description by metes and bounds, numbered to correspond to numbers shown on the map, is available."[9] According to Federal Defendants, the following two maps were also enclosed: a numbered map

---

[4] AR000138; AR000146.

[5] AR000158.

[6] AR000162-63.

[7] AR000166-76; AR000177-86.

[8] AR000177 (emphasis in original); AR000167.

[9] AR000177; AR000167.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 3 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 3 of 74

corresponding to the June 1957 Metes and Bounds Description ("1957 Metes and Bounds Map"), and a map of Alaska with the boundary of the proposed range more generally identified.[10] The 1957 Metes and Bounds Map shows Point 2 at the mouth of the Staines River and draws the segment between Points 2 and 3 southwards along the length of the Staines River until it connects to the Canning River.[11] The relevant portion of the 1957 Metes and Bounds Map is copied below:



12

On October 17, 1957, the Washington, D.C. Office sent another telegram to the Regional Office requesting a metes and bounds description of the proposed

---

[10] Docket 41 at 8-9 (first citing AR000153-54; and then citing AR000190). With respect to the 1957 Metes and Bounds Map at AR000154, the State contends in its reply that it is not "on a scale of four miles to the inch" as described by the letter and that it therefore was not the enclosed map. Docket 44 at 21-22. The Court addresses this contention below. *See* discussion *infra* p. 66.

[11] *See* AR000154 (1957 Metes and Bounds Map, copied *infra* p. 5).

[12] AR000154 (1957 Metes and Bounds Map).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 4 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 4 of 74

Range.[13]  The Regional Office responded on October 22, 1957, "enclosing five copies of a full description by metes and bounds of the Arctic Wildlife Range" and explaining that "[t]his description is numbered to correspond to the numbers shown on each of the maps of this area which were sent [to the Washington, D.C. Office] on September 18, 1957."[14]  The description of the northwest corner of the boundary in this metes and bounds description is, for the Court's purposes here, identical to the June 1957 Metes and Bounds Description.[15]

On November 18, 1957, the Director of the FWS Bureau of Sport Fisheries and Wildlife filed an official withdrawal application for the Range with the Secretary of the Interior ("1957 Withdrawal Application").[16]  The application includes the following description of the northwest corner of the boundary:

> Beginning at the intersection of the International Boundary line between Alaska and Yukon Territory, Canada, with the line of extreme low water of the Arctic Ocean in the vicinity of Monument 1 of said International Boundary line;
>
> thence westerly along the said line of extreme low water, including all offshore bars, reefs, and islands to a point of land on the Arctic Seacoast known as Brownlow Point, at approximate Long. 145°51' W. and Lat. 70°10'N.;

---

[13] AR000194.

[14] AR000198.

[15] The June 1957 Metes and Bounds Description and this metes and bounds description are identical with respect to the first three reference points, except that the third reference point refers to "N. E. of Mt. Salisbury" as opposed to "N. W. of Mt. Salisbury." *Compare* AR000202, *with* AR000146.

[16] AR001256-57.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 5 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 5 of 74

thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River;[17]

thence southerly up the said west bank of the Canning River along the mean high water mark approximately seventy (70) miles to the mouth of Marsh Fork of Canning River at approximate Long. 145°53' W. and Lat. 69°12'N. and 10½ miles E. of Mt. Salisbury; . . . .[18]

The 1957 Withdrawal Application was not accompanied by a map.[19]

On January 21, 1958, the Bureau of Land Management ("BLM") published a "Notice of Proposed Withdrawal and Reservation of Lands" in the Federal Register, providing that the "Bureau of Sport Fisheries and Wildlife has filed an application . . . for the withdrawal of . . . land for an Arctic Wildlife Range for the preservation of the wildlife and wilderness resources of northeastern Alaska."[20] The notice included the same description of the northwest corner of the boundary as the 1957 Withdrawal Application.[21]

In the spring of 1958, BLM prepared an internal report on the 1957 Withdrawal Application ("1958 BLM Field Report").[22] BLM included with that report

---

[17] Note that this description differs from the June 1957 Metes and Bounds Description in that it replaces the nine-mile path snaking along the level of mean high tide between Points 1 and 2 with an approximately three-mile-long path between the same points. *Compare* AR001270-71, *with* AR000138.

[18] AR001270-71.

[19] AR000010; AR000106.

[20] Notice of Proposed Withdrawal and Reservation of Lands, 23 Fed. Reg. 355, 364 (Jan. 14, 1958).

[21] *Compare id.*, *with* AR001270-71.

[22] AR001976-99.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 6 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 6 of 74

two maps, each of which depicted the northwestern boundary of the proposed withdrawal as following a path southeast of the Staines River, following a more easterly branch of the Canning River.[23]  The relevant portion of one of those maps is copied below:



24

On December 6, 1960, the Secretary of the Interior issued Public Land Order ("PLO") 2214, approving the 1957 Withdrawal Application and establishing the "Arctic National Wildlife Range" "[f]or the purpose of preserving unique wildlife, wilderness and recreational values."[25]  PLO 2214 includes the same description of the northwest corner of the boundary as the 1957 Withdrawal Application:

> Beginning at the intersection of the International Boundary line between Alaska and Yukon Territory, Canada, with the line of extreme

---

[23] AR002000-01 (1958 BLM Field Report maps).

[24] AR002000 (1958 BLM Field Report map).

[25] AR000668-69.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 7 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 7 of 74

low water of the Arctic Ocean in the vicinity of Monument 1 of said International Boundary line;

thence westerly along the said line of extreme low water, including all offshore bars, reefs, and islands to a point of land on the Arctic Seacoast known as **Brownlow Point, at approximate longitude 145°51' W., and latitude 70°10'N.**;

thence in a **southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River**;

thence southerly up the said west bank of the Canning River along the mean high water mark approximately seventy (70) miles to the mouth of Marsh Fork of Canning River at approximate longitude 145°53' W., and latitude 69°12'N., and 10½ miles E. of Mt. Salisbury; . . . .[26]

No map was attached to PLO 2214.[27]

The Secretary simultaneously issued PLO 2215, which opened lands previously withdrawn under PLO 82 for selection by the State of Alaska, but excluded from selection lands withdrawn "for use as the Arctic Wildlife Range," which was described as "all lands lying east of Canning River, extending from its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W., to its source in the Brooks Range in approximate longitude 145°13' W., latitude 68°53' N."[28]

## II. The Alaska Statehood Act, Alaska's Selection of Lands, and BLM's Survey of State Selections

---

[26] AR000668 (emphases added).

[27] *See* AR000668-69.

[28] AR000669.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 8 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 8 of 74

On July 7, 1958, prior to the issuance of the PLOs in December 1960, Congress passed the Alaska Statehood Act, admitting Alaska to the Union.[29] Pursuant to Section 6(b) of the Alaska Statehood Act, the State was entitled to select 102,550,000 acres of "public lands . . . vacant, unappropriated, and unreserved."[30] In early 1964, the State filed applications for several parcels, including lands in six townships located near the northwestern boundary of the Range ("1964 State Selections").[31] On October 9, 1964 and January 15, 1965, BLM "tentatively approved" the conveyance of the six 1964 State Selections.[32] On January 21, 1965, the State of Alaska Department of Natural Resources sent a letter to BLM, requesting "protractions delineating Public Land Order 2214" because they were "unable to determine the boundaries of this withdrawal."[33] On February 4, 1965, BLM issued two decisions modifying its prior tentative approvals "to exclude . . . land . . . withdrawn by Public Land Order 2214" because "the northern boundary of the Reserve [sic] was not correctly plotted on the records."[34]

---

[29] Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958).

[30] *Id.* at 340.

[31] AR000670-71.

[32] *See* AR000673-77.

[33] AR000678.

[34] AR000679-81.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 9 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 9 of 74

In 1965, BLM conducted surveys of land covered by the 1964 State Selections.[35]  The survey plat identifies "[t]he extreme west bank of the Staines River, a distributary of the Canning River," as the boundary of the Range.[36]  The survey plat also relied on U.S. Geological Survey topological maps; a relevant portion of one of those maps—which shows the boundary line between Tract A (the area outside of the Range) and Tract B (the area within the Range)—is copied below.[37]  The survey plats were submitted for approval and accepted by the BLM Chief of the Division of Engineering on October 25, 1968.[38]

---

[35] AR000671; AR000782-89; AR000790-802; AR000803-12.

[36] *See* AR000783 ("The extreme west bank of the Staines River, a distributary of the Canning River, forms the boundary between Tracts 'A' and 'B.'"); AR000787 (providing that "[t]he net area of Tract 'A' includes all lands and all islands, islets, and rocks, outside of the Artic [sic] National Wildlife Range" and "[t]he net area of Tract 'B' includes all lands and all islands, islets, and rocks, lying above the line of mean high tide within the Arctic National Wildlife Refuge").

[37] AR000783.

[38] AR000671; AR000783-89.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 10 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 10 of 74



In 1968, the State filed an application for additional lands abutting the Range ("1968 State Selections"), including lands in Township 6 N., Range 23 E. ("Township 6-23").[40]   In February 1969, BLM issued two decisions partially vacating its October 9, 1964 and January 15, 1965 tentative approvals of State conveyances, as modified on February 4, 1965.[41]   BLM rejected certain State selections to exclude portions of the lands that were within the Range and "to conform[] the tentatively approved acreage to that shown on the plats of survey

---

[39] AR000783.

[40] *See* AR000365-71.  The State modified its selection "to include all available land within these townships, excluding patented land," on June 16, 1972.  *See* AR000365.

[41] AR000723; AR000725-29.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 11 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 11 of 74

filed in this office."[42]  On March 27, 1974, BLM tentatively approved certain of the 1968 State Selections, but rejected the State's application for Township 6-23 to the extent it encompassed "lands . . . included within the Arctic National Wildlife Reserve [sic]."[43]  BLM issued patents for the tentatively approved State land selections in 1974.[44]

## III.  Establishment of the Arctic National Wildlife Refuge

On December 2, 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. §§ 3101 *et seq.*  ANILCA expanded the Range and redesignated it the Arctic National Wildlife Refuge ("ANWR" or "the Refuge"), referencing its "general[] depict[ion] on a map entitled 'Arctic National Wildlife Refuge,' dated August 1980."[45]  This map, the relevant portion of which is copied below, shows the labeled Staines River as the northwest boundary:

---

[42] AR000723; AR000725-29.

[43] AR000365.

[44] *See* AR000671.

[45] Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 303(2)(A), 94 Stat. 2371, 2390 (1980) (codified at 16 U.S.C. §§ 3101 *et seq.*).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 12 of 74



Congress also directed the Secretary of the Interior (or, with respect to units of the National Forest System, the Secretary of Agriculture) to publish "a map and legal description of each change in land management status effected by [ANILCA]" in the Federal Register, stating that "each such description shall have the same force and effect as if . . . included in this Act," and that "[i]n the event of discrepancies between the acreages specified in this Act and those depicted on such maps, the maps shall be controlling."[47]

---

[46] AR000135 (ANILCA map); *see also* AR000133-34. The same photographs can be found on the State's Department of Natural Resources website, identified as "scans of large format color negatives of the original maps used by Congress and referred to in Title III of [ANILCA]," derived from photographs "taken by State personnel within several days of the December 2, 1980 passage of ANILCA" and "show[ing] the boundaries of the Conservation System Units created or expanded by ANILCA, as of December 2, 1980." *ANICLA Boundary Maps*, Alaska Department of Natural Resources, State of Alaska, https://dnr.alaska.gov/mlw/realty/anilca/ (last visited Aug. 12, 2025) (choose "Arctic NWR" from the menu). Thus, while "[t]he United States has been unable to locate the original version of this August 1980 Refuge Map within its own records," Docket 41 at 37, the parties agree that these maps represent the ones referenced in ANILCA. *See* Docket 39 at 13 (citing AR003549, which is the same as the map found at AR000133, as the map referenced in ANILCA).

[47] ANILCA § 103(a), (b), 94 Stat. at 2376-77.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 13 of 74

In compliance with this directive, FWS published a description of ANWR in the Federal Register on February 24, 1983 ("1983 FWS Description").[48] FWS described the northwest corner as following:

> the line of mean high water on the west bank of the Canning River, Tps. 1 and 2 S., R. 25 E., Umiat Meridian;

> Thence northerly, along the mean high water line of the left bank of the Canning River, approximately 60 miles to the intersection of the extreme left bank with the mean high tide of the Arctic Ocean in section 15, T. 9 N., R. 24 E., Umiat Meridian;

> Thence on an approximate forward bearing of N. 56 ½° E., approximately 3 ¼ miles to the line of extreme low water of the most westerly tip of the most northwesterly island, westerly of Brownlow Point, section 6, T. 9 N., R. 25 E., Umiat Meridian . . . .[49]

FWS also published a corresponding map that shows the boundary following the Canning River and continuing where the Staines River is located, though the map does not label the Staines River by name.[50] The relevant portion of this map is copied below:

---

[48] AR000912-21; National Wildlife Refuges in Alaska; Description of Boundaries, 48 Fed. Reg. 7,890, 7,929-36 (Feb. 24, 1983).

[49] AR000915; National Wildlife Refuges in Alaska, 48 Fed. Reg. at 7,930.

[50] AR000921; National Wildlife Refuges in Alaska, 48 Fed. Reg. at 7,936.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 14 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 14 of 74



In 2003, FWS conducted a "field reconnaissance to a portion of the disputed northwestern-most boundary of [ANWR] . . . to determine the location of the extreme west bank of the Staines/Canning River system, and to document the westernmost distributary channels of the Canning River."[52] FWS did not reach a definitive conclusion about the distributary channels of the Canning River "due to extensive snow and ice cover."[53] The FWS crew "look[ed] for a Staines River distributary, but did not see evidence of any active or recently active channels," only identifying a "former channel breaking off from the Canning River" where the USGS "topographic map shows the Refuge boundary first trending west away from the main stem of the Canning River."[54]

---

[51] AR000921 (1983 FWS Description map).

[52] AR000374.

[53] AR000376.

[54] AR000374.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 15 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 15 of 74

BLM conducted a survey of Township 6-23 in the summer of 2012, in which it noted that the boundary of ANWR follows the "most westerly channel of the Canning River, now called the Staines River."[55]  The survey was accepted by the BLM Chief Cadastral Surveyor for Alaska on July 24, 2015.[56]

## IV.    BLM's Decisions, IBLA's Decisions, and This Litigation

On October 17, 2014, the State of Alaska Department of Natural Resources sent a letter to the BLM Alaska State Office "request[ing] a priority conveyance of certain lands west of" ANWR, including lands "west of the mean high water mark of the extreme west bank of the Canning River," based on its previous selections under Section 6(b) of the Alaska Statehood Act.[57]  On February 2, 2016, the BLM Alaska State Office responded that "there are no remaining State-selected lands in these townships" because the lands were either previously conveyed to the State or were "within the boundary of the . . . Range" created by PLO 2214 ("2016 Land Grant Selection Decision").[58]

In February 2016, BLM published a "Notice of Filing of Plats of Survey" based on the 2012 survey of Township 6-23.[59]  On March 25, 2016, the State submitted a Notice of Protest of the plat of Township 6-23, followed by a Statement

---

[55] AR000283.

[56] AR000283.

[57] AR000780-81.

[58] AR000670.

[59] 81 Fed. Reg. 10,274 (Feb. 29, 2016).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 16 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 16 of 74

of Reasons on May 25, 2016.[60]  In its Statement of Reasons, the State indicated that it was challenging the portion of the ANWR boundary that followed the Staines River rather than the Canning River.[61]  BLM denied the State's protest on November 8, 2016, maintaining that the drafters of PLO 2214 intended for the boundary to follow "the Staines River, a named distributary channel of the Canning River" ("2016 Township 6-23 Decision").[62]

The State appealed the 2016 Land Grant Selection Decision and the 2016 Township 6-23 Decision to the Interior Board of Land Appeals ("IBLA").[63]  The IBLA affirmed both 2016 Decisions in a single, consolidated decision dated November 9, 2020 ("2020 IBLA Decision").[64]  First, the IBLA declined to dismiss the State's appeal on the ground of administrative finality; in response to BLM's assertion that the State had acquiesced to a decision dating back to the 1960s, the IBLA determined that the State's protests of the 2016 Decisions were "raised at the first opportunity for the State to have lodged such a challenge."[65]  However, the IBLA indicated that "while [it] do[es] not apply the doctrine of administrative finality . . . , it is nevertheless worthy of note that the State acquiesced, without challenge or

---

[60] AR003561-72.

[61] AR003561-72.

[62] AR000419; AR000021.

[63] *See* AR000006-07.

[64] AR000006.

[65] AR000024-25, AR000027.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 17 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 17 of 74

objection, in the Department's delineation of the ANWR boundary along the Staines River through numerous actions over several decades."[66]  The IBLA then turned to the merits, concluding that "the historical record demonstrates that the drafters of PLO 2214 and associated documents intended for the boundary they were describing to follow the topographic features depicted on contemporaneous maps as the Staines River distributary of the Canning River system," finding that "the State has not carried its burden to demonstrate error by BLM" in so concluding.[67]

On April 6, 2022, the State initiated this action in this Court, challenging the 2020 IBLA Decision, the 2016 Land Grant Selection Decision, and the 2016 Township 6-23 Decision.[68]  On November 17, 2022, the State moved to supplement the administrative record with U.S. Geological Survey ("USGS") quadrangle maps that were purportedly available to the drafters of PLO 2214 (the "1951 Maps").[69]  The Court granted this motion on March 9, 2023 and remanded the case to the IBLA to reconsider the 2020 IBLA Decision in light of the 1951 Maps.[70]  The Court found that the 1951 Maps were "available when the PLO 2214

---

[66] AR000039.

[67] AR000007-08; AR000050.  The 2020 IBLA Decision does not appear to make a finding regarding whether the text of PLO 2214 is ambiguous.  *See* discussion *infra* p. 56 n.209.

[68] Docket 1 at 23.

[69] Docket 23.

[70] Docket 29.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 18 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 18 of 74

drafters drafted the boundary's description, . . . are relevant to the IBLA's interpretation of the PLO 2214 drafters' intent, . . . and . . . may have been the most refined topographical depiction of the disputed land available when the 1957 Withdrawal Application . . . was drafted."[71]

On remand, the IBLA issued a second decision, in which it considered how, if at all, the introduction of the 1951 Maps altered its analysis and decision ("2024 IBLA Decision").[72]  With respect to one of the maps, the "1951 Flaxman Island Map," the IBLA determined "that there is insufficient evidence on which to definitively determine that [it] was actually used by the drafters in creating the metes and bounds description," but nonetheless "assume[d] for the sake of analysis" that it was available during drafting.[73]   A relevant excerpt of the 1951 Flaxman Island Map is copied below:

---

[71] Docket 29 at 15-16.

[72] AR005416-37.

[73] AR005421-22.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 19 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 19 of 74


74

The IBLA also considered another map introduced by the State on remand, which was published in June 1958 ("State Exhibit 3"). The IBLA concluded that it was not considered by the drafters in crafting the metes and bounds description, but that it "may retain relevance as part of the larger record of materials available shortly after FWS drafted the metes and bounds description."[75] A relevant excerpt of State Exhibit 3 is copied below:

---

[74] AR005412.

[75] AR005420-21.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 20 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 20 of 74



Because the parties "agree[d] that the 1955 Maps presented in the original appeals were not available in 1957 when FWS drafted the metes and bounds language," the IBLA also "modif[ied its] Decision to reflect that the 1955 Maps were not available to the drafters," finding that "this modified understanding of the 1955 Maps does not render them irrelevant to the analysis as the State suggests," and treating them as "among the maps of the era that were created contemporaneously with the legal description of the range."[77]  A relevant excerpt of one of the maps, the "1955 Flaxman Island map," is copied below:

---

[76] AR005320 (State Exhibit 3).

[77] AR005429-30 (internal quotation marks and citations omitted); *see* AR000618-21 (the 1955 maps).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 21 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 21 of 74



78

The IBLA ultimately found that "[n]either the introduction of the 1951 Maps nor the modified understanding of the 1955 Maps alters the overall conclusions drawn from the record as a whole or leads to the reversal" of the 2020 IBLA

---

78 AR000620 (1955 Flaxman Island map). According to Federal Defendants, this is a version of the map that was used to "prepare the legal description for" the 1983 FWS Description. Docket 41 at 21-22 (citing AR000920).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 22 of 74
Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 22 of 74

Decision.[79]  On June 3, 2024, the State amended its Complaint in this action to include a challenge to the 2024 IBLA Decision.[80]

On September 30, 2024, the State filed a Motion for Summary Judgment.[81] In its motion, the State contends first, that the plain text of PLO 2214 "unambiguously establishes the Canning River as the Refuge's northwest boundary"; second, that "[t]he IBLA improperly looked beyond the four corners to reach its contradictory interpretation of PLO 2214"; third, that the "IBLA unilaterally adjusted the Refuge's northwest boundary by reinterpreting PLO 2214's reference to the Canning River to mean the Staines River," which "circumvents congressional oversight and public accountability processes";[82] fourth, that "[e]ven if PLO 2214 is ambiguous, the IBLA wrongly concluded that the Staines River is the Refuge's intended northwest boundary" because the IBLA improperly discounted certain record evidence and placed too much emphasis on other ambiguous or inconclusive evidence; and fifth, that "BLM's surveyed boundary is a line that does not align with any river currently in existence or that existed in 1957," which "renders the decisions arbitrary and capricious.[83]

---

[79] AR005433.  The 2024 IBLA Decision does not address whether the text of PLO 2214 is ambiguous.  *See* AR005416-37.

[80] *See* Docket 34 at 23, 25.

[81] Docket 39.

[82] Because the Court finds that the IBLA did not "reinterpret" PLO 2214 but rather properly confirmed the original intent of the drafters, *see infra* Discussion Section II.C, the Court does not address this argument.

[83] Docket 39 at 21, 28, 33, 36-38, 51, 53, 57.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 23 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 23 of 74

In Federal Defendants' opposition filed on December 13, 2024, they maintain first, that the IBLA correctly determined that the text, history, structure, and purpose of PLO 2214 unambiguously "place the northwestern boundary of the Range along the Staines River distributary of the Canning River"; second, that "[t]he IBLA correctly concluded that Congress endorsed Interior's placement of the northwestern boundary of the Range along the Staines River" in ANILCA; third, that the IBLA correctly determined that Congress delegated authority to the Secretary of the Interior to establish the boundaries of ANWR, that the Secretary placed the boundary along the Staines River, and that the Court should give deference to the agency's factual determination; and fourth, that the State's arguments about PLO 2214's plain meaning as well as the import of the State's recent investigations of the rivers are without merit.[84]

The State replied on January 27, 2025, asserting first, that the IBLA improperly disregarded the plain meaning of the term "Canning River" in the text of PLO 2214; second, that even if the Court were to consider extrinsic evidence, this evidence confirms the State's interpretation that the Staines River is not the northwest boundary of ANWR; and third, that ANILCA did not establish the Staines River as the Refuge's northwest boundary.[85]

The parties' dispute is illustrated by the State in the following map:

---

[84] Docket 41 at 36, 39-40, 44-47.

[85] Docket 44 at 7, 12, 28.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 24 of 74



Oral argument was held on the motion on March 28, 2025.[87]

---

[86] Docket 39 at 15 (Disputed ANWR Boundary Map).

[87] Docket 53.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 25 of 74

## LEGAL STANDARD

This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), which provides for judicial review of final agency action. In reviewing an administrative agency's decision, the "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."[88] "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."[89]

"Under the [APA], only 'final agency action' is subject to judicial review."[90] A decision of the IBLA "constitute[s] final agency action when made."[91] "In reviewing decisions of the IBLA, [courts] exercise a limited standard of review and will reverse only if the decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law."[92] Courts "carefully search the entire record to determine whether it contains such relevant evidence as a reasonable mind might

---

[88] *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

[89] *Id.* (internal quotation marks omitted) (quoting *Occidental Eng'g Co.,* 753 F.2d at 770).

[90] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1064 (9th Cir. 2010) (quoting 5 U.S.C. § 704).

[91] *Id.*; *see also IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009-10 (10th Cir. 2000) ("With respect to our review, we examine both the BLM's and the IBLA's decisions; but . . . because the IBLA is the final decision maker of the agency, we apply the deferential standard of review to the decision of the IBLA, not of the BLM."); *Backes v. Bernhardt*, 523 F. Supp. 3d 1233, 1243-44 (D. Or. 2021).

[92] *Akootchook v. United States*, 271 F.3d 1160, 1164 (9th Cir. 2001); *see also Hjelvik v. Babbitt*, 198 F.3d 1072, 1074-75 (9th Cir.1999).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 26 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 26 of 74

accept as adequate to support a conclusion and whether it demonstrates that the decision was based on a consideration of relevant factors."[93]

Courts apply *Auer*[94] deference to defer to an agency's interpretation of ambiguous regulations or other legal instruments so long as the agency's interpretation is "reasonable," it represents "the agency's authoritative or official position," it "implicate[s the agency's] substantive expertise," and it "reflect[s the agency's] fair and considered judgment."[95] The scope of *Auer* deference was limited in *Kisor v. Wilke*, in which the Supreme Court held that "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous."[96] To determine if a legal instrument is "genuinely ambiguous," the *Kisor* Court directs courts to "exhaust all the 'traditional tools' of construction," including analysis of the regulation's "text, structure, history, and purpose."[97] "[D]etermining whether a regulation or statute is ambiguous presents a legal question, which [courts]

---

[93] *Akootchook*, 271 F.3d at 1164 (citation modified) (quoting *Hjelvik,* 198 F.3d at 1074).

[94] *See Auer v. Robbins*, 519 U.S. 452 (1997). Note that, while the Supreme Court has overruled *Chevron* deference, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), *Auer* deference remains good law. *See Rana v. Jenkins*, 113 F.4th 1058, 1067 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1128 (2025) (noting in a case published a month after the publication of *Loper Bright*, that "[t]he Supreme Court rejected the opportunity to [undermine *Auer* deference] in *Kisor v. Wilkie*").

[95] *Kisor v. Wilkie*, 588 U.S. 558, 574-75, 577, 579 (2019) (internal quotation marks and citations omitted).

[96] *Id.* at 574; *see also United States v. Scheu*, 83 F.4th 1124, 1127 (9th Cir. 2023).

[97] *Kisor*, 588 U.S. at 574-75 (citation omitted).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 27 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 27 of 74

determine *de novo.*[98]  If the instrument's text is unambiguous, a court gives no deference to the agency's interpretation, and "[t]he regulation then just means what it means."[99]

## DISCUSSION

### I.    The Parties' Positions

The parties disagree on the location of the northwest boundary of the Refuge as established in PLO 2214.  First, the parties disagree on whether the IBLA and the Court should look beyond the four corners of PLO 2214 to determine whether the boundary description is ambiguous.   Next, the parties offer differing interpretations of the plain text; different analyses about the history, structure, and purpose of PLO 2214; and different assertions about the import of modern survey information.   Finally, the parties disagree on the significance of subsequent Congressional action. The Court discusses each of these arguments in turn before turning to its findings.

#### A. The Parties Disagree on the Proper Means for Determining Whether PLO 2214 Is Ambiguous.

The State contends that "discerning the meaning of the legal description in PLO 2214 is a question of law on which the Court must exercise its independent

---

[98] *Humanoids Grp. v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004);  *see also United States v. Gomez-Osorio*, 957 F.2d 636, 639 (9th Cir. 1992) ("The interpretation of statutes and applicable regulations raises a question of law that we review *de novo*."); *John v. United States*, 247 F.3d 1032, 1041-42 (9th Cir. 2001) (Tallman, J., concurring) (Whether a statute is ambiguous is a pure question of law to be determined by the courts . . . .").

[99] *Kisor*, 588 U.S. at 575.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 28 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 28 of 74

judgment"[100] and that "a court may not look beyond the four corners of a PLO unless the text is ambiguous."[101]  According to the State, "unlike statutes—which are sometimes intentionally drafted to be ambiguous—public land orders such as PLO 2214 are instruments that are required to be unambiguous on their face."[102] The State bolsters this contention by asserting that PLO 2214's lack of a reference map "further confirm[s] that the order's boundary description was meant to be and, at the time, understood to be, perfectly unambiguous."[103]

The State maintains that the IBLA improperly looked beyond the four corners of PLO 2214 to reach its conclusion that the northwest boundary of the Refuge follows the Staines River.[104]  The IBLA's analysis, which "relied upon the collective weight of a host of record elements available during the drafting of PLO 2214 and

---

[100] Docket 39 at 22; *see also* Docket 39 at 21 (quoting *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 393 (2024)) ("[T]he APA require[s] reviewing courts to exercise independent judgment on questions of law."); Docket 39 at 21 (citing *City & Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1242 (9th Cir. 2018)) ("rejecting agency interpretation of Executive Order that was contrary to its unambiguous text").

[101] Docket 39 at 22; *see also* Docket 39 at 22 (quoting *S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1237 (10th Cir. 2010)) ("An order, if it is not ambiguous, must be enforced according to its plain meaning.").

[102] Docket 39 at 22-23 (citation omitted); *see also* Docket 39 at 23 (quoting U.S. Dep't of Interior, *Specifications for Descriptions of Tracts of Land* 2 (1931, re-issue, 1941)) ("[D]escriptions of tracts of land in orders and proclamations 'should be susceptible of one and only one interpretation' and should be 'a model of precision just as far as the available survey data permit.'"); Docket 44 at 9 (first citing AR003447; and then citing AR003462); AR003447 ("The description of the tract or tracts of land involved should be technically competent, definite, and susceptible of only one interpretation."); AR003462 (stating that when "the boundaries of a tract are defined entirely or in part by natural monuments, . . . it is essential that each boundary be described so definitely and specifically that there is no uncertainty as to its identification").

[103] Docket 39 at 25.

[104] Docket 39 at 28.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 29 of 74

developed over time during implementation of PLO 2214,"[105] was improper, according to the State, because the IBLA did not first find the text of PLO 2214 to be ambiguous, and "[t]he IBLA may not look beyond the four corners of a PLO when the text is unambiguous."[106]  According to the State, there is no "latent" ambiguity in PLO 2214, which "is not created simply because parties have different interpretations and dispute the meaning of a writing"; rather, ambiguity only exists when, "although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen."[107]

Federal Defendants contend that the State "relies on a flawed plain-meaning analysis" for its contention "that the Court must look to the text—and only the text—to determine whether an agency's regulation, or in this case public land order, is ambiguous."[108]  Federal Defendants cite *Kisor v. Wilkie* for the proposition that a court must consider "the text, structure, history, and purpose of a regulation" before determining "whether the text is genuinely ambiguous or capable of only one

---

[105] Docket 39 at 28 (quoting AR005432-33).

[106] Docket 39 at 29-30. The State asserts that the IBLA's cited authorities "resort to extrinsic evidence in situations where the language in the conveyance is determined to be ambiguous." Docket 39 at 29-30 (citing AR000031-33 (collecting cases)).

[107] Docket 39 at 31-32 (first citing *United States v. Gila Valley Irrigation Dist.*, 961 F.2d 1432, 1441 (9th Cir. 1992); and then quoting *Bolton v. Constr. Laborers' Pension Trust*, 56 F.3d 1055, 1059 (9th Cir. 1995)).

[108] Docket 41 at 35.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 30 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 30 of 74

interpretation."[109]  Here, Federal Defendants contend, neither the "extreme west bank of the Canning River" nor "the Canning River" is "defined and neither lends itself to a common or ordinary meaning."[110] According to Federal Defendants, the State "also invents its own rule of interpretation that public land orders 'are required to be unambiguous on their face.'"[111]

In its reply, the State maintains that the terms of PLO 2214 "have a plain meaning on their face; [Federal Defendants'] efforts to twist out some other meaning contravenes the directive that an interpretive analysis must 'begin with a look toward the plain meaning of the [order] and stop there if the language is clear.'"[112]  "Taken to its logical conclusion, [Federal Defendants'] position seems to be that any reference to a named river in a public land order—or at least to any river with tributaries, distributaries, or other branches—is facially unclear and must always be open to interpretation. Such an argument would, absurdly, cast doubt on the plain meaning of likely thousands of public land orders that refer to named rivers with distributaries and branches."[113]  The State also maintains that "*Kisor* requires that courts exhaust all these traditional interpretive tools before reaching

---

[109] Docket 41 at 36.

[110] Docket 41 at 28.

[111] Docket 41 at 45 (quoting Docket 39 at 22).

[112] Docket 44 at 7 (emphasis omitted) (quoting *Safe Air for Everyone v. EPA*, 475 F.3d 1096, 1103 (9th Cir. 2007))

[113] Docket 44 at 8.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 31 of 74

a conclusion that an order is ambiguous and thus deserving of agency deference, but the decision *does not require* the use of any tools beyond the text if the text's plain meaning is clear."[114]

## B. The Parties Disagree on the Plain Meaning of the Text of PLO 2214.

### 1. "the extreme west bank of the Canning River"

The parties first dispute the meaning of PLO 2214's provision that the northwestern boundary of the Refuge follows "the extreme west bank of the Canning River."[115] Both sides assert that PLO 2214 is unambiguous, but they take opposite positions as to what PLO 2214 unambiguously provides.[116]

The State asserts that "the express term 'Canning River' is unambiguous in denoting the actual Canning River rather than the separate and distinct Staines River or some other asserted distributary of the Canning."[117] According to the State, "[t]he IBLA transformed the straightforward phrase 'extreme west bank of the Canning River' . . . into the very different phrase 'westernmost channel of the Staines River' —in so doing converting 'Canning' into 'Staines' and 'west bank' into

---

[114] Docket 44 at 11 (emphasis in original).

[115] AR000668.

[116] *See* Docket 39 at 21; Docket 41 at 26.

[117] Docket 39 at 24.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 32 of 74

'westernmost channel.'"[118]   The State also maintains that "when tributaries were included in the boundary description, PLO 2214 expressly called them out."[119]

Federal Defendants contend that because the phrase "extreme west bank of the Canning River" is undefined and does not lend itself to a common or ordinary meaning, it is "proper to consult contemporary sources to help explain the term's ordinary meaning."[120]   Federal Defendants cite two somewhat contemporaneous sources to determine the meaning of "the Canning River."  First, the 1906 United States Geological Survey ("USGS") Geographic Dictionary of Alaska defines the Staines and Canning as "now thought to be two mouths of the same river," and its entry for the Staines River simply states, "see Canning."[121]  And second, the 1967 Dictionary of Alaska Place Names defines the Staines as a "distributary of [the] Canning River."[122]   Federal Defendants also maintain that "[t]he descriptor 'extreme west bank' implies multiple west banks and demonstrates that the

---

[118] Docket 39 at 25-26.

[119] Docket 39 at 27 (citing AR03151) (noting that the seventh, eighth, fifteenth, and nineteenth courses refer to tributaries).

[120] Docket 41 at 28 (citing *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (consulting dictionaries to interpret statutory terms to be "consistent with their ordinary meaning . . . at the time Congress enacted the statute" (alteration in original) (internal quotation marks and citation omitted)); *see also* Docket 41 at 28 (quoting *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017)) ("[W]e examine contemporaneous sources to determine the legal meaning of the term at the time Congress employed it in the statute." (alteration in original)).

[121] Docket 41 at 29 (quoting AR000126-27).

[122] Docket 41 at 29 (alteration in original) (quoting AR000583).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 33 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 33 of 74

Secretary intended for the furthest western distributary of the Canning River—the Staines River—to form the boundary."[123]

The State takes issue with Federal Defendants' reliance on these two contemporaneous sources. With respect to the 1906 USGS Geographic Dictionary of Alaska, the State asserts that Federal Defendants "only speculate[] that PLO 2214's drafters utilized this definition."[124] The State maintains that contemporaneous maps labeling the Staines and Canning and therefore identifying them as distinct rivers "provide more reliable, contemporary authority than a 1906 dictionary."[125] With respect to the 1967 Dictionary of Alaska Place Names, the State contends that "even if a river is a distributary or tributary of another river, the two rivers are not described as one" and that the 1967 Dictionary "omit[s] the Canning River from the list of 'variant names' for the Staines River."[126] Moreover, the fact that the 1967 Dictionary identified the Staines River as a distributary of the Canning is "irrelevant" according to the State; "[o]therwise, . . . any reference to a river would necessarily include all tributaries and distributaries

---

[123] Docket 41 at 29.

[124] Docket 44 at 14.

[125] Docket 44 at 14; *see also* Docket 39 at 38-39 (first citing AR005412 (1951 Flaxman Island Map, copied *supra* p. 20); then citing AR000135 (ANILCA map, copied *supra* p. 13); then citing AR000154 (1957 Metes and Bounds Map, copied *supra* p. 5); then citing AR000219; then citing AR000229; then citing AR000426; then citing AR000617; then citing AR000620 (1955 Flaxman Island map, copied *supra* p. 22); then citing AR002000 (1958 BLM Field Report map, copied *supra* p. 8); and then citing AR005245 (1951 Flaxman Island Quadrangle Map, copied *infra* p. 42)).

[126] Docket 44 at 15 (citing AR000583).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 34 of 74

of that river system. For example, a reference to the 'Mississippi River' could be interpreted to mean any and all of its tributaries, which include the Missouri, Ohio, and Red Rivers."[127]  The State also maintains that Federal Defendants ignore the fact that the Canning River is "a highly braided river that split into multiple channels before reaching the Arctic Ocean. Therefore, PLO 2214's reference to the Canning River's 'extreme west bank' can be reconciled with [Federal Defendants'] assertion that 'extreme west bank' 'implies multiple west banks.'"[128]

## 2. "a point of land . . . known as Brownlow Point at approximate longitude 145º51' W., and latitude 70º10' N.; thence in a southwesterly direction approximately three (3) miles . . ."

The parties next dispute the significance of PLO 2214's description of the northwest boundary of the Refuge as following from "a point of land on the Arctic Seacoast known as Brownlow Point at approximate longitude 145º51' W., and latitude 70º10' N.; thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River."[129]

The State contends that "[t]he IBLA arbitrarily moved the location of Brownlow Point to justify its preferred boundary."[130]  While Federal Defendants

---

[127] Docket 39 at 39.

[128] Docket 44 at 16 (first citing AR005412 (1951 Flaxman Island Map, copied *supra* p. 20); and then quoting Docket 41 at 29).

[129] AR000668.

[130] Docket 39 at 43.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 35 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 35 of 74

and the IBLA place Brownlow Point at the western tip of the sand spit, the State

places it at the terminus of the peninsula:



The State asserts that its placement of Brownlow Point is recognized by the U.S.

National Geodetic Survey, which has a survey control point on the peninsula called

Brownlow Point.[132]  Moreover, "the IBLA's location of Brownlow Point at a

transitory feature such as a sand spit is inconsistent with principles governing

surveys and the establishment of boundaries," which direct that a "good monument

should possess the quality of being easily visible, certain of identification, stable in

location, permanent in character, and nondependent on measurement for its

location."[133]  The State also maintains that "the IBLA's placement of Brownlow

Point at the sand spit puts it approximately two minutes west of the referenced

---

[131] Docket 39 at 45 (citing AR000789).

[132] Docket 39 at 45 (citing AR000854-57).

[133] Docket 39 at 46 (internal quotation marks omitted) (quoting AR000307).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 36 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 36 of 74

longitude and latitude."[134]  The State contends that a three-mile southwesterly line from its favored placement of Brownlow Point arrives at its asserted river outlet, whereas a line to the Staines River would be approximately 4 ¼ miles long:



---

[134] Docket 39 at 50 (citing AR005281).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 37 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 37 of 74



135

Federal Defendants respond that "using any relevant map in the Administrative Record that could have been available in 1960, a bound drawn from Brownlow Point in a southwesterly direction for 'approximately three (3) miles' places the boundary at the mouth of the Staines River," whereas "a bound drawn from Brownlow Point to other distributaries of the Canning River would have followed a southeasterly, due south, or, at best, a south-southwesterly course."[136]

The State replies that Federal Defendants provide "absolutely no support" for their assertion that the Staines River is located approximately three miles from

---

[135] Docket 39 at 47-48 (first citing AR000668; then citing AR005282; and then citing AR005281).

[136] Docket 41 at 30 (emphasis omitted).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 38 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 38 of 74

Brownlow Point.[137]  The State also maintains that Federal Defendants "do[] not defend whatsoever the IBLA's conclusion that Brownlow Point is the low-lying, transient sand spit in the Arctic Ocean. Accordingly, [Federal Defendants] ha[ve] conceded that Brownlow Point is located at the peninsula's terminus and not the sand spit."[138]

## C. The Parties Disagree on the Conclusions to be Drawn from the History, Structure, and Purpose of PLO 2214.

### 1. 1957 Metes and Bounds Map

The State takes issue with the IBLA's reliance on the 1957 Metes and Bounds Map, and specifically with the IBLA's conclusion that that map is "perhaps the strongest evidence of contemporaneous drafter intent" based on the fact that the map "places the ANWR boundary following the 'Staines R[iver]' from its split with the main branches of the Canning River to the Beaufort Sea."[139]  "The IBLA concluded that the map is a 'contemporaneous response from the drafters of the

---

[137] Docket 44 at 20. *But see* AR005426 (2024 IBLA Decision noting that the State previously conceded that a line drawn between the sand spit and the Staines River would be approximately 3 ¼ miles long).

[138] Docket 44 at 18 (citations omitted).  The Court does not understand Federal Defendants' response to be a concession as to this point.  The Court understands Federal Defendants' contention that a bound drawn from Brownlow Point to the State's preferred river outlet may follow a southeasterly course to mean that Federal Defendants are drawing that bound from the end of the sand spit.  *See* Docket 41 at 29.  Moreover, Federal Defendants state elsewhere in their opposition that the 1983 FWS Description provides "clarification" that Brownlow Point is pushed "further west to include the spit of land." Docket 41 at 42.  Federal Defendants further clarified that they consider Brownlow Point to be located at the end of the sand spit at oral argument.  *See* Docket 57 at 4 (Federal Defendants' attorney responding that "if you extend [the boundary] out to the end of the sandspit here it would not be cut off" in response to the Court's question about Federal Defendants' proposed boundary cutting off landforms).

[139] Docket 39 at 51 (citing AR000034); AR005433.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 39 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 39 of 74

metes and bounds description to a request that they graphically depict the course and markers that they were describing, providing clear representation of their intent.'"[140]

According to the State, "[t]he administrative record lacks any information about who drafted the map or when or why"; the map was simply found "with the FWS's draft metes and bounds description in a National Archives file of correspondence related to the Refuge."[141] Moreover, "[t]he map contains stray lines and scribbles (circled in green) that bear no relation to PLO 2214's boundary."[142] The State contends that "the unknown map maker could have also erroneously traced the Staines River rather than the Canning River as the boundary—a likely outcome given the map's scale and the fact that it does not separately label the Canning River at its mouth."[143]

Federal Defendants respond that "the 1957 Metes and Bounds Map is the only numbered map of the era found anywhere in the Administrative Record" and that the State "has not identified any other contemporaneous map that could have potentially been used to convey a contrary intent."[144]

---

[140] Docket 39 at 51 (quoting AR005434).

[141] Docket 39 at 51 (citing AR000102); *see also* Docket 44 at 22-24.

[142] Docket 39 at 52 (citing AR000154 (1957 Metes and Bounds Map, copied *supra* p. 5)).

[143] Docket 39 at 52 (emphasis omitted).

[144] Docket 41 at 31 (emphasis omitted).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 40 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 40 of 74

The State replies that the fact that the map "is in the Administrative Record does not mean it reflects PLO 2214's intent or even that [it] was used when drafting PLO 2214."[145]  The 1957 Metes and Bounds Map—which "may have been hastily drafted and in error" and which "may not have been drafted by the Bureau of Sport Fisheries at all"—"raises more questions than it answers," according to the State.[146]

## 2. PLO 2215

The State also takes issue with the IBLA's reliance on what it describes as the "ambiguous and inconclusive" PLO 2215.[147]  The IBLA cited PLO 2215 as providing "meaningful indications of the intent behind PLO 2214."[148]  PLO 2215 excluded from selection lands withdrawn by PLO 2214, which PLO 2215 described as "all lands lying east of Canning River, extending from its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W., to its source in the Brooks Range in approximate longitude 145°13' W., latitude 68°53' N."[149]  The IBLA found that "a line following the marked course of 146° W longitude runs through the heart of Flaxman Island . . . to a location very close to the mouth of the

---

[145] Docket 44 at 22.

[146] Docket 44 at 23-24.

[147] Docket 39 at 53.

[148] AR005432 n.104 (quoting AR000034).

[149] AR000669.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 41 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 41 of 74

Staines River."[150]   However, the State contends that "[b]oth the Staines and Canning Rivers are found at 'approximate' longitude 146° W"[151]:



[152]

---

[150] AR005436.

[151] Docket 39 at 54; *see also* Docket 44 at 25-26.

[152] Docket 39 at 54 (citing AR005245 (1951 Flaxman Island Quadrangle Map)).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 42 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 42 of 74

Federal Defendants, on the other hand, maintain that "[m]aps of the era place the mouth of the Staines River at almost exactly longitude 146° W."[153]

### 3. 1958 BLM Field Report

The State asserts that the IBLA arbitrarily dismissed the 1958 BLM Field Report, which included a map depicting "the Canning River, rather than the Staines River, as the northwest boundary."[154] The State rejects each of the IBLA's four "thin" reasons for dismissing the 1958 BLM Field Report.[155] First, the State dismisses the IBLA's speculation that "FWS may not have been aware" of the report and that BLM did not consult with FWS on it, noting that "BLM was the United States' expert agency in interpreting and applying legal descriptions."[156] Second, the State rejects the IBLA's dismissal of the 1958 BLM Field Report based on the fact that "the report had recommended rejection of the FWS's withdrawal application," maintaining that "BLM based its recommendation to reject the FWS's withdrawal application on its finding that the FWS had not justified the *need* for the withdrawal, not based on any errors in the legal description."[157] Third, the IBLA "discounted the field report because the BLM had requested it be kept

---

[153] Docket 41 at 33-34 (first citing AR000154 (1957 Metes and Bounds Map, copied *supra* p. 5); then citing AR000618; then citing AR005245 (1951 Flaxman Island Quadrangle Map, copied *supra* p. 42); then citing AR002000 (1958 BLM Field Report map, copied *supra* p. 8); then citing AR000620 (1955 Flaxman Island map, copied *supra* p. 22).

[154] Docket 39 at 41 (citing AR002000 (1958 BLM Field Report map, copied *supra* p. 8)).

[155] Docket 39 at 41.

[156] Docket 39 at 41-42 (citing AR000035-36).

[157] Docket 39 at 42 (emphasis in original) (first citing AR000035; and then citing AR001991).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 43 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 43 of 74

confidential," but the State asserts that "BLM sought to keep the report's recommendations confidential because of the controversy surrounding the withdrawal," not because of any dispute surrounding the northwest boundary.[158] And fourth, the IBLA concluded that BLM's 1965 modified approval of the State's Section 6(b) applications—in which BLM explained that "the northern boundary of the Reserve was not correctly plotted on the records" and "more of the lands selected . . . are within PLO 2214 than was previously shown on the protractions"— indicated BLM's subsequent adjustment of the boundary to follow the Staines River.[159] However, because this modification "reduced the total area of the State's selections by . . . nearly triple the number of the acres between the Staines River and Canning River," the State asserts that the "boundary adjustment appears unrelated to the present issue of whether the Staines River or the Canning River was the intended northwest boundary."[160]

Federal Defendants discount the 1958 BLM Field Report map as "irrelevant to understanding the FWS's or the Secretary's intent" given that "there is no

---

[158] Docket 39 at 42 (first citing AR000035; then citing AR000035 n.198; then citing AR001122-23; and then citing AR001973).

[159] AR000035 (alteration in original) (quoting AR000679).

[160] Docket 39 at 43 (citing AR002544-45). The Court notes that elsewhere, the State appears to concede that BLM's 1965 modified approval of State selections implicated the disputed lands. In the State's Amended Complaint, it provides that "[t]hrough two decisions dated February 4, 1965, the BLM modified its October 9, 1964 and January 15, 1965 decisions to exclude those lands between the Staines and Canning Rivers from the 1964 Land Grant Selections." Docket 34 at ¶ 31.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 44 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 44 of 74

indication in the record that the BLM's own internal map was ever provided to the FWS or the Secretary of the Interior before the drafting of PLO 2214."[161]

### 4. Purpose

The IBLA agreed with the BLM that "splitting the broad delta of the Canning River system with the boundary . . . makes no sense from a habitat or boundary management standpoint."[162]  The State takes issue with this conclusion, maintaining that "[t]he Staines River . . . cannot be characterized as part of the Canning River's 'delta,'" which is defined as a "fan-shaped alluvial tract formed at the mouth of a river, when it deposits more solid material there than can be removed by tidal or other currents."[163] Moreover, according to the State, the IBLA's rejection of the State's position because the ensuing line would carve out "the northwest portion of the peninsula, as well as another outcropping of the coastline" ignores the fact that "PLO 2214 describes the boundary as following the 'line of extreme low water, including all offshore bars, reefs, and islands' to Brownlow Point . . . Nothing in the description suggests that the boundary stops following the extreme low water line between Brownlow Point and the Canning River.  By

---

[161] Docket 41 at 33.

[162] AR000039 (internal quotation marks and citation omitted).

[163] Docket 39 at 56-57 (internal quotation marks omitted) (quoting Bureau of Land Mgmt., *Glossaries of BLM Surveying and Mapping Terms* 88 (1980), https://www.blm.gov/sites/default/files/cadastralglossary.pdf).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 45 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 45 of 74

continuing to follow the extreme low water line, the boundary captures the peninsula in its entirety, contrary to the IBLA's conclusion."[164]

Federal Defendants point to the purpose of the Refuge as described in PLO 2214, which is to "preserv[e] unique wildlife, wilderness and recreational values."[165] According to Federal Defendants, their proposed boundary "would not risk splitting any reefs, islands, or bars between federal and state control. The State's proposed boundary, however, would sever geographic features in the area, including the peninsula from which Brownlow Point extends."[166]

In its reply, the State contends that Federal Defendants "ignore[] that placement of the Refuge's boundary at the Staines River would also 'sever' geographic features in the area, most notably a knoll of land with the RUTH 1949 U.S. Coast Guard and Geodetic Survey marker"[167]:

---

[164] Docket 39 at 49-50 (first quoting AR005425; and then quoting AR000668).

[165] Docket 41 at 34 (quoting AR000668).

[166] Docket 41 at 34.

[167] Docket 44 at 26.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 46 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 46 of 74



168

The State also maintains that Federal Defendants "place[] too much weight on the Refuge's purpose as determinative of its northwest boundary" given that, in the September 18, 1957 letter from the Regional Office of the FWS Bureau of Sport Fisheries and Wildlife, the Director indicated that "[i]t might be argued the boundaries should be adjusted in some different manner but this would make little difference in the overall objective."[169]

---

[168] Docket 44 at 27 (citing AR005245 (1951 Flaxman Island Quadrangle Map, copied *supra* p. 42)).

[169] Docket 44 at 27-28 (internal quotation marks omitted); AR000162.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 47 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 47 of 74

At oral argument, Federal Defendants responded that RUTH 1949 "would not be cut off" from the Refuge if the boundary "extend[ed] out to the end of the sandspit."[170]

### D. The Parties Disagree on the Import of Modern Survey Information.

The State contends that "much of the BLM's surveyed boundary is a line that does not align with any river currently in existence or that existed in 1957."[171] The State points to ground photography taken of the area in 2016 in which "no river exists whatsoever" in the place designated by the Federal Defendants as the surveyed boundary.[172] Federal Defendants take issue with these photographs, indicating that "Alaska's own factfinding decades after the drafting of the text is irrelevant to the drafter's intent."[173]

### E. The Parties Disagree as to the Significance of Subsequent Congressional Action.

In their opposition, Federal Defendants contend that "[t]he IBLA correctly concluded that Congress endorsed Interior's placement of the northwestern boundary of the Range along the Staines River."[174] Federal Defendants point to ANILCA, in which Congress incorporated the existing Arctic National Wildlife

---

[170] Docket 57 at 4.

[171] Docket 39 at 57.

[172] Docket 39 at 58-60; AR000328; AR000335. At oral argument, the State also pointed to photographs taken in 2003. Docket 57 at 3.

[173] Docket 41 at 46.

[174] Docket 41 at 36.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 48 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 48 of 74

Range into the newly created Refuge, and described the new boundaries of ANWR by reference to a map which depicts the northwestern boundary as following the Staines River.[175]  Federal Defendants also assert that, after being delegated the authority to do so by Congress in ANILCA, Interior "placed the same boundary along the Staines River."[176]  Federal Defendants cite to ANICLA's directive to the Secretary of the Interior to publish a map and legal description of ANWR, and to the resulting 1983 FWS Description and corresponding map.[177]  The 1983 FWS Description describes the boundary as running from "the extreme left bank with the mean high tide of the Arctic Ocean in section 15, T. 9 N., R. 24 E., . . ." then "on an approximate forward bearing of N. 56 ½° E., approximately 3 ¼ miles to the line of extreme low water of the most westerly tip of the most northwesterly island, westerly of Brownlow Point, section 6, T. 9 N., R. 25 E."[178]  Federal Defendants note that "[t]he mouth of the Staines is within section 15, T. 9 N., R. 24 E" and that the end point of "'the most northwesterly island, westerly of Brownlow Point' pushes that reference point further west to include the spit of land."[179]

---

[175] Docket 41 at 37-38 (first citing ANILCA, § 303(2), 94 Stat. at 2390; and then citing AR000135 (ANILCA map, copied *supra* p. 13)).

[176] Docket 41 at 39-40.

[177] Docket 41 at 40-41 (first citing ANILCA, § 103(b), 94 Stat. at 2390; and then citing National Wildlife Refuges in Alaska, 48 Fed. Reg. at 7,929-36).

[178] National Wildlife Refuges in Alaska, 48 Fed. Reg. at 7,930; AR000915.

[179] Docket 41 at 42.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 49 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 49 of 74

In its reply, the State first contends that "[t]he IBLA did not find that ANILCA and its implementation control the determination of the Refuge's northwest boundary," and thus the Federal Defendants' argument is a "post hoc rationalization."[180] Instead, the State maintains, the IBLA merely found that "ANILCA and its implementation . . . provid[ed] '*further support* for the agencies' longstanding interpretation of PLO 2214.'"[181] The State moreover asserts that Congress did not "endorse" Federal Defendants' interpretation of PLO 2214.[182] "First, the State's pending land selections prevented Congress from altering the boundary established by PLO 2214, even had Congress intended to do so."[183] Second, the State argues that ANILCA is a "sweeping piece of legislation," rendering it unlikely that "Congress paid particular attention to an approximately 25-mile stretch of the Refuge's northwest boundary," and that the referenced map "is never represented by Congress to be more than a general description of the Refuge's location."[184] Third, the State asserts that ANILCA merely provided the Secretary of the Interior with the authority to confirm the boundaries already established by PLO 2214, rather than to set new boundaries.[185] And fourth, the

---

[180] Docket 44 at 28-29.

[181] Docket 44 at 30 (emphasis in original) (quoting AR000037).

[182] Docket 44 at 31.

[183] Docket 44 at 31.

[184] Docket 44 at 31-32.

[185] Docket 44 at 33.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 50 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 50 of 74

State asserts that any argument about congressional intent is "squarely refuted by subsequent congressional actions," pointing to the 2017 Tax Cuts and Jobs Act, in which Congress referenced a map of ANWR, and the legend on that map stated that it was "not intended to prejudice ongoing boundary litigation between the State of Alaska and the U.S. Department of the Interior."[186]

## II.    The Court's Findings

The Court first finds that the northwest boundary of the Refuge in PLO 2214 is "genuinely ambiguous."[187]  The Court next finds that the IBLA's interpretation of PLO 2214 is likely entitled to *Auer* deference because it is "reasonable," it represents "the agency's authoritative or official position," it "implicate[s the agency's] substantive expertise," and it "reflect[s the agency's] fair and considered judgment."[188]  And finally, even if the Court does not apply *Auer* deference, the Court upholds the 2024 IBLA Decision, finding that it is not arbitrary or capricious, that it is supported by substantial evidence, and that it is not contrary to law.[189]

### A. The Court Finds that the Northwest Boundary of the Refuge in PLO 2214 is Ambiguous.

---

[186] Docket 44 at 33-34 (first citing Pub. L. No. 115-97, § 20001(a)(1), 131 Stat. 2054, 2236 (2017); and then citing U.S. Fish & Wildlife Serv., *Legal Description of the Arctic National Wildlife Refuge Coastal Plain* 29 (2020), https://www.fws.gov/r7/nwr/Realty/data/LegalDocuments/PL/PL-115-97.pdf (last visited Sept. 2, 2025)).

[187] *Kisor*, 588 U.S. at 574.

[188] *Id.* at 574-75, 577, 579 (internal quotation marks and citations omitted).

[189] *See Akootchook*, 271 F.3d at 1164.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 51 of 74

Whether PLO 2214 is ambiguous is a legal question, and the Court therefore considers that question *de novo*.[190]  The Court "begin[s] with the text"; "[i]f [PLO 2214] is unambiguous, its plain meaning governs."[191]  A regulation is ambiguous if it is "susceptible to more than one reasonable reading."[192]  To determine whether PLO 2214 is "genuinely ambiguous," the Court "must exhaust all the traditional tools of construction" and "must carefully consider [its] text, structure, history, and purpose."[193]

The Court begins with the text, which describes the northwest boundary as following "the mean high water mark of the extreme west bank of the Canning River."[194]  To determine whether this phrase has one plain meaning, the Court considers contemporaneous dictionary definitions.[195]  The 1906 USGS Geographic Dictionary of Alaska references the Staines River in its definition of "Canning," states that the two rivers are "now thought to be two mouths of the

---

[190] *Humanoids Grp.*, 375 F.3d at 306; *Gomez-Osorio*, 957 F.2d at 639; *John*, 247 F.3d at 1041-42 (Tallman, J., concurring); *Loper Bright*, 603 U.S. at 392.

[191] *League of California Cities v. Fed. Commc'ns Comm'n*, 118 F.4th 995, 1015 (9th Cir. 2024) (internal quotation marks omitted) (first quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457, (2022); and then quoting *Amazon.com, Inc. v. Comm'r*, 934 F.3d 976, 984 (9th Cir. 2019)).

[192] *Kisor*, 588 U.S. at 566.

[193] *Id.* at 575 (citation and internal quotation marks omitted).

[194] AR000668.

[195] The Ninth Circuit "appl[ies] traditional rules of statutory interpretation to regulations, starting with the plain language of the regulation."  *Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1268 (9th Cir. 2023).  With respect to statutory interpretation, "[t]o determine ordinary meaning, [a court] consider[s] dictionary definitions."  *Tomczyk v. Garland*, 25 F.4th 638, 644 (9th Cir. 2022) (quoting *United States v. Cox*, 963 F.3d 915, 920 (9th Cir. 2020)).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 52 of 74

same river," and simply states "see Canning" in its entry for the Staines River.[196] And the 1933 edition of the Oxford English Dictionary defines "extreme" to mean "[o]utermost, farthest from the centre (of any area); endmost," which could be read to encompass the Staines River.[197]  On the other hand, some contemporaneous maps label the two rivers separately,[198] indicating that the Staines and the Canning may have been considered to be two separate rivers. And yet other contemporaneous maps do not label the Staines[199] or do not separately label the Canning River at the mouth, indicating that map-makers at the time may have viewed the Canning as turning into the Staines.[200]  The "extreme west bank of the Canning River," therefore, is ambiguous because it is "susceptible to more than one reasonable reading."[201]  If the Staines River was considered to be part of the Canning, then the extreme west bank would follow the west bank of the Staines distributary of the Canning River. But if the Staines and the Canning were

---

[196] AR000126-27.

[197] *Extreme*, The Oxford English Dictionary (1st ed. 1933) https://archive.org/details/the-oxford-english-dictionary-1933-all-volumes/The%20Oxford%20English%20Dictionary%20Volume%203/page/474/mode/2up?view=theater.

[198] *See* AR005412 (1951 Flaxman Island Map, copied *supra* p. 20); AR000135 (ANILCA map, copied *supra* p. 13); AR000620 (1955 Flaxman Island map, copied *supra* p. 22).

[199] *See* AR000921 (1983 FWS Description map, copied *supra* p. 15).

[200] *See* AR000154 (1957 Metes and Bounds Map, copied *supra* p. 5) .

[201] *Kisor*, 588 U.S. at 566.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 53 of 74

considered to be two separate rivers, then the boundary would follow the west bank of western-most channel of the main Canning River.

The text's reference to "a point of land on the Arctic Seacoast known as Brownlow Point at approximate longitude 145º51' W., and latitude 70º10' N."[202] likewise leaves room for ambiguity. Google Maps shows that those coordinates are at a location that is neither at the terminus of the peninsula nor at the end of the sand spit:



203

---

[202] AR000668.

[203] Google Maps, https://www.google.com/maps (enter "70°10'N 145°51'W" in search bar) (showing coordinates north of the terminus of the peninsula and east of the end of the sand spit);

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 54 of 74

In addition, while much of the history surrounding PLO 2214 favors the boundary line propounded Federal Defendants,[204] the fact that the 1958 BLM Field Report included maps that depict the northwestern boundary of the proposed withdrawal as following a path southeast of the Staines River[205] supports a finding that the intent of the Secretary (who did not have the benefit of Google Maps) for the northwest boundary in PLO 2214 is ambiguous.

The Court notes that while the Department of Interior has expressed a preference that public land orders "be technically competent, definite, and susceptible of only one interpretation,"[206] a preference for precision does not mean that it is achieved in all cases. The Court agrees with the State that, "unlike statutes—which are sometimes intentionally drafted to be ambiguous," a boundary description in a public land order ought to be unambiguous,[207] but does not agree that public land orders are therefore unambiguous in all cases.

---

Docket 57 at 4 (State's attorney noting that "when a latitude and longitude is intended to refer to specific location, there's also the use of [seconds], which we don't have here. . . . [W]e don't have that fine point").

[204] *See infra* Discussion Section II.C.2.

[205] AR002000-01 (1958 BLM Field Report maps).

[206] AR003447.

[207] Docket 39 at 22-23.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 55 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 55 of 74

For the foregoing reasons, the Court finds that the PLO 2214's description of the northwest boundary as following "the mean high water mark of the extreme west bank of the Canning River" is ambiguous.[208]

### B. The Court Finds that the IBLA's Interpretation of PLO 2214 is Likely Entitled to *Auer* Deference.

The Court next turns to the IBLA's finding that the northwest boundary of the Refuge in PLO 2214 follows the Staines River.[209]  As a threshold matter, the Court

---

[208] The Court does not agree that finding ambiguity here leads to the "parade of horribles" envisioned by the State, where "any reference to a named river in a public land order—or at least to any river with tributaries, distributaries, or other branches—is facially unclear and must always be open to interpretation" which would "cast doubt on the plain meaning of likely thousands of public land orders." Docket 44 at 8; *see e.g.*, *Simmons v. Himmelreich*, 578 U.S. 621, 629 (2016) (dismissing an argument as a "parade of horribles").

The Court does agree with the State that "[a]mbiguity is not created simply because parties have different interpretations and dispute the meaning of a writing," Docket 39 at 31, and the Court's finding of ambiguity here does not rest on the fact that there is disagreement.

[209] While Federal Defendants aver that the IBLA determined that PLO 2214 unambiguously placed the northwest boundary of the Refuge along the Staines River, Docket 41 at 26, the IBLA does not appear to have made a specific finding with respect to ambiguity, other than by including language in the 2020 IBLA Decision about how the 1983 FWS Description "unambiguously describes a boundary staked to the Staines River" and "eliminates any doubt or ambiguity." AR000038; AR000050. *But see* AR000031 (noting that the State's position about PLO 2214 is "compelling").  To the extent that the IBLA determined that PLO 2214 was unambiguous, this was an error of law, and "[g]enerally, when an agency commits an error of law, this court remands to the agency to reconsider its decision as required by law." *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 633 (9th Cir. 2005).  However, even assuming that the IBLA made this error of law and found PLO 2214 to be not ambiguous, the Court declines to remand to the IBLA here, given that "'[t]here is not the slightest uncertainty as to the outcome' of the agency's proceedings on remand." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023), (alteration in original) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *see also NLRB v. HMO Int'l*, 678 F.2d 806, 811 (9th Cir. 1982) ("If there is a reasonable possibility that application of the correct rule would produce a different result, a remand to the agency is appropriate.").  While this "narrow" exception is generally applied in cases where an agency is "required" to take a particular action on remand, *see Calcutt*, 598 U.S. at 630 (emphasis omitted), which is not the case here, the Court finds that remand would nonetheless be a useless formality and therefore declines to do so "[i]n the interests of judicial economy."  *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 633 (9th Cir. 2005).  Given that the IBLA previously found that PLO 2214 defined the boundary of ANWR as following the Staines River, the IBLA is certain to come to the same conclusion if the Court were to remand to the IBLA with instructions that PLO 2214 is ambiguous.  The Court notes

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 56 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 56 of 74

finds that the IBLA's interpretation of PLO 2214's intended northwest boundary is entitled to deference, so long as it meets the elements for *Auer* deference. The State contends that "the Court owes the IBLA no deference when reviewing this conclusion," because "the IBLA has no authority to review, or expertise in reviewing, FWS decisions"; the IBLA, the State contends, "is not the expert agency; neither it nor BLM drafted PLO 2214."[210] Federal Defendants disagree, pointing to *Loper Bright*, in which the Supreme Court reiterated that Section 706 of the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential."[211]

The IBLA's interpretation of PLO 2214 satisfies the *Auer* deference requirements. Contrary to the State's assertions,[212] it was the Secretary of the Interior—not FWS—that promulgated PLO 2214,[213] and BLM's authority to administer PLOs gives it interpretive authority.[214] *Auer* deference is warranted as

_____

that the State appears to agree that the Court should nonetheless rule on the merits if it finds PLO 2214 to be ambiguous. *See* Docket 39 at 36.

[210] Docket 39 at 36-37; Docket 44 at 13 n.2.

[211] Docket 41 at 46 (internal quotation marks omitted) (quoting 603 U.S. at 392).

[212] *See* Docket 39 at 37.

[213] *See* AR000669.

[214] *Auer* deference generally applies to an agency's interpretation of a regulation that it promulgated. *See Nat'l Parks Conservation Ass'n*, 6 F.4th at 1050-51; *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366, 1378 (Fed. Cir. 2003) ("[O]nly the interpretation of the agency that promulgated the regulation matters."); *Kisor*, 588 U.S. at 570 (describing the policy rationale for *Auer* deference as being "[i]n part . . . because the agency that promulgated a rule is in the better position [to] reconstruct its original meaning" (third alteration in original) (internal quotation marks and citation omitted)). Courts also defer to regulations that agencies are charged with "administering." *City & Cnty. of San Francisco*, 130 F.3d at 880 (quoting *Rainsong Co. v. FERC*, 106 F.3d 269, 272 (9th Cir. 1997)); *see also Kisor*, 588 U.S. at 571 (describing additional policy

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 57 of 74

long as the regulation is "genuinely ambiguous," the agency's interpretation is "reasonable," it represents "the agency's authoritative or official position," it "implicate[s the agency's] substantive expertise," and it "reflect[s the agency's] fair and considered judgment."[215] With respect to whether a reading reflects the agency's fair and considered judgment, "[i]ndicia of inadequate consideration include conflicts between the agency's current and previous interpretations; signs that the agency's interpretation amounts to no more than a convenient litigating position; or an appearance that the agency's interpretation is no more than a post hoc rationalization advanced by an agency seeking to defend past agency action against attack."[216]

---

rationales for *Auer* deference, including that "[a]gencies (unlike courts) have unique expertise, often of a scientific or technical nature, . . . [a]nd agencies (again unlike courts) have political accountability" (internal quotation marks and citations omitted)).

BLM has the authority to administer PLOs. *See* Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1702(e), 1714 ( defining "public lands" as "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management," and providing authority for the withdrawal of public lands from the operation of the public land laws). Here, the record shows that BLM played a role in administering PLO 2214. *See e.g.*, Notice of Proposed Withdrawal and Reservation of Lands, 23 Fed. Reg. at 364 (BLM's January 21, 1958 Notice issued in the Federal Register, providing that an application had been submitted for the Range, and noting that "persons having cause may present their objections in writing to the undersigned official of the Bureau of Land Management"); *see supra* Background Section II (describing how the State requested "protractions delineating Public Land Order 2214" from BLM, and BLM's role in surveying lands within PLO 2214). The IBLA, for its part, is given the authority to "hear, consider, and decide . . . matters as fully and finally as might the Secretary [of Interior]." 43 C.F.R. § 4.1(a), (b) (2025).

[215] *Kisor*, 588 U.S. at 574-75, 577, 579 (internal quotation marks and citations omitted).

[216] *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1034 (9th Cir. 2013) (alteration in original) (quoting *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830 n.4 (9th Cir. 2012) (en banc)).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 58 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 58 of 74

First, the Court has previously determined that PLO 2214 is genuinely ambiguous based upon review of its "text, structure, history, and purpose."[217] Second, as discussed below, the agency's interpretation is reasonable.[218] Third, the interpretation is the "agency's authoritative or official position" given that it was published by BLM in the Federal Register and then confirmed in the two IBLA decisions.[219] Fourth, the interpretation "implicates the agency's substantive expertise." The State itself recognizes that BLM is "the United States' expert agency in interpreting and applying legal descriptions [of public lands],"[220] and the IBLA—as a final decisionmaker for the Department of the Interior—is likewise an expert in this area.[221] And fifth, the interpretation "reflects the agency's fair and considered judgment" given that BLM has been consistent with its interpretation since its 1965 survey plat in which it identified the boundary as following the Staines River, indicating that the agency's position is not just a "convenient litigating position."[222]

---

[217] *See supra* Discussion Section II.A; *Kisor*, 588 U.S. at 575.

[218] *See infra* Discussion Section II.B.

[219] *See* Notice of Filing Plats of Survey, 81 Fed. Reg. 10,274; AR000006-57; AR005416-37.

[220] Docket 39 at 42 (citing AR003773 (BLM-issued "Manual of Instructions for the Survey of the Public Lands of the United States)).

[221] *See* 43 C.F.R. § 4.1 (2025).

[222] *See* AR000783 (BLM's 1965 survey plat identifying "[t]he extreme west bank of the Staines River, a distributary off the Canning River," as ANWR's boundary); AR000283 (BLM's 2012 survey plat noting that the boundary of ANWR follows the "most westerly channel of the Canning River, now called the Staines River"); AR000006-57 (2020 IBLA Decision upholding BLM's interpretation of the boundary); AR005416-37 (2024 IBLA Decision upholding BLM's interpretation of the boundary).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 59 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 59 of 74

Applying *Auer* deference to the IBLA's interpretation of PLO 2214, the Court upholds the IBLA's finding that the northwest boundary of the Refuge follows the Staines River, a distributary of the Canning River.

## C. The Court Finds that the IBLA Decision Is Not Arbitrary or Capricious, that it Is Supported by Substantial Evidence, and that it Is Not Contrary to Law.

In any case, even if the Court does not apply *Auer* deference, "[i]n reviewing decisions of the IBLA, [the Court] exercise[s] a limited standard of review and will reverse only if the decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law."[223]   For the following reasons, the Court finds that, even if it does not apply *Auer* deference to the IBLA's interpretation of PLO 2214, the 2024 IBLA Decision is not arbitrary or capricious, it is supported by substantial evidence, and it is not contrary to law.

---

The Court here notes that the fact that the agency here has a vested interest—given that this is a land dispute between Federal Defendants and the State—does not automatically rebut deference, though it may subject the agency's interpretation to greater scrutiny.  This has been stated explicitly by the Ninth Circuit in the context of *Chevron* deference to agency interpretations of statutes.   *See Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 834-35 (9th Cir. 2009) ("Where an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny to ensure that it is consistent with Congressional intent and the underlying purpose of the statute. We acknowledge that 'self-interest alone gives rise to no automatic rebuttal of deference.'" (quoting *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1040 (D.C. Cir. 2002))).  While this holding is not directly applicable to agency interpretations of regulations and *Chevron* has since been overruled, *see Loper Bright*, 603 U.S. 369 (2024), the Court understands this reasoning to be applicable here.

[223] *Akootchook*, 271 F.3d at 1164; *see also Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021); *Loper Bright*, 603 U.S. at 392 (noting that "Section 706 [of the APA] does mandate that judicial review of agency policymaking and factfinding be deferential," quoting § 706(2)(A)'s language that agency action is to be set aside if "arbitrary, capricious, [or] an abuse of discretion" and quoting § 706(2)(E)'s language that agency factfinding in formal proceedings is to be set aside if "unsupported by substantial evidence" (emphasis omitted)).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 60 of 74

## 1. Plain Meaning

The Court first considers the plain meaning of the phrase "extreme west bank of the Canning River."[224]  With respect to the definition of "Canning River," the IBLA responded to the State's arguments about the Canning and the Staines as being distinct and separate rivers by pointing to contemporaneous maps and dictionary definitions in the record that support the conclusion that the Staines River was considered to be a component of the Canning River.[225]  The Court finds that these contemporaneous resources are relevant factors upon which IBLA relied, and agrees that these resources support the IBLA's conclusion.[226]  For example, the 1906 USGS Geographic Dictionary of Alaska states that the Staines and Canning "are now thought to be two mouths of the same river," and defines the Staines by stating "see Canning."[227]  The State's assertion that other tributaries were expressly referred to as such in PLO 2214[228] is unpersuasive without

---

[224] AR000668.

[225] AR000034.

[226] The Ninth Circuit "appl[ies] traditional rules of statutory interpretation to regulations, *Backcountry Against Dumps*, 77 F.4th at 1268, and with respect to statutory interpretation, the Circuit considers contemporaneous dictionary definitions to determine plain meaning, *Tomczyk*, 25 F.4th at 644; *see also Wis. Cent. Ltd.*, 585 U.S. at 277-78.

[227] AR000126-27. The Court rejects the State's challenge of the use of the 1906 USGS Geographic Dictionary of Alaska on the basis that Federal Defendants "only speculate[] that PLO 2214's drafters utilized this definition."  *See* Docket 44 at 14.  In general, dictionary definitions are used to interpret statutes and regulations not because there is any evidence that the drafter utilized that exact dictionary, but because there is presumption that a contemporaneous dictionary definition constitutes the ordinary meaning of a term at the time the statute or regulation was promulgated.  *See Wis. Cent. Ltd.*, 585 U.S. at 277.

[228] Docket 39 at 27 (citing AR03151).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 61 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 61 of 74

information about whether those tributaries were similarly considered to be components of their main river channels. Nor does the Court agree with the State that the IBLA's interpretation opens the door for "any reference to a river [to] necessarily include all tributaries and distributaries of that river system. For example, a reference to the 'Mississippi River' could be interpreted to mean any and all of its tributaries, which include the Missouri, Ohio, and Red Rivers."[229] This result does not follow from the Court's finding given the sheer size and standalone nature of the Missouri, Ohio, and Red Rivers.[230]

The definition of "extreme" provides additional support for the IBLA's interpretation of PLO 2214. The contemporaneous definition of "extreme" from the 1933 edition of the Oxford English Dictionary—meaning "[o]utermost, farthest from the centre (of any area); endmost"—supports a finding that drafters of PLO 2214 intended for the reference to refer to the bank of the *outermost* or furthest west channel of the Canning, namely, the Staines distributary.[231]

---

[229] Docket 39 at 39.

[230] *See Missouri River*, American Rivers, https://www.americanrivers.org/river/missouri-river/ (last visited Aug. 15, 2025) (describing the Missouri River as being over 2,300 miles long and the world's fourth longest river); *Ohio River*, Britannica, https://www.britannica.com/place/Ohio-River (last visited Aug. 15, 2025) (describing the Ohio River as being 981 miles long, beginning in western Pennsylvania before marking the state boundaries between Ohio–West Virginia, Ohio–Kentucky, Indiana–Kentucky, and Illinois–Kentucky); *Red River*, Britannica, https://www.britannica.com/place/Red-River (last visited Aug. 15, 2025) (describing the Red River as being 1,290 miles long and serving as the Texas-Oklahoma border before flowing into Louisiana).

[231] *Extreme*, The Oxford English Dictionary (1st ed. 1933) https://archive.org/details/the-oxford-english-dictionary-1933-all-volumes/The%20Oxford%20English%20Dictionary%20Volume%203/page/474/mode/2up?view

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 62 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 62 of 74

The Court does not agree with the State that the interpretation of "extreme west bank" as following the Staines distributary improperly conflates "bank" with "channel."[232]  The Court understands PLO 2214 to mean that the boundary follows the bank, which, as the State explains, is the "fast land which confines the water of the river in its channel or bed in its whole width."[233]  As Federal Defendants rightly state, however, a reference to the "extreme" west bank "implies multiple west banks."[234]  The phrase "extreme west bank" must necessarily refer to the western-most bank of the western-most channel; otherwise, the "extreme" modifier would be superfluous, because a single river channel has only one west bank and one east bank.[235]

The Court turns next to PLO 2214's description of the northwest boundary as following from "a point of land on the Arctic Seacoast known as Brownlow Point at approximate longitude 145º51' W., and latitude 70º10' N.; thence in a southwesterly direction approximately three (3) miles to the mean high water mark of the extreme west bank of the Canning River."[236]  The Court agrees with the IBLA

_____

=theater.

[232] *See* Docket 39 at 25-26.

[233] Docket 39 at 26 (quoting *Howard v. Ingersoll*, 54 U.S. 381, 417 (1852)).

[234] Docket 41 at 29.

[235] *See Nacarino v. Kashi Co.*, 77 F.4th 1201, 1210 (9th Cir. 2023) ("[A] statute or regulation should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (alteration in original) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).

[236] AR000668.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 63 of 74

that the State failed to show that BLM erred in determining that Brownlow Point is located at the end of the sand spit. As the IBLA stated, "the State's criticism that such a natural monument would be a poor choice for a metes and bounds description does not overcome the historical record evidence indicating that it was the monument chosen."[237] The 2024 IBLA Decision refers to historical record evidence cited in its 2020 IBLA Decision,[238] including the fact that the 1983 FWS Description describes Brownlow Point as being "the most westerly tip of the most northwesterly island,"[239] which is "neither novel nor divergent from the agencies' original views dating to the 1960s" as evidenced by BLM's 1965 survey plat, which "plainly traces the relevant call to the end of the spit of land, in fact to the last of the broken pieces of the spit."[240] The IBLA also remarked that, despite the State's arguments to the contrary, the sand spit appears in the 1951 Maps, including the 1951 Flaxman Island Map and the "other resources available at the time of drafting."[241] The Court agrees that the appearance of the sand spit on contemporaneous maps is an indication that the drafters incorporated the sand spit when designating the boundary.

---

[237] AR005424; *see* Docket 39 at 46.

[238] AR005424 (citing AR000045-47, 49-50).

[239] AR005428 (citing AR000016 (quoting AR000915)).

[240] AR000050; *see* AR000789.

[241] AR005423-24; *see* AR005412 (1951 Flaxman Island Map, copied *supra* p. 20).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 64 of 74

Case 3:22-cv-00078-SLG    Document 58    Filed 09/24/25    Page 64 of 74

Thus, while PLO 2214's call to "approximate longitude 145º51' W., and latitude 70º10' N"[242] could place Brownlow Point at either the terminus of the peninsula or at the end of the sand spit,[243] historical evidence suggests that the call was intended to refer to the end of the sand spit, and the State's arguments to the contrary do not demonstrate that the IBLA erred in so concluding. The Court is not persuaded by the State's argument about the Brownlow Point survey control point on the peninsula, given that the survey control point itself is southwest of the terminus of the peninsula and therefore is not located at either parties' proposed location.[244] The IBLA also dismissed the State's argument that "the label for Brownlow Point on State Exhibit 3 does not appear above the sand spit," concluding that it does "not view the placement of the label as significant for purposes of evaluating the parties' conflicting positions on the call."[245] The Court agrees with this assessment.

The Court's determination that the drafters of PLO 2214 likely intended to locate Brownlow Point at the end of the sand spit provides considerable support for Federal Defendants' position because a southwest line beginning at the end of

---

[242] AR000668.

[243] *See e.g.*, AR000620 (1955 Flaxman Island map, copied *supra* p. 22). The State maintains that "the IBLA's placement of Brownlow Point at the sand spit puts it approximately two minutes west of the referenced longitude and latitude," Docket 39 at 50, but the State's placement of Brownlow Point at the terminus of the peninsula is likewise only an approximate match, being just south of the coordinates, *see* Google Maps image, copied *supra* p. 54.

[244] *See* Docket 39 at 45.

[245] AR005423; *see* AR005320 (State Exhibit 3, copied *supra* p. 21).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 65 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 65 of 74

the sand spit terminates at the mouth of the Staines River in "approximately" three miles,[246] whereas a line from the end of the sand spit to the State's preferred river outlet would be due south or southeast.[247]

## 2. History, Structure, and Purpose

The IBLA found that the 1957 Metes and Bounds Map represents "perhaps the strongest evidence of contemporaneous drafter intent."[248] The State contends that the map was likely not enclosed with the Regional Office's September 18, 1957 letter regarding the "Proposed Arctic Wildlife Area" because it is not at the proper scale of four miles to the inch.[249] However, given that the map contains numbers corresponding to the June 1957 Metes and Bounds Description[250] and given that it was "obtained from the National Archives in Seattle, Washington, where the original documents reside and are maintained for the Department of the Interior in a folder . . . entitled 'Metes & Bounds Maps' within a box . . . entitled 'Arctic Wildlife Refuge Correspondence,"[251] the Court agrees with the IBLA that, more likely than not, the map was "created alongside and to accompany the metes

---

[246] *See* AR005426 (2024 IBLA Decision stating that an approximately "three-mile-long line following the common definition of southwest" beginning "at the last of the pieces of land extending west from the peninsula" "terminat[es] at the mouth of the Staines River" (alteration omitted) (internal quotation marks omitted)).

[247] *See* Docket 39 at 15 (Disputed ANWR Boundary Map, copied *supra* p. 25).

[248] AR005433-34 (quoting AR000034).

[249] Docket 44 at 21-22; (citing AR000163).

[250] *Compare* AR000146, *with* AR000154 (1957 Metes and Bounds Map, copied *supra* p. 5).

[251] AR000008 (alterations in original).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 66 of 74

and bounds descriptions developed by FWS in connection with the withdrawal process."[252]  That the 1957 Metes and Bounds Map shows the ANWR boundary following the Staines River, therefore, is compelling and relevant evidence that the drafters intended for the boundary to do so.

The Court agrees with the IBLA that the description of the ANWR boundary in PLO 2215 provides further evidence supporting Federal Defendants' interpretation of PLO 2214.  PLO 2215 describes the boundary as including "all lands lying east of Canning River, extending from its mouth on the Arctic Ocean at Flaxman Island in approximate longitude 146° W., to its source in the Brooks Range in approximate longitude 145°13' W., latitude 68°53' N."[253]  Flaxman Island lies west of Brownlow Point and due north of the mouth of the Stains River.[254]  The Court agrees with the IBLA's observation that "a line following the marked course of 146° W longitude runs through the heart of Flaxman Island . . . to a location very close to the mouth of the Staines River, and substantially west of the State's preferred channel.[255] In response to the State's argument that a reference to the "approximate" longitude could refer to either the Staines or the Canning, the Court quotes the IBLA for its conclusion that "elsewhere in the very same sentence, PLO

---

[252] AR000034; *see also* AR005434.

[253] AR000669.

[254] *See* AR005320 (State Exhibit 3, copied *supra* p. 21); AR000620 (1955 Flaxman Island map, copied *supra* p. 22).

[255] AR005435-36; AR005412 (1951 Flaxman Island Map, copied supra p. 20); AR005245 (1951 Flaxman Island Quadrangle Map, copied *supra* p. 42).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 67 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 67 of 74

2215 identifies specific locations in both degrees and minutes, indicating that the absence of minutes in the call to 146° W longitude is best understood to be a reference to that line itself, with the 'approximate' modifier simply allowing for a limited amount of deviation between that line and the targeted river mouth."[256] The description of the Staines River in the 1967 Dictionary of Alaska Place Names published by the U.S. Department of the Interior illustrates the operative effect of the "approximate" modifier, placing the mouth of the Staines River 15 seconds east of the 146° W longitude while placing that of the Canning River 54 minutes east of the same longitude.[257] The Court further agrees with the IBLA that the only contemporaneous evidence that places the boundary along the State's preferred channel—the 1958 BLM Field Report—is unpersuasive.[258] BLM characterized the report as being "for administrative use only," to be "kept strictly confidential" and "not discuss[ed] . . . outside [the] Bureau."[259] "[T]here is no evidence that FWS, which was responsible for drafting the Withdrawal Application, or the Secretary, who was responsible for drafting the PLO incorporating its metes and bounds

---

[256] AR005436 (internal quotation marks and citation omitted); *see* AR000669.

[257] AR000129-31.

[258] AR005428 (citing AR000035-36); *see* AR002000-01 (1958 BLM Field Report maps showing the boundary following the State's preferred channel).

[259] AR001976; AR001973. The State's argument that the report was being kept confidential because of the controversy surrounding the withdrawal, rather than because of any dispute surrounding the northwest boundary, *see* Docket 39 at 42, does not address the relevant fact, which was that the report was intended to be kept confidential *within BLM* and therefore likely was not utilized by the Secretary or by FWS in issuing the PLO or drafting the 1957 Withdrawal Application, respectively.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 68 of 74

description, relied upon or were even aware of BLM's maps when developing the relevant language."[260]  Moreover, the fact that BLM indicated on February 4, 1965 that "the northern boundary of the Reserve was not correctly plotted on the records" further undermines the 1958 BLM Field Report's utility.[261]  While the IBLA concluded that "it is not certain whether [BLM] was referencing the 1958 BLM maps [in the February 4, 1965 communication], this statement does reflect BLM's acknowledgement in 1965 that the boundary had been incorrectly plotted in its records previously and that the more easterly boundary was 'in conflict with PLO 2214.'"[262]

The Court further agrees with the IBLA that Federal Defendants' boundary is more in line with the original purpose of the Refuge, which was to "preserv[e] unique wildlife, wilderness and recreational values."[263]  The Canning and Staines form "elements of a river system," and splitting "the Canning River system with the boundary. . . makes no sense from a habitat or boundary management

---

[260] AR000035-36.

[261] AR000679.

[262] AR000035 (quoting AR000679).  As noted earlier, *see* discussion *supra* p. 44 n.160, while it takes an inconsistent position in its Motion for Summary Judgment, *see* Docket 39 at 43, the State appears to have earlier conceded that BLM's 1965 modified approval of State selections implicated the disputed lands in its Amended Complaint, *see* Docket 34 at ¶ 31 ("Through two decisions dated February 4, 1965, the BLM modified its October 9, 1964 and January 15, 1965 decisions to exclude those lands between the Staines and Canning Rivers from the 1964 Land Grant Selections . . . .").  In any case, the Court does not agree with the State's contention in its Motion for Summary Judgment that the fact that the modification implicated "nearly triple the number of the acres between the Staines River and Canning River" means that it is "unrelated" to the disputed lands.  *See* Docket 39 at 43.

[263] *See* AR000039; AR000668.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 69 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 69 of 74

standpoint."[264]  Moreover, the State's proposed boundary is more likely to sever geographic features in the area.[265]  The Court does not agree with the State that Federal Defendants' proposed boundary "would also 'sever' geographic features in the area, most notably a knoll of land with the RUTH 1949 U.S. Coast Guard and Geodetic Survey marker";[266] on the contrary, a line drawn from the end of the sand spit to the Staines River outlet does not appear to sever the RUTH marker or any other geographic features.[267]

The Court also agrees with the IBLA that it is "worthy of note that the State acquiesced, without challenge or objection, in the Department's delineation of the ANWR boundary along the Staines River through numerous actions over several decades."[268]

### 3. Modern Survey Information

---

[264] AR000039 (citation and internal quotation marks omitted).  This is true regardless of whether the IBLA used the proper technical definition of "delta."  *See* Docket 39 at 56-57.

[265] *See* Docket 39 at 48 (showing the State's proposed line from the terminus of the peninsula to the Canning River, which cuts across geographic features).  Regarding the State's contention that its intended boundary would follow the line of extreme low water and include all offshore bars, reefs, and islands, *see* Docket 39 at 49-50, the Court notes that it is not altogether clear from PLO 2214's boundary description that the line was intended to do so between Brownlow Point and the river mouth, given that the first, second, and fourth courses are explicit about the water line that they follow whereas the third course is silent in that regard, *see* AR000668.  Because of this, it is possible that the drafters intended the three-mile line to cut straight across between Brownlow Point and the river mouth.  In any case, the Court notes that it would be seemingly difficult to draw a meandering water line that includes these features using the State's proposal. *See* Docket 39 at 48 (citing AR005281 map, copied *supra* p. 38).

[266] Docket 44 at 26-27.

[267] *See* AR005245 (1951 Flaxman Island Quadrangle Map, copied *supra* p. 42).

[268] AR000039.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 70 of 74

Given that the photographs presented by the State for its contention that "much of the BLM's surveyed boundary is a line that does not align with any river currently in existence or that existed in 1957"[269] were all taken in 2016 or 2003,[270] the Court agrees with the IBLA that "none of the State's underlying analysis or surveying was available in 1960, and it thus offers little to no material insight into the meaning of PLO 2214."[271]  The Court therefore finds that these photographs do not render the IBLA's decision arbitrary or capricious.

Given the "absence of such on-the-ground information" from the time of drafting, the Court agrees with the IBLA "that the drafters 'relied upon the hydrography as depicted' on available maps 'to inform their understanding of the physical circumstances along their intended boundary line.'"[272]  State Exhibit 3 and the 1951 Flaxman Island Map, as well as the 1955 Flaxman Island Map, "depict the Staines as a river for the entirety of the relevant stretch."[273]  And these maps

---

[269] Docket 39 at 57.

[270] *See* Docket 39 at 58-60 (photographs cited by the State); AR000328 ("All ground photographs included in this report were taken in August 2016."); AR000335 (the ground photographs); Docket 57 at 3 (State attorney presenting photographs taken in 2003).

[271] AR000047-48; *see also* AR000046 ("The State's efforts to call into question the presence of an active river channel along portions of the boundary through surveying, fieldwork, expert analysis, and application of modern technology 50 years later are of little to no relevance in determining what the drafters of the withdrawal and PLO intended when describing the location of the desired boundary line based on their understanding of the resources actually available to them between 1957 and 1960.").

[272] AR005431 (quoting AR000045).

[273] AR005431; *see* AR005320 (State Exhibit 3, copied *supra* p. 21); AR005412 (1951 Flaxman Island Map, copied *supra* p. 20); AR000620 (1955 Flaxman Island Map, copied *supra* p. 22).

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 71 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 71 of 74

"similarly depict the Staines as the westernmost distributary originating from the main forks of the Canning."[274]

### 4. Congressional Action

The IBLA found that "[t]he record materials associated with the statutory codification of ANWR through ANILCA twenty years later provide further support for the agencies' longstanding interpretation of PLO 2214."[275] This Court agrees. The fact that the map referenced by Congress in ANILCA shows the ANWR boundary as following the Staines River provides additional support for the IBLA's finding that PLO 2214 designated the Staines River as the boundary of the Refuge. The State mischaracterized Federal Defendants' position. Federal Defendants did not argue that Congress set new boundaries in ANILCA;[276] rather, Federal Defendants expressly stated that "while the August 1980 Refuge Map did not affect the pre-ANILCA boundary of the Range and the State of Alaska's selection rights, the IBLA correctly concluded that this map . . . indicated that Congress endorsed Interior's placement of the Range boundary following the Staines."[277]

The Court does not agree with the State that the map referenced in the 2017 Tax Cuts and Jobs Act, which shows the boundary following the unnamed Staines

---

[274] AR005432; *see* AR005320 (State Exhibit 3, copied *supra* p. 21); AR005412 (1951 Flaxman Island Map, copied *supra* p. 20); AR000620 (1955 Flaxman Island Map, copied *supra* p. 22).

[275] AR000037.

[276] *See* Docket 44 at 31.

[277] Docket 41 at 39.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 72 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 72 of 74

River but which includes a legend stating that the "map is not intended to prejudice ongoing boundary litigation between the State of Alaska and the U.S. Department of the Interior," is an indication that Congress "expressly declined to determine the placement of the northwest boundary."[278]

The Court further agrees with the IBLA that the 1983 FWS Description "describes a boundary staked to the Staines River."[279] The call to section 15, T. 9 N., R. 24 E places the boundary along the Staines River,[280] and "the more detailed phrasing of the call for Brownlow Point . . . leaves no question that the Staines River was the intended boundary marker."[281] The Court agrees with the IBLA that this description "did not alter the relevant portion of the ANWR boundary as defined by PLO 2214," but merely "identif[ied] the same intended line in [a] different way[]," [282] therefore further reinforcing Federal Defendants' propounded boundary.

The Court therefore finds that, even if it does not apply *Auer* deference, the 2024 IBLA Decision is not arbitrary or capricious, it is supported by substantial evidence, and it is not contrary to law.

---

[278] U.S. Fish & Wildlife Serv., *Legal Description of the Arctic National Wildlife Refuge Coastal Plain* 29 (2020), https://www.fws.gov/r7/nwr/Realty/data/LegalDocuments/PL/PL-115-97.pdf (last visited Sept. 2, 2025); Docket 44 at 33.

[279] AR000038.

[280] AR000038; *see* AR000782.

[281] AR000038; see AR000915 (definitively marking Brownlow Point as the end of the sand spit).

[282] AR000038-39.

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 73 of 74

## CONCLUSION

For the reasons set forth above, the State's Motion for Summary Judgment at Docket 39 is **DENIED**, and the IBLA's 2024 Decision interpreting PLO 2214 is AFFIRMED.  The Clerk of Court shall enter final judgment for Federal Defendants accordingly.

DATED this 23rd day of September, 2025, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

Case No. 3:22-cv-00078-SLG, *Alaska v. U.S. Dep't of the Interior, et al.*
Order on Motion for Summary Judgment
Page 74 of 74

Case 3:22-cv-00078-SLG     Document 58     Filed 09/24/25     Page 74 of 74